# 17-1240-ag

## United States Court of Appeals
### for the
## Second Circuit

BERNARD G. MCGEE,

*Petitioner,*

— v. —

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

ON APPEAL FROM THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## SPECIAL APPENDIX

UNITED STATES SECURITIES AND
    EXCHANGE COMMISSION
By: MICHAEL ANDREW CONLEY, Solicitor
*Attorneys for Respondent*
100 F Street, NE
Washington, DC 20549
(202) 551-5127

SUGARMAN LAW FIRM, LLP
*Attorneys for Petitioner*
211 West Jefferson Street
Syracuse, New York 13202
(315) 474-2943

i

# Table of Contents

**Page**

Securities and Exchange Commission Decision,
Dated March 27,2017, Appealed From ................................. SPA-1

National Adjudicatory Council Decision,
Dated July 18, 2016 ............................................................. SPA-22

Amended Extended Hearing Panel Decision,
Dated December 22, 2014 ................................................... SPA-60

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Release No. 80314 / March 27, 2017

Admin. Proc. File No. 3-17402

---

In the Matter of the Application of

BERNARD G. MCGEE

For Review of Disciplinary Action Taken by

FINRA

---

OPINION OF THE COMMISSION

REGISTERED SECURITIES ASSOCIATION—REVIEW OF DISCIPLINARY
PROCEEDINGS

**Fraud**

**Unsuitable Recommendation**

**Failure to Provide Written Notice to Firm of Outside Business Activities**

**Failure to Timely Disclose Material Information on Form U4**

**Conduct Inconsistent with Just and Equitable Principals of Trade**

Former registered representative of FINRA member firm appeals from FINRA
disciplinary action finding that he induced an investor's securities transaction through a
material omission, made an unsuitable recommendation to an investor, engaged in
undisclosed outside business activities, failed to disclose material information to his firm,
and misrepresented information on compliance questionnaires. *Held*, association's
findings of violations and imposition of sanctions are sustained.

APPEARANCES:

    *Kevin R. Van Duser*, of *Sugarman Law Firm, LLP*, for Bernard G. McGee.

    *Alan Lawhead, Jennifer Brooks*, and *Jante Turner* for FINRA.

Appeal filed: August 17, 2016
Last brief received: December 7, 2016

Bernard G. McGee, formerly associated with FINRA member firm Cadaret, Grant & Co., Inc., seeks review of FINRA disciplinary action taken against him. FINRA found that McGee induced an investor to engage in a securities transaction through a material omission and made an unsuitable recommendation. Based on these violations, FINRA imposed a bar from association with any FINRA member firm, and ordered McGee to pay restitution, plus interest. FINRA also found that McGee engaged in undisclosed outside business activities, failed to disclose material information to his firm, and misrepresented information on compliance questionnaires. FINRA did not impose sanctions for those additional violations.

McGee contends that he did not recommend the transaction in question, and thus could not have committed fraud or made an unsuitable recommendation. He also argues that any outside business activities fell within a prior disclosure to his firm, that he timely disclosed material information to his firm, and that he was honest on his compliance questionnaires. Based on our independent review of the record, we reject McGee's contentions and sustain all of FINRA's findings of violations and imposition of sanctions.

## I.     Background

McGee entered the securities industry in 1988 and was registered continuously until 2016. During the period relevant to this case, McGee was registered as a general securities representative and principal with Cadaret. In October 2012, Cadaret permitted McGee to resign due to his failure to disclose outside business activities; it filed a Form U5 with FINRA. The misconduct identified in the Form U5 commenced FINRA's investigation of McGee's handling of investor CF's account. This proceeding followed.

**A.     McGee recommended that investor CF surrender her variable annuities and use the proceeds to purchase a charitable gift annuity from a company called 54Freedom.**

McGee began managing CF's investments in 2007 when he worked at New England Securities, after CF's previous representative left the firm. CF was 67 years old at the time. She had become a customer of New England Securities after a divorce settlement through which she received a Teachers Insurance and Annuity Association ("TIAA") account, a College Retirement Equities Fund ("CREF") account, and cash. CF had minimal employment outside of the home and, until her divorce, had no experience investing or controlling her finances. CF's investment objective was "long term growth" and her risk tolerance was "moderate." New England Securities discharged McGee shortly after he assumed management of CF's investments, and he took CF's account with him when he transferred to Cadaret.

Between 2007 and 2010, CF purchased four variable annuities at McGee's recommendation—two with The Hartford, and two with Pacific Life Insurance Company. In March 2011, CF's holdings with McGee totaled approximately $840,000.[1] Over half of these holdings were invested in The Hartford and Pacific Life variable annuities.

---

[1]     CF also maintained $258,000 in the TIAA account, which McGee did not manage.

This case stems from CF's surrender of these variable annuities and use of the proceeds to purchase a charitable gift annuity from a company called 54Freedom.

**1.     McGee had a business relationship with 54Freedom and its CEO.**

In 2008 or 2009, McGee met James Griffin, the founder and CEO of 54Freedom, a corporation that offered insurance and a purported charitable gift annuity program. Charitable gift annuities are investment products that allow individuals to transfer securities or cash to charitable organizations. Through administrators, the charitable organizations issue gift annuities to the individuals in exchange for a current income tax deduction and the organization's agreement to make fixed annual payments for life. Upon the annuitant's death, any remaining funds are disbursed to the charitable organization.[2] According to 54Freedom's marketing materials, the corporation's charitable gift annuity program was a "patent pending" investment opportunity that was "unavailable elsewhere."[3] The materials also stated that the company's "generous street level compensation" for sales personnel was eight percent.

In 2010, McGee proposed to enter into a joint venture with Griffin whereby McGee would sell securities and 54Freedom would sell insurance products. McGee developed a business plan for the joint venture and moved his Cadaret business operations to 54Freedom's premises in late 2010 or early 2011. McGee did not update his Form U4 to reflect his updated business address at 54Freedom's premises until December 5, 2011.

**2.     McGee recommended 54Freedom's charitable gift annuity program to CF.**

In late 2010 or early 2011, McGee advised his assistant that he planned to invest a customer's funds with 54Freedom's charitable gift annuity program to determine whether the program worked. McGee indicated that if it did he would recommend the product to his other clients. McGee discussed 54Freedom with CF in December 2010, and followed up on those discussions by giving her 54Freedom's marketing materials about the charitable gift annuity program.

On March 9, 2011, McGee met with CF at her home, and gave her a portfolio summary listing the total value of CF's variable annuities, the cost basis of the annuities, the anticipated gains associated with their surrender, the estimated taxes due because of their surrender, and the surrender charges for surrendering the variable annuities. During this meeting, McGee provided, and CF signed, the surrender forms for her four variable annuities. McGee submitted the surrender documents, at which time the value of CF's annuities totaled $492,642.

---

[2]     *See NASD Regulatory & Compliance Alert*, Summer 2002 at 26/27, http://www.finra.org/sites/default/files/RCA/p002369.pdf.

[3]     We do not decide whether 54Freedom's investment opportunity qualified as a charitable gift annuity or whether a charitable gift annuity can meet the definition of a security.

In anticipation of CF's receipt of the surrender checks, McGee prepared an analysis—which he did not share with CF—showing that he expected compensation from 54Freedom of $49,264. The Hartford and Pacific Life checks actually totaled $454,998.75—the value of the four annuities at the time of surrender minus surrender charges, administrative fees, and taxes. On March 17, 2011, McGee drove CF to the bank and completed the deposit slip for her; CF deposited the surrender checks into her checking account. McGee asked CF to write a check payable to 54Freedom for $454,998.75, which she did. McGee immediately delivered the check to 54Freedom's office. McGee did not provide CF with any documentation of the transaction or ever disclose his expected, or actual, compensation from 54Freedom to CF or Cadaret.

### 3. 54Freedom paid compensation to McGee for the transaction and used CF's investment to pay several expenses unrelated to a charitable gift annuity.

54Freedom paid McGee $49,264 on March 25, 2011.[4] McGee testified that he knew this money was compensation for CF's purchase of the 54Freedom charitable gift annuity. 54Freedom used CF's funds to pay several expenses unrelated to CF's charitable gift annuity. 54Freedom spent the rest of CF's investment to purchase three Lincoln Financial fixed indexed annuities on CF's behalf and to make donations on her behalf to three charitable organizations, each with connections to 54Freedom or McGee: 54Freedom's call center; "Creative Healing Connections," founded by a customer of McGee's; and 54Freedom Foundation, which subsequently donated a portion of the money to the Blind Children's Center (an organization established by a 54Freedom board member).[5] As finder's fees for its services, 54Freedom received from the charities approximately 40 to 50% of the donation amount.[6]

## B. McGee resigned after Cadaret investigated CF's investment with 54Freedom.

CF was unable to get information from McGee regarding her investment with 54Freedom, so she hired an attorney who contacted McGee in June 2012. McGee responded to the attorney by letter on June 18, 2012, stating that he had "introduced [CF] to a local charitable gifting firm, 54Freedom" but that after the introduction he "was no longer involved in any further processing of her donations." Subsequently, the attorney sent a complaint to Cadaret's compliance department, and Cadaret began an internal investigation.

---

[4]     The record does not contain an explanation as to why 54Freedom paid McGee 10% of the pre-surrender value of the variable annuities.

[5]     FINRA found that 54Freedom invested a total of $429,998 for CF: $254,998 in the fixed indexed annuities and $175,000 in the charities. Together with the $49,264 paid to McGee, the amount exceeds CF's proceeds from the variable annuities by $24,263.25. The record, as FINRA noted, does not explain this inconsistency. We note that McGee does not challenge FINRA's findings as to the amounts invested. In any case, the precise amount invested is not relevant to the issue of McGee's failure to disclose to CF his compensation from 54Freedom.

[6]     The record does not contain documentation to validate the status of any of these organizations as bona fide charities or as non-profits.

On August 12, 2012, a Cadaret compliance officer made an unannounced visit to McGee's office to discuss CF's account. McGee said that he had done "consulting" work for 54Freedom, but that with regard to CF he had merely "handed her off" to Griffin. Initially, McGee said that he had not received payment in relation to CF's transactions with 54Freedom, but he eventually conceded that he had received a "referral fee" of approximately $50,000. McGee denied that he received the $50,000 for any specific transaction. McGee also told his Cadaret supervisor during the investigation that he did not receive any compensation directly related to the transactions between CF and 54Freedom.

Cadaret permitted McGee to resign following its investigation and noted on McGee's Form U5 terminating his association with the firm that the resignation was related to undisclosed outside business activities. Subsequently, Griffin was prosecuted and found guilty of ten counts of mail fraud, eight counts of wire fraud, and five counts of money laundering for fraudulently inducing investors to purchase 54Freedom's charitable gift annuities and converting their funds to pay personal expenses and 54Freedom's liabilities.[7] The Commission also has a pending federal civil action against Griffin related to his receipt of investor funds through 54Freedom.[8]

Lincoln Financial refunded CF the $254,998 in premiums that 54Freedom had paid on her behalf for the three fixed indexed annuities. CF has not received a refund for the remaining $200,000 that she invested with 54Freedom.

**C.     FINRA found that McGee committed fraud, made unsuitable recommendations, and violated other FINRA rules in connection with CF's 54Freedom investment.**

FINRA's Department of Enforcement charged McGee with: (1) misrepresenting to CF that she faced a tax liability to induce her to sell her variable annuities and invest in a charitable gift annuity, and failing to disclose the fee he would receive in connection with that transaction, in willful violation of Section 10(b) of the Securities Exchange Act of 1934, Exchange Act Rule 10b-5, and FINRA Rules 2020 and 2010; (2) making unsuitable recommendations to CF that she sell her variable annuities and purchase a charitable gift annuity, in violation of NASD Rule 2310[9], NASD IM-2310-2, and FINRA Rule 2010; (3) failing to disclose his relationship with 54Freedom to his employing member firm, in violation of FINRA Rules 3270 and 2010; (4) failing to timely update his Form U4 to reflect his new office address, in violation of FINRA Rules 1122 and 2010 and Article V, Section 2 of FINRA's By-Laws; and (5) making misrepresentations on member firm compliance questionnaires regarding his email address and

---

[7]     *United States v Griffin*, Criminal Docket No. 5:15-cr-00207-FJS (N.D.N.Y., filed July 22, 2015). Griffin was sentenced to five years imprisonment and ordered to pay $2,153,530.93 in restitution.

[8]     *SEC v. Griffin*, Civil Docket No. 5:15-cv-00927-FJS (N.D.N.Y., filed July 30, 2015).

[9]     FINRA Rule 2111, effective July 9, 2012, superseded NASD Rule 2310 and NASD IM-2310-2. *See Regulatory Notice 11-25*, 2011 FINRA LEXIS 45, at *2-4 (May 2011).

whether he had processed transactions away from his firm, in violation of NASD Rule 2110[10] and FINRA Rule 2010.

At the ensuing hearing, McGee denied that he recommended to CF that she sell her variable annuities and purchase a charitable gift annuity from 54Freedom. He asserted instead that CF insisted on the liquidations, and that she independently decided to invest in a charitable gift annuity with 54Freedom. He also maintained that the financial products that 54Freedom purchased with CF's charitable gift annuity investment were not securities. McGee further maintained that he had no obligation to disclose his relationship with 54Freedom as an outside business activity and that he properly disclosed his office and email addresses to his firm.

The Hearing Panel's decision found that, with the exception of the alleged misrepresentation concerning the tax liability, Enforcement proved the charged violations. The Hearing Panel barred McGee for the antifraud and unsuitable recommendation violations. It also ordered McGee to pay CF restitution in the amount of $236,202.50, representing the unreturned portion of CF's investment with 54Freedom, the surrender charges from liquidating the variable annuities, and interest. The Hearing Panel further ordered McGee to disgorge his compensation plus interest. In light of the bar, the Hearing Panel declined to impose any additional sanctions for McGee's failure to disclose his outside business activities, failure to timely update his Form U4, and provision of false information to his member firm. The Hearing Panel also ordered McGee to pay hearing costs of $12,325.34.

McGee appealed the Hearing Panel's decision to FINRA's National Adjudicatory Council ("NAC"). The NAC affirmed the Hearing Panel's findings of liability and the sanctions imposed, except that it did not order disgorgement on the ground that it would be duplicative of his obligation to pay restitution. McGee timely filed this appeal.

## II.    Analysis

Under Exchange Act Section 19(e)(1), we review FINRA disciplinary action to determine whether the associated person engaged in the conduct that FINRA found, whether such conduct violates the statutes and rules that FINRA specified, and whether FINRA's rules are, and were applied in a manner, consistent with the purposes of the Exchange Act.[11]

---

[10]    FINRA Rule 2010, effective December 15, 2008, superseded NASD Rule 2110. *See Regulatory Notice 08-57*, 2008 FINRA LEXIS 50, at *30-33 (Oct. 2008).

[11]    *See* 15 U.S.C. § 78s(e)(1).

**A.** **We sustain FINRA's finding that McGee committed fraud when he induced CF to liquidate her variable annuities in order to purchase a 54Freedom charitable gift annuity without disclosing his compensation from 54Freedom.**

We find that McGee recommended that CF surrender her variable annuities in order to purchase the 54Freedom charitable gift annuity as FINRA found. We also find that by doing so without disclosing his compensation from 54Freedom McGee violated Exchange Act Section 10(b) and Rule 10b-5 thereunder and FINRA Rules 2020 and 2010. We find further that FINRA's rules are, and were applied in a manner, consistent with the purposes of the Exchange Act.

**1.** **McGee recommended the 54Freedom transaction.**

McGee argues that he did not recommend that CF liquidate her variable annuities or purchase a 54Freedom charitable gift annuity. According to McGee, it was CF's idea to surrender her variable annuities because her relationship with her daughters had deteriorated and they were listed as beneficiaries. McGee testified that he merely suggested that CF contact 54Freedom to discuss charitable giving, as CF had decided to identify alternatives for her estate. McGee also stated that he was unaware that CF wanted to liquidate her variable annuities and purchase a charitable gift annuity until he went to her home on March 9, 2011. He argues that, because she was adamant, he had no choice but to process her request.

We sustain the NAC's finding based on the testimony of McGee's assistant and the documentary evidence that McGee recommended the transaction to CF. McGee's assistant testified that McGee discussed using CF as a case study with him to determine whether 54Freedom's charitable gift annuity program was effective. The Hearing Panel found this testimony credible. Such credibility determinations are entitled to considerable weight and deference and can be overcome only where there is substantial evidence in the record for doing so.[12] Our *de novo* review of the record finds nothing to contradict the Hearing Panel, and we find that the NAC's reliance on the Hearing Panel's determination was appropriate. McGee's determination to use CF as a case study supports the NAC's finding that it was McGee's idea for CF to invest in 54Freedom.

So does the documentary evidence. McGee gave 54Freedom's marketing materials to CF in January or February 2011. On March 9, 2011, he went to CF's home with all of the necessary surrender forms, which she signed. In anticipation of CF's receipt of the surrender checks, McGee prepared an analysis of the compensation he would receive from 54Freedom for CF's transaction. On March 17, 2011, he prepared CF's deposit slip, took her to the bank, and directed CF to write a check to 54Freedom in the amount she had just deposited. McGee then went directly to 54Freedom to drop off CF's check. One week later, McGee received a payment from 54Freedom for $49,264. Indeed, McGee's written response to the Cadaret compliance

---

[12]    *See The Dratel Grp., Inc.*, Exchange Act Release No. 72293, 2014 WL 2448896, at *4 n.17 (June 2, 2014).

officer admitted that he had "suggested" the charitable gift annuity to CF. Based on these facts, we sustain FINRA's finding that McGee recommended that CF liquidate her variable annuities and purchase a charitable gift annuity from 54Freedom.

### 2. McGee's failure to disclose his compensation violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5 and FINRA Rules 2020 and 2010.

A respondent violates Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 when, in connection with the purchase or sale of a security, and acting with scienter, he omits a material fact despite a duty to speak.[13] McGee does not dispute that he did not inform CF that he would receive compensation from 54Freedom for her purchase of the charitable gift annuity. We find that McGee violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5 because his compensation from 54Freedom was a material fact that he had a duty to disclose, he acted recklessly, and his material omission was in connection with the purchase or sale of a security.

#### a. McGee's compensation was a material fact that he had a duty to disclose.

We find that, having recommended that CF sell the variable annuities and purchase the 54Freedom charitable gift annuity, McGee had a duty to disclose to CF that he would receive compensation from 54Freedom if she did so. When recommending a security to a customer, a representative has a duty to "disclose material adverse facts of which [he] is aware" such as "economic self-interest" because such facts could influence the representative's recommendation.[14]

McGee's compensation from 54Freedom was a material fact that he should have disclosed to CF. A fact is material if there is a substantial likelihood that a reasonable investor would consider the omitted fact important in making an investment decision.[15] When a representative "has a self-interest (other than the regular expectation of a commission) . . . that could influence [his] recommendation, it is material and should be disclosed."[16] McGee's compensation from 54Freedom was "other than the expected commission" because it came from

---

[13]    *SEC v. First Jersey Secs.*, 101 F.3d 1450, 1467 (2d Cir. 1996). The respondent must also use the means of interstate commerce. 15 U.S.C. § 78j(b). McGee does not dispute that he communicated with CF via telephone, and sent her surrender forms to The Hartford and Pacific Life by U.S. mail and facsimile.

[14]    *See, e.g.*, *Richmark Capital Corp.*, Exchange Act Release No. 48758, 2003 WL 22570712, at *3 (Nov. 7, 2003) (internal quotation omitted); *William Scholander*, Exchange Act Release No. 77492, 2016 WL 1255596, at *5 (Mar. 31, 2016) (citing cases).

[15]    *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[16]    *Scholander*, 2016 WL 1255596, at *5 (internal quotations omitted).

the issuer, 54Freedom, as opposed to McGee's member firm.[17]  A reasonable investor would consider it material that more than 10% of her investment would be paid back as compensation to the broker by the issuer of the recommended security.[18]

### b.     McGee acted with scienter.

We also find that McGee acted with scienter when he failed to disclose the compensation that he would receive from 54Freedom for CF's purchase of the charitable gift annuity.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."[19]  Recklessness satisfies the scienter requirement, and is defined as conduct that constitutes "an extreme departure from the standards of ordinary care…to the extent that the danger [of deceiving investors] was either known to the [applicant] or so obvious that the [applicant] must have been aware of it."[20]

McGee had an established business relationship with 54Freedom and Griffin at the time of CF's purchase.  He was operating his business from 54Freedom's office space, and planning to enter into a joint business venture with Griffin and 54Freedom.  He had also seen marketing material promising generous compensation to sales personnel.  He had identified CF as a case study for 54Freedom investments, and prior to CF's investment prepared an analysis that assumed he would receive compensation of $49,264 for CF's purchase of the charitable gift annuity.  Based on this evidence, we find, like the NAC, that McGee knew of the compensation he would receive from the transaction.  The conflict between his being paid such high compensation from the issuer and his recommendation of the investment to CF was so great that he must have been aware of the danger of misleading CF by omitting this information.  Therefore, we find he acted at least recklessly when he failed to disclose his compensation to CF.

McGee argues that he did not act with scienter because New York insurance law does not require him to disclose commissions earned on fixed annuities.  New York law does not govern the conduct in this case; Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5, and FINRA rules apply.[21]  In any case, McGee knew that 54Freedom based his compensation on the value of CF's variable annuities as opposed to any fixed annuities.

---

[17]     *Id.* (distinguishing substantial compensation from the issuer of a security from employer compensation, which an associated person is not required to disclose absent a fiduciary duty).

[18]     *See United States v. Nouri*, 711 F.3d 129, 142 (2d Cir. 2013) (finding that bribe received in exchange for a broker's recommendation was material because "[a]t the very least it suggests the customer should seriously question the genuineness or reliability of the recommendation").

[19]     *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

[20]     *Scholander*, 2016 WL 1255596, at *6 (internal citations omitted).

[21]     *Cf. Jerome v. United States*, 318 U.S. 101, 104 (1943) (absent an indication that Congress intended otherwise, the meaning of a federal statute will not be dependent on state law).

c.   **McGee's material omission met the "in connection with" requirement.**

We find further that McGee's material omission was in connection with the purchase or sale of securities. The Supreme Court has endorsed the Commission's "consistently . . . broad reading of the ... 'in connection with'" requirement.[22] When interpreting the "in connection with" requirement, the Supreme Court has held that the material omission need only "coincide" with the purchase or sale of a security.[23]  A security need only be involved on one side of the transaction.[24]  McGee's material omission was in connection with CF's sale of the variable annuities, and it is well established that variable annuities are securities.[25]

McGee argues that the "in connection with" requirement is not satisfied because the Lincoln Financial fixed indexed annuities that 54Freedom purchased for CF are not securities. He similarly stated in his Notice of Appeal that "FINRA lacked jurisdiction over this matter where McGee's commission...was not from the sale of a security." These arguments ignore the sale of CF's variable annuities. The sale of the variable annuities was a necessary first step to CF's investment in 54Freedom; without McGee inducing those sales, CF would not have had the money for the subsequent investment. And it was the value of the variable annuities prior to their sale that formed the basis for calculating McGee's compensation.

In *SEC v. Zandford*, the Supreme Court held that the "in connection with" requirement is satisfied where a broker "sells customer securities with intent to misappropriate the proceeds."[26] In that case, the "in connection with" requirement was satisfied even though "the sales themselves were perfectly lawful" because the broker's misappropriation "coincided with the sales."[27]  We see little difference between a broker inducing the sale of securities so that he can misappropriate the proceeds and a broker inducing the sale of securities so that he can reinvest the proceeds and receive a portion of the reinvested funds for himself as compensation.  As in *Zandford*, the sale of the variable annuities that McGee recommended was part of the same fraud as McGee's failure to disclose his compensation from using the proceeds of those sales to invest with 54Freedom.

*          *          *

---

[22]   *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotations omitted).

[23]   *Id.* at 822; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 81, 85 (2006).

[24]   *Zandford*, 535 U.S. at 820-22.

[25]   *See, e.g., SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 67-73 (1959); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001).

[26]   *Zandford*, 535 U.S. at 819-20.

[27]   *Id.* at 820.

McGee argues that the fact that Griffin, and not he, is the subject of criminal and civil proceedings, is evidence that he has not committed fraud. But the criminal and civil proceedings against another individual do not preclude FINRA from taking disciplinary action.[28] McGee also notes that neither Cadaret nor CF's attorney made a finding that he committed fraud. But there is no evidence that either Cadaret or CF's attorney even investigated fraud allegations. Cadaret investigated McGee's outside business activities, and its investigator testified that he "did not attempt to make a conclusion" as to whether McGee committed fraud. CF's attorney sought only to locate CF's investment with 54Freedom.

The record establishes that McGee made a material omission with scienter in connection with the purchase or sale of a security in violation of Exchange Act Section 10(b) and Rule 10b-5. A violation of these provisions also constitutes a violation of FINRA Rule 2020, which prohibits FINRA members from "effect[ing] any transaction in, or induc[ing] the purchase of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance."[29] Such conduct also violates Rule 2010, which prohibits conduct inconsistent with just and equitable principles of trade.[30] Therefore, we sustain FINRA's finding that McGee's conduct violated Exchange Act Section 10(b) and Rule 10b-5 and FINRA Rules 2020 and 2010.

### 3. FINRA Rules 2020 and 2010 are, and were applied in a manner, consistent with the purposes of the Exchange Act.

FINRA Rule 2020 protects investors by prohibiting the same conduct as Exchange Act Section 10(b) and Rule 10b-5. It is therefore consistent with the purposes of the Exchange Act. FINRA applied Rule 2020 in a manner consistent with the purposes of the Exchange Act because a preponderance of the evidence supports FINRA's findings that McGee violated Rule 2020.[31]

FINRA Rule 2010 is consistent with the purposes of the Exchange Act because it reflects the mandate of Exchange Act Section 15(b)(6) that FINRA design its rules to "promote just and

---

[28]  *Cf. Janet Gurley Katz*, Exchange Act Release No. 61449, 2010 WL 358737, *21 (Feb. 1, 2010) (stating that registered representative "cannot shift the blame for her violations to others or claim that others' misconduct somehow excuses her own misdeeds"), *aff'd*, 647 F.3d 1156 (D.C. Cir. 2011).

[29]  *See, e.g., Donner Corp. Int'l*, Exchange Act Release No. 55313, 2007 WL 516282, at *13 (Feb. 20, 2007) (finding the same conduct violated Section 10(b) and Rule 2020's predecessor).

[30]  *See Kenny Akindemowo*, Exchange Act Release No. 79007, 2016 WL 5571625, at *5 n.3 (Sept. 30, 2016) (stating that it is well established that a violation of a FINRA conduct rule "is conduct inconsistent with just and equitable principles of trade and therefore is also a violation of FINRA Rule 2010").

[31]  *Id.* at *7.

equitable principles of trade."[32] The application of Rule 2010 to McGee's conduct furthered the objective of preventing conduct inconsistent with just and equitable principles of trade.[33]

**B.   We sustain FINRA's finding that McGee's recommendation that CF surrender the variable annuities and purchase a 54Freedom charitable gift annuity was unsuitable.**

As discussed above, we find that McGee recommended that CF liquidate her variable annuities and purchase a charitable gift annuity from 54Freedom. We find that by doing so McGee violated NASD Rule 2310 and NASD IM-2310-2—the customer suitability rules—and FINRA Rule 2010. NASD IM-2310-2 stated that "the fundamental responsibility for fair dealing" is implicit in the relationships between customers and registered representatives.[34] NASD Rule 2310 required that registered representatives have "reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."[35]

A registered representative must have a reasonable basis for recommending a transaction.[36] This test focuses on the particular recommendation, rather than a particular customer, as a broker cannot determine whether a recommendation is suitable for a particular customer unless he has a "reasonable basis" to believe that the recommendation could be suitable for at least some customers.[37] McGee did not have such a reasonable basis here.

McGee knew almost nothing about charitable gift annuities in general or 54Freedom's charitable gift annuity program. Although McGee argues that 54Freedom appeared to be a successful company, he based this judgment on insufficient evidence. He looked at 54Freedom's website, reviewed its marketing materials, and spoke with Griffin, but he did not do any further research. McGee did not know anything about 54Freedom's financial condition and operations, was unaware of whether anyone else had ever purchased a 54Freedom charitable gift annuity, and wondered to his assistant whether charitable gift annuities even worked. Indeed, McGee knew so little about the financial condition of 54Freedom or its charitable gift annuity program that he used CF as a case study to test the program's viability. He therefore lacked an "'adequate

---

[32]   15 U.S.C. 78o-3(b)(6).

[33]   *Akindemowo*, 2016 WL 5571625, at *7 n.16.

[34]   NASD IM-2310-2(a)(1).

[35]   NASD Rule 2310(a); *William J. Murphy*, Exchange Act Release No. 69923, 2013 WL 3327752, *10 (July 2, 2013), *aff'd*, 751 F.3d 472 (7th Cir. 2014).

[36]   *Michael Frederick Siegel*, Exchange Act Release No. 58737, 2008 WL 4528192, at *8 n.23 (Oct. 6, 2008), *aff'd in relevant part*, 592 F.3d 147 (D.C. Cir. 2010).

[37]   *Id.*

and reasonable' understanding of [the] investment before recommending" that a customer sell variable annuity securities in order to purchase 54Freedom's charitable gift annuity.[38]

McGee's recommendation also lacked customer specific suitability. Customer specific suitability requires that a recommendation be consistent with the customer's best interests and financial situation.[39] At the time of the transaction, CF was a 71-year-old retiree with an income of approximately $1,000 a month. She intended to rely on her investments to sustain her for the rest of her life. CF's stated investment objective was "long term growth," and her risk tolerance was "moderate." Nonetheless, McGee recommended that CF surrender nearly half of her assets in order to invest in one company, 54Freedom—an extremely high-risk strategy.[40] Moreover, CF incurred expenses worth nearly eight percent of the value of her variable annuities in surrendering them to generate the money to invest in 54Freedom. This meant that the new investment, whose prospects were unknown to McGee, needed to recoup at least an eight percent return simply to put CF in the position she was in before she started. McGee's compensation further reduced the amount of CF's 54Freedom investment. This sort of blind experiment with such a large portion of the assets of an unsophisticated investor of moderate means seeking moderate risk was unsuitable for this customer.[41] We therefore sustain FINRA's finding that McGee did not have a reasonable basis for recommending the transaction to CF in violation of NASD Rule 2310 and NASD IM 2310-2.

NASD Rule 2310 and NASD IM-2310-2 are consistent with the purposes of the Exchange Act, which is meant to protect investors, because they require that registered representatives make suitable recommendations. FINRA applied these rules in a manner consistent with the Exchange Act. A preponderance of the evidence supports FINRA's

---

[38]     *See Richard G. Cody*, Exchange Act Release No. 64565, 2011 WL 2098202, at *10 n.20 (May 27, 2011), *aff'd*, 693 F.3d 251 (1st Cir. 2012), *citing Hanley v. SEC*, 415 F.2d 589, 597 (2d Cir. 1969) (finding that broker had an independent obligation to ensure that he understood investment before recommending it); *see also* NASD Regulation, Inc., *Regulatory and Compliance Alert Spring 2002*, at 13 (stating that "members must keep in mind that the suitability rule applies to any recommendation to sell a variable annuity . . . including situations where the member recommends using the proceeds to purchase an unregistered product such as an equity-indexed annuity"), *available at* http://www.finra.org/sites/default/files/RCA/p002370.pdf.

[39]     NASD Rule 2310(a); *Cody*, 2011 WL 2098202, at *11.

[40]     *See George E. Brooks & Assoc., Inc.*, Exchange Act Release No. 23392, 1998 WL 479756, *4 (Aug. 17, 1998) (finding that representative engaged in unsuitable transactions where he placed "large portions of his clients' funds in one or two stock positions" despite the fact that the clients were elderly and had little investment experience).

[41]     *See, e.g., Murphy*, 2013 WL 3327752, at *11 (finding that a highly risky investment strategy was unsuitable for an investor "with only moderate risk tolerance and limited understanding of" the recommended investment).

conclusion that McGee's conduct violated NASD Rule 2310, NASD IM-2310-2, and FINRA Rule 2010.

**C.    We sustain FINRA's finding that McGee engaged in undisclosed outside business activities because he failed to inform Cadaret of the full extent of his relationship with 54Freedom.**

We find that McGee failed to disclose his business relationship with 54Freedom to Cadaret, that this failure violated FINRA Rules 3270 and 2010, and that Rules 3270 and 2010 are, and were applied in a manner, consistent with the purposes of the Exchange Act. McGee failed to disclose his business relationship with 54Freedom until August 2012, after Cadaret received a letter from CF's attorney. This conduct violated FINRA Rule 3270 which provides that "[n]o registered person may be . . . compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he … has provided prior written notice to the member."

McGee argues that he informed Cadaret in April 2007 that he acted as an independent insurance agent and that because the charitable gift annuity was an "insurance product," his April 2007 advisement was sufficient. As the NAC stated, this argument demonstrates a "profound misunderstanding of FINRA Rule 3270." FINRA explained in adopting Rule 3270 that even if a registered person has provided some prior notice of an outside business activity, such notice is only valid "to the extent that it continues to accurately describe the outside business activity and, thus, it is incumbent on the registered person to provide prior written notice before altering the nature of any outside business activity previously disclosed in writing to the firm."[42] McGee therefore was required to disclose the full nature of his activity with 54Freedom. McGee, Griffin, and 54Freedom were business partners. Beginning in late 2010 or early 2011, McGee ran his business operations, rent-free, from 54Freedom's office space and proposed a joint venture with 54Freedom in which he planned to sell securities. McGee also received compensation of approximately $50,000 from 54Freedom for selling a charitable gift annuity. As the NAC found, McGee's "narrow disclosure" that he was acting as an independent insurance agent was insufficient notification of his ongoing relationship with 54Freedom and his expectation of compensation from that relationship for selling securities.

We find that FINRA Rule 3270 is consistent with the purposes of the Exchange Act because it ensures that member firms may raise objections to an associated person's outside business activities at a meaningful time and exercise appropriate supervision.[43] FINRA applied

---

[42]    Securities Exchange Act Release No. 62762 (Aug. 23, 2010), 75 Fed. Reg. 53,362 (Aug. 31, 2010) (SR-FINRA-2009-042).

[43]    *Proposed Rule Change by NASD Relating to Outside Business Activities of Associated Persons*, Exchange Act Release No. 26663, 1988 WL 902707 (Sept. 6, 1988); *Kent M. Houston*, Exchange Act Release No. 71589, 2014 WL 651953, at *4 (Feb. 20, 2014).

the rules in a manner consistent with the purposes of the Exchange Act here because a preponderance of the evidence supports FINRA's conclusion that McGee violated Rules 3270 and 2010.

**D.    We sustain FINRA's finding that McGee failed to timely disclose material information on his Form U4.**

We find that McGee failed to timely disclose material information on his Form U4, that by doing so he violated Section 2(c) of Article 5 of FINRA's By-Laws and FINRA Rules 1122 and 2010, and that those provisions are, and were applied in a manner, consistent with the purposes of the Exchange Act. McGee failed to update his Form U4 to reflect that he moved his business operations to 54Freedom's office space in late 2010 or early 2011 until about a year later. During his on-the-record testimony in 2012 and 2013, McGee testified that he moved to 54Freedom's premises in late 2010 or early 2011, and was working there when he processed CF's transaction with 54Freedom in March 2011. During the hearing, McGee testified that his earlier testimony was a misstatement and that he moved to 54Freedom's premises in late 2011 or early 2012. We sustain the NAC's reliance on McGee's on-the-record testimony. The on-the-record testimony of McGee's assistant corroborates that testimony,[44] and McGee's on-the-record testimony occurred closer in time to the underlying events and before he was charged.

McGee's failure to update his Form U4 until approximately a year after he moved his business operations to 54Freedom's office space violated FINRA's By-Laws and rules. Section 2(c) of Article 5 of FINRA's By-Laws provides that every application for registration, including the Form U4, must be kept current at all times by filing supplementary amendments within 30 days of learning of the facts or circumstances giving rise to the amendment. Similarly, FINRA Rule 1122 provides that no person associated with a member shall file incomplete or inaccurate information with respect to membership or registration "so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

These provisions are consistent with the purposes of the Exchange Act because Form U4 is a "critically important regulatory tool" that assists regulatory agencies in determining and monitoring the fitness of securities professionals.[45]    FINRA applied those provisions consistent with the purposes of the Exchange Act because the evidence supports the finding of a violation.

---

[44]    McGee argues that his assistant's hearing testimony that he purchased business cards in January 2012 demonstrates the timing of the move to 54Freedom's offices. The NAC agreed with the Hearing Panel's determination that the assistant's on-the-record testimony was temporally closer to the underlying events and therefore more reliable, and we sustain that determination.

[45]    *Joseph S. Amudsen*, Exchange Act Release No. 69406, 2013 WL 1683914, *6 (April 18, 2013).

**E.    We sustain FINRA's finding that McGee engaged in conduct inconsistent with the just and ethical principles of trade when he made false statements on compliance questionnaires.**

We find that McGee made false statements on compliance questionnaires, that such false statements violated FINRA rules, and that such rules are and were applied in a manner consistent with the Exchange Act. Cadaret asked McGee to disclose on an annual compliance questionnaire all of his business-related email addresses and any involvement in the offer or sale of non-Cadaret processed securities or investments without his firm's approval. From 2007 through 2011, McGee failed to disclose a Yahoo account that he used for securities business. While McGee argues in his brief that he only used the Yahoo account for insurance business, his assistant testified that McGee typically used the Yahoo account to communicate with him about work-related matters. McGee himself testified that, although it was not his "intention" to use his Yahoo email address for securities business, it "ended up happening sometimes." And McGee previously signed an affidavit in which he stated that he used the Yahoo email address for securities business while at Cadaret. In light of this evidence, we sustain the NAC's finding that McGee used his Yahoo email for securities business and failed to disclose it.

McGee also failed to disclose his involvement in the purchase of the charitable gift annuity for CF. McGee sold the charitable gift annuity to CF in March 2011. But he falsely stated on a July 2011 compliance questionnaire that he had not been involved in the offer or sale of any security or investment that was not processed through Cadaret or with Cadaret's written permission.

These false statements violated NASD Rule 2110 and FINRA Rule 2010. As discussed above, FINRA Rule 2010 provides that an associated person must observe high standards of commercial honor and just and equitable principles of trade. The standard applies to all business-related misconduct, regardless of whether the conduct involves securities.[46] We find that McGee's omissions on his compliance questionnaires were inconsistent with just and equitable principles of trade. For the reasons discussed above, we find that Rule 2010 is, and was applied in a manner, consistent with the purposes of the Exchange Act.

### III.    Sanctions

Pursuant to Exchange Act Section 19(e)(2), we must sustain FINRA's sanctions unless we find, having due regard for the public interest and the protection of investors, that the sanctions are excessive or oppressive or impose an unnecessary or inappropriate burden on competition.[47] Pursuant to this review, we must consider any aggravating or mitigating factors.[48]

---

[46]    *Vail v. SEC*, 101 F.3d 37, 39 (5th Cir. 1996) (internal citations omitted).

[47]    15 U.S.C. § 78s(e)(2).

[48]    *Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013) (citing *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

The Commission is not bound by FINRA's Sanction Guidelines; however, we use them as a benchmark in conducting our review under Section 19(e)(2).[49]

### A.    The bar FINRA imposed on McGee is neither excessive nor oppressive.

FINRA's Sanction Guidelines recommend consideration of a bar in particularly egregious situations where an associated person engaged in reckless or intentional misrepresentations.[50] We agree with FINRA that aggravating factors demonstrate that McGee's fraudulent omission and unsuitable recommendation were egregious and justify a bar. McGee persuaded CF to liquidate nearly half of her investment holdings and invest those assets with 54Freedom, even though CF incurred nearly $40,000 in various expenses by doing so and McGee knew almost nothing about 54Freedom's financials or operations. As a result of this transaction, CF lost $200,000.[51] McGee, on the other hand, earned $49,264 in compensation from 54Freedom.[52]

Moreover, even though CF was 71 years old at the time of the transaction, financially unsophisticated, and receiving income of only $1000 a month, McGee chose her to serve as a case study to determine whether 54Freedom's charitable gift annuity program worked.[53] McGee violated his duty as a broker to disclose to CF that he would receive compensation from her investment in 54Freedom. McGee even attempted to conceal his misconduct during Cadaret's investigation.[54]

We agree with FINRA that significant aggravating factors are present in this case. We have also held that violations involving fraud are particularly serious and should be subject to the most severe sanctions.[55] Barring McGee will protect the public by preventing McGee from defrauding other customers. It will also encourage other registered representatives to disclose material information to their customers when they recommend securities transactions. For all of these reasons, we sustain FINRA's imposition of a bar.

---

[49]    *See, e.g., John Joseph Plunkett*, Exchange Act Release No. 69766, 2013 WL 2898033, at *11 (June 14, 2013).

[50]    Guidelines at 87.

[51]    *Id.* at 6 (providing that whether the respondent's misconduct resulted in harm to the investing public is a principal consideration in determining the appropriate sanction).

[52]    *Id.* at 7 (providing that whether the misconduct resulted in monetary gain for the respondent is a principal consideration in determining the appropriate sanction).

[53]    *Id.* (providing that whether the affected customer was sophisticated is a principal consideration in determining the appropriate sanction).

[54]    *Id.* (providing that whether the respondent attempted to conceal his misconduct is a principal consideration in determining the appropriate sanction).

[55]    *Scholander*, 2016 WL 1255596, at *9.

**B.      The restitution FINRA ordered is neither excessive nor oppressive.**

FINRA's Sanction Guidelines provide that FINRA may order restitution when an identifiable individual has "suffered a quantifiable loss" that was "proximately caused by [the] respondent's misconduct."[56]  CF suffered a loss of $237,643.25 as a result of McGee's fraud and unsuitable recommendation—the $200,000 that CF has not recouped from her investment with 54Freedom, the variable annuity surrender charges of $36,202.50, and taxes and administrative fees of $1,440.75.  We have held that restitution is appropriate when it is necessary to restore the status quo ante in those situations where a victim would otherwise suffer unjust loss,[57] and we therefore sustain FINRA's imposition of restitution as well.[58]

An appropriate order will issue.[59]

By the Commission (Acting Chairman PIWOWAR and Commissioner STEIN).

Brent J. Fields
Secretary

BY: Eduardo A. Aleman
Assistant Secretary

---

[56]      Guidelines at 4.

[57]      *See Joseph R. Butler*, Exchange Act Release No. 77984, 2016 WL 3087507, at *9.

[58]      We also sustain FINRA's imposition of costs, as we find the sanctions FINRA imposed were appropriately tailored to the misconduct.  *See Scholander*, 2016 WL 1255596, at n.68.

[59]      We have considered all of the parties' contentions.  We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 80314 / March 27, 2017

Admin. Proc. File No. 3-17402

In the Matter of the Application of

BERNARD G. MCGEE

For Review of Disciplinary Action Taken by

FINRA

ORDER SUSTAINING DISCIPLINARY ACTION TAKEN BY FINRA

On the basis of the Commission's opinion issued this day, it is

ORDERED that the disciplinary action taken by FINRA against Bernard G. McGee be, and it hereby is, sustained.

By the Commission.

Brent J. Fields
Secretary

BY: Eduardo A. Aleman
Assistant Secretary

MAR 31 2017
P11016 KRV

CERTIFIED
No. _____
MAIL
RETURN RECEIPT REQUESTED

70 0001 1134 2511

Bernard G. McGee
c/o Kevin R. Van Duser, Esq.
Sugarman Law Firm LLP
211 West Jefferson Street, Suite 20
Syracuse, NY 13202

3- 17402



02 1P $0
0000873316 MA
MAILED FROM ZIP C

MAR 31 2017

P11016 KRV

$ 007.92⁰

PITNEY BOWES

02 1P
0000873316   MAR 28 2017
MAILED FROM ZIP CODE 20001

3- 17402

7016 2070 0001 1134 2863

MAIL STOP 16...
ASHINGTON, D.C. 20549

**OFFICIAL BUSINESS**

Kevin R. Van Duser Esq.
Sugarman Law Firm
211 West Jefferson Street
Syracuse, NY 13202

:RTIFIED

MAIL
RECEIPT REQUESTED

BEFORE THE NATIONAL ADJUDICATORY COUNCIL

FINANCIAL INDUSTRY REGULATORY AUTHORITY

In the Matter of

Department of Enforcement,

          Complainant,

vs.

Bernard G. McGee
Cazenovia, NY,

          Respondent.

DECISION

Complaint No. 2012034389202

Dated: July 18, 2016

SEC
Mail Processing
Section

*12:50*

JUL 18 2016

Washington DC

**In connection with a customer's surrender of four variable annuities[1] and purchase of a charitable gift annuity, respondent willfully omitted a material fact, made an unsuitable recommendation, engaged in undisclosed outside business activities, failed to timely update his Form U4, and made misrepresentations on his firm's annual compliance questionnaires.**
**Held, findings affirmed, sanctions affirmed in relevant part.**

**Appearances**

For the Complainant: Edwin Aradi, Esq., Daniel Gardner, Esq., Leo Orenstein, Esq., Lane Thurgood, Esq., Department of Enforcement, Financial Industry Regulatory Authority

For the Respondent: Stephen Davoli, Esq., Kevin Van Duser, Esq.

FINRA 005862

## TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| I. | | Factual Background | 2 |
| | A. | McGee Begins Managing CF's Investments | 2 |
| | B. | McGee Develops a Relationship with 54Freedom's Founder and CEO, James Griffin | 3 |
| | C. | McGee Uses CF's Investment as a "Case Study" for 54Freedom's Charitable Gift Annuity Program | 4 |
| | D. | McGee Does Not Inform CF of the Compensation He Received for Her Purchase of 54Freedom's Charitable Gift Annuity | 5 |
| | E. | 54Freedom's Use of CF's Investment | 5 |
| | F. | CF Hires an Attorney to Assist Her in Locating McGee and Her Investment with 54Freedom | 6 |
| | G. | Cadaret Grant's Investigation | 7 |
| | H. | Griffin's Indictment and Arrest for Fraud | 8 |
| II. | | Procedural History | 9 |
| III. | | Discussion | 10 |
| | A. | McGee Engaged in Fraud, in Violation of the Exchange Act and FINRA's Rules | 10 |
| | | 1. Fraud Under the Exchange Act | 10 |
| | | 2. Fraud Under FINRA's Rules | 21 |
| | B. | McGee's Recommendation That CF Surrender the Variable Annuities and Purchase the Charitable Gift Annuity Was Unsuitable | 22 |
| | | 1. Customer-Specific Suitability | 23 |
| | | 2. Reasonable Basis Suitability | 24 |
| | C. | McGee Engaged in Undisclosed Outside Business Activities | 25 |
| | D. | McGee Failed to Timely Update His Form U4 to Disclose His Move to 54Freedom's Offices | 26 |

SPA-24

**TABLE OF CONTENTS (cont'd)**

PAGE

E.  McGee Provided False Responses on Cadaret Grant's Annual Compliance
    Questionnaires............................................................................................................27

IV. Sanctions............................................................................................................................29

A.  Fraudulent Omission of Material Fact and Unsuitable Recommendation.................29

B.  Restitution.................................................................................................................31

C.  Undisclosed Outside Business Activities..................................................................32

D.  Failure to Timely Update the Form U4....................................................................33

E.  Misrepresentations on Cadaret Grant's Annual Compliance Questionnaires............34

V.  Conclusion ........................................................................................................................36

SPA-25

### Decision

In March 2011, Bernard McGee's 71-year-old customer, CF, surrendered four variable annuity policies and used the proceeds to purchase a charitable gift annuity through 54Freedom Services, Inc. ("54Freedom"), a company that purported to sell insurance. In reality, the company was a fraudulent enterprise. This appeal focuses on McGee's role in CF's surrender of the variable annuities and purchase of the charitable gift annuity.

In the proceedings below, the Hearing Panel determined that McGee advised CF to liquidate a substantial portion of her portfolio, surrender the variable annuities, and invest the proceeds in 54Freedom's charitable gift annuity, and that, in so doing, McGee violated FINRA's rules. Specifically, the Hearing Panel found that McGee: (1) willfully failed to inform CF of the $49,264 in commissions that he received in connection with her purchase of 54Freedom's charitable gift annuity; (2) made an unsuitable recommendation to CF when he proposed that CF surrender the variable annuities and purchase a charitable gift annuity; (3) engaged in undisclosed outside business activities when he failed to provide his firm with written notice of his activities with 54Freedom; (4) failed to timely update his Uniform Application for Securities Industry Registration or Transfer ("Form U4") to disclose that he moved his business office to 54Freedom's premises; and (5) made misrepresentations on his firm's annual compliance questionnaires when he falsely stated that he had disclosed all of his business-related email addresses, and that he was not involved in the offer or sale of any security or investment that the firm did not approve.

The Hearing Panel barred McGee for the fraudulent omission and unsuitable recommendation, and it ordered McGee to pay $236,202.50 in restitution to CF and disgorge his commissions. The Hearing Panel declined to impose sanctions for the three remaining causes of action. After an independent review of the record, we affirm the Hearing Panel's findings and most, but not all, of the sanctions imposed. As discussed later in the decision, we have modified the restitution amount and decided not to order disgorgement.

I.    Factual Background

McGee entered the securities industry in January 1988, registering with a firm as a general securities representative. In October 1990, he registered with FINRA as a general securities principal. McGee has been registered with FINRA continuously since January 1988, and he is currently registered with a firm as a general securities representative and principal. During the period relevant to the facts of this case, McGee was registered as a general securities representative and principal with Cadaret, Grant & Co., Inc. McGee joined Cadaret Grant in April 2007. Five years later, in October 2012, Cadaret Grant permitted McGee to resign because of the conduct at issue.

A.    McGee Begins Managing CF's Investments

CF was married for 36 years, beginning at age 20. She did very little work outside the home, her husband controlled the family's finances, and she did no investing. She filed for

SPA-26

divorce in the early 1990s. As part of the divorce settlement, CF received cash, money market funds, and the joint accounts that she and her former spouse maintained at the Teachers Insurance and Annuity Association ("TIAA") and College Retirement Equities Fund ("CREF").

CF was unfamiliar with financial matters when she received the divorce settlement, and she asked her accountant for assistance. The accountant recommended that she invest the assets received in the divorce settlement with his son, an individual who was then-registered with a broker-dealer. CF invested the funds with the accountant's son in 1999. The accountant's son serviced CF's account for eight years, until he left the firm in 2007. The firm assigned CF's account to McGee when the accountant's son resigned. In April 2007, McGee took CF's account with him to a new firm, Cadaret Grant. When CF transferred her account to Cadaret Grant, she opened the account with a "long term growth" investment objective and "moderate" risk tolerance.

Between October 2007 and June 2010, while McGee was registered with Cadaret Grant, he recommended that CF purchase four variable annuities, and she did. CF purchased two variable annuities with "The Hartford," and she purchased two variable annuities with Pacific Life Insurance Company. By March 2011, CF's accounts held assets of approximately $842,000. Of this amount, CF had $584,000 in accounts that McGee had recommended or was assigned to: (1) $505,000 through the four Hartford and Pacific Life variable annuities; (2) $67,000 in a Cadaret Grant brokerage account; and (3) $12,000 in a non-traded Cadaret Grant real estate investment trust (REIT). CF also maintained $258,000 in a TIAA account, which was not under McGee's management.

     B.     McGee Develops a Relationship with 54Freedom's Founder and CEO, James Griffin

In 2008 or 2009, McGee met James Griffin while playing golf. The two men developed a business relationship, and Griffin told McGee about his insurance company, 54Freedom, and 54Freedom's charitable gift annuity program.[1] McGee examined 54Freedom's website, and he read the company's marketing materials. 54Freedom's marketing materials stated that the

---

[1]    Charitable gift annuities are investment products, typically issued through third-party administrators, which enable individuals to transfer cash or marketable securities to charitable organizations. *See NASD Regulatory & Compliance Alert*, Summer 2002 at 26/27, http://www.finra.org/sites/default/files/RCA/p002369.pdf. The charitable organizations, through the administrators, then issue gift annuities to the individuals in exchange for a current income tax deduction and the organization's promise to make fixed annual payments for life. *See id.* At the deaths of the annuitants, the remaining funds are disbursed to the charity. *See id.*; *NASD Notice to Members 02-70*, 2002 NASD LEXIS 84, at *7-8 (Oct. 2002) (explaining that "[a] [c]haritable [g]ift [a]nnuity enables an individual to transfer cash or marketable securities to charitable organizations that then issue gift annuities in exchange for a current income tax deduction and the organization's promise to make fixed annual payments for life. Registered persons may be told that [charitable gift annuities] do not require federal or state securities registration or licensing. This is false, however, if representatives will receive a commission").

SPA-27

company's charitable gift annuity program was a "unique," "patent-pending" investment "solution" that was "unavailable elsewhere." The marketing materials also touted 54Freedom's referral fees and "generous street level compensation." 54Freedom's marketing materials stated that the company's "street level compensation" was eight percent.

By late 2010, the business relationship between McGee and Griffin deepened, and McGee and Griffin proposed to enter into a joint venture. McGee prepared a business plan for the joint venture. McGee proposed that he sell securities products, that Griffin and 54Freedom sell insurance products, and that both men contribute to the opening of a new office on Singer Island, Florida, where Griffin resided. As McGee's and Griffin's joint venture developed, McGee moved his business operations to 54Freedom's premises.[2] Griffin did not charge McGee for the use of 54Freedom's office space.

C.   McGee Uses CF's Investment as a "Case Study" for 54Freedom's Charitable Gift Annuity Program

McGee's assistant, Andrew Baker, testified at the hearing. Baker testified that, after McGee moved his business operations to 54Freedom's premises, McGee informed him that he decided to use a customer's investment as a "case study" to "see if [54Freedom's charitable gift annuity program] really work[ed]." McGee told Baker that, if 54Freedom's charitable gift annuity program "worked," McGee would begin incorporating the product into more of his customers' portfolios. McGee's "case study" was CF.

McGee began discussing 54Freedom and the charitable gift annuity program with CF in December 2010. In January 2011 or February 2011, McGee provided CF with 54Freedom's marketing materials. In March 2011, McGee prepared a summary of CF's portfolio and presented CF with the portfolio summary at an in-person meeting at CF's house on March 9, 2011. The portfolio summary noted the total value of CF's four variable annuities, $505,244.78, the cost basis of the variable annuities, $200,000, the anticipated gains associated with the surrender of the variable annuities, $300,000, the estimated taxes due as a result surrendering the variable annuities, $100,000, and the surrender charges that CF would incur if she surrendered the variable annuities, $36,516.60. During the meeting in CF's house, McGee prepared, and CF signed, forms to surrender the four variable annuities.

When CF surrendered the four variable annuities, the actual value of the annuities was $492,642. In the days following McGee's preparation and submission of the variable annuity surrender documents, Hartford and Pacific Life issued checks to CF totaling $454,998.75. The surrender charges on the four variable annuities totaled $36,202.50. The remainder of the funds from the surrender of the variable annuities, $1,440.75, went toward taxes and administrative fees.

---

[2]   McGee moved into 54Freedom's offices in late 2010 or early 2011. McGee, however, did not notify Cadaret Grant of the move until December 2011. On December 5, 2011, McGee informed Cadaret Grant of his new address, and Cadaret Grant filed an updated Form U4 with FINRA to reflect McGee's address change.

On March 17, 2011, McGee met CF at her house, drove her to the bank, completed deposit slips for the deposit of the surrender checks into CF's checking account, and directed CF to write a check payable to 54Freedom in the amount of $454,998.75. McGee then left with CF's check, and he immediately went to the 54Freedom's office to deliver the funds. McGee did not provide CF with any documentation related to the transaction.

D.    McGee Does Not Inform CF of the Compensation He Received for Her Purchase of 54Freedom's Charitable Gift Annuity

In anticipation of CF's receipt of the surrender checks from Hartford and Pacific Life, McGee prepared an analysis reflecting the compensation he expected to receive from 54Freedom for CF's purchase of the charitable gift annuity. He calculated that his compensation for the sale would be $49,264, or 10 percent of the actual value of CF's variable annuities prior to the deduction of the surrender charges. On March 25, 2011, eight days after McGee delivered CF's funds to 54Freedom, 54Freedom provided McGee with a check, signed by Griffin, in the amount of $49,264.[3] McGee testified that he knew that the compensation was for CF's purchase of the 54Freedom charitable gift annuity, and that it was one of the 10 largest commissions of his career. McGee, however, did not inform CF that he expected to receive compensation in connection with her investment with 54Freedom.

E.    54Freedom's Use of CF's Investment

On the day that McGee hand-delivered CF's check to 54Freedom, 54Freedom had only $100 in its account. Between January 2011 and May 2011, the only deposit into 54Freedom's account was CF's check for $454,998.75. Over the next several weeks, Griffin used CF's funds not only to pay McGee, but also to fund several of Griffin's other 54Freedom-affiliated enterprises.

Between April 2011 and May 2011, 54Freedom, through Griffin, began using CF's funds to implement her charitable gift annuity. 54Freedom purchased three Lincoln Financial fixed indexed annuities, totaling $254,998, on behalf of CF. Griffin also made charitable donations of $175,000 to three organizations in CF's name.[4] Each of the "charities" was related to 54Freedom, Griffin, or McGee.

Griffin donated $85,000 to "The American Legion Harvey W. Seeds Post #29," which, in reality, was 54Freedom's call center in Miami, Florida. Griffin also donated $50,000 to

---

[3]    McGee received an additional $10,000 from 54Freedom, $5,000 in September 2011 and $5,000 in January 2012, based on CF's purchase of the 54Freedom charitable gift annuity.

[4]    CF invested $454,998.75 with 54Freedom. Our review of the evidence demonstrates 54Freedom used CF's funds in the following manner: (1) $254,998 for the Lincoln Financial fixed indexed annuities; (2) $175,000 for donations to "charities;" and (3) $49,264 for McGee's compensation. These three amounts total $479,262, which exceeds CF's investment by $24,263.25. The record does not explain this discrepancy.

FINRA 005868

"Creative Healing Connections," an entity founded by an individual who was McGee's customer and someone with whom McGee and Griffin played golf. Finally, Griffin donated $40,000 to "54Freedom Foundation,"[5] which, in turn, donated $25,000 to the "Blind Children's Center," an entity established by a 54Freedom board member. 54Freedom received 40 to 50 percent of the $175,000 that Griffin disbursed as charitable donations as "finder's fees" for its services.

     F.     **CF Hires an Attorney to Assist Her in Locating McGee and Her Investment with 54Freedom**

Between March 2011, when CF gave McGee the funds to purchase the 54Freedom charitable gift annuity, and April 2012, CF testified that McGee provided her with no information concerning her investment with 54Freedom. Accordingly, CF hired an attorney to assist her with communicating with McGee and locating the funds that she had given McGee. CF testified that she hired an attorney "[b]ecause I wasn't getting any answers to what [] McGee had done with my money[,] and it just seemed like something was terribly wrong."[6]

CF's attorney reached McGee in mid-June 2012. On June 18, 2012, McGee sent CF's attorney a letter "[i]n response to your letter dated June 14, 2012 and to follow-up with our phone conversation of this morning . . . ." McGee provided CF's attorney with the contact information of Griffin and a second 54Freedom executive. McGee also summarized the facts surrounding CF's surrender of the variable annuities and purchase of the 54Freedom charitable gift annuity:

> On several occasions[,] while discussing what options [CF] has to choose from[,] she offered to "give" me her money. I declined as I did not[,] nor could not[,] be responsible for same. I recommended she donate to charity to receive tax deductions and introduced her to a local charitable gifting firm, 54Freedom. After this occurred[,] I no longer was involved in any further process of her donations.[7]

---

[5]     CF's donation was the only donation that 54Freedom Foundation received in 2011.

[6]     Correspondence from CF's attorney to CF, dated April 2012, states that CF had a tax liability totaling $16,000 for fiscal year 2011, legal expenses associated with the attorney's efforts to communicate with McGee, and accounting expenses for the preparation of CF's taxes for fiscal year 2011. The attorney's correspondence states that CF needed to communicate with McGee, at a minimum, to have him liquidate a portion of CF's investment with 54Freedom to pay the tax bill and legal and accounting fees.

[7]     In December 2010, CF gave McGee two checks, totaling $13,000, made out to "cash." CF testified that McGee stated he needed the funds to assist him with establishing his new business. CF testified that McGee told her that his new business was named 54Freedom.

SPA-30

G.    Cadaret Grant's Investigation

CF's attorney was not satisfied with McGee's response, and, on August 1, 2012, he sent a letter to Cadaret Grant's compliance department. The attorney's letter briefly recounted CF's surrender of the variable annuities and purchase of the charitable gift annuity. CF's attorney concluded that "these investments were undertaken with reckless disregard of penalties and/or other losses[,] which might be incurred by my client . . . [and m]y client demands the return of her initial investment and repayment of the penalties[,] which she incurred." Upon receipt of CF's attorney's letter, Cadaret Grant initiated an internal investigation.[8]

On August 13, 2012, the compliance officer made an unannounced visit to McGee's office to ask him about the transaction involving CF and 54Freedom. McGee told the compliance officer that he had done "consulting" work for 54Freedom, but, as far as CF was concerned, he had "handed [her] off to Griffin." The compliance officer was skeptical. As an initial matter, McGee's customer file concerning CF contained documents related to the surrender of the variable annuities and purchase of the 54Freedom charitable gift annuity. Moreover, when the compliance officer asked McGee if he had been paid in relation to CF's transactions, McGee said he had not. But later in that same conversation, McGee acknowledged that he had received a "referral fee" of about $50,000 from 54Freedom. McGee, however, denied that the payment was connected to any specific transaction.[9] After the compliance officer met with McGee about CF and 54Freedom, he "deduce[d] very quickly that there was more involvement than a simple hand-off."[10]

Cadaret Grant permitted McGee to resign. CF's attorney contacted Lincoln Financial, and Lincoln Financial refunded CF $254,998, the amount of the premiums that 54Freedom had paid on behalf of CF for the three fixed indexed annuities. The remainder of CF's original investment with 54Freedom, $200,000, remains unreturned.

---

[8]    During the course of the internal investigation, Cadaret Grant pulled and reviewed each of the annual compliance questionnaires that McGee completed between 2007 and 2011. On each questionnaire, McGee certified that he had "disclosed all business-related email addresses to Cadaret Grant," and that he had not been "involved in any offers or sales of any security, or any type of investment, whether or not registered with the [Commission] that were not processed through Cadaret Grant . . . without written permission from Cadaret Grant."

[9]    McGee provided a similar account of events to his supervisor at Cadaret Grant. McGee told his supervisor that he was paid for "consulting work and marketing" by 54Freedom, but that "he did not receive any compensation directly related to transactions for [CF]."

[10]    In notes summarizing his investigation, the compliance officer observed that he had "to repeatedly ask [McGee] the same questions in different ways and at different times" to get him to provide details. The compliance officer also noted that McGee's explanations "were not consistent throughout the interview or in subsequent conversations."

H.  Griffin's Indictment and Arrest for Fraud

In July 2015, Griffin was arrested on charges that he engaged in mail fraud, wire fraud, and unlawful monetary transactions to perpetuate the mail fraud and wire fraud.[11] The criminal complaint, alleged that Griffin and his 54Freedom enterprises fraudulently induced investors to purchase 54Freedom's charitable gift annuities by misrepresenting that the annuities would be issued by a highly-rated, major insurance carrier, and the annuity, which was a pivotal feature of the charitable gift annuity package, would provide investors with guaranteed lifetime income. The criminal complaint also alleged that Griffin converted the $1.6 million in funds that he received from the purchasers of 54Freedom charitable gift annuities to pay personal expenses and 54Freedom's liabilities. Griffin has been released on bond, subject to certain conditions, and the criminal proceeding is pending.

One week after Griffin's federal criminal indictment and arrest, the Commission filed a follow-on federal civil action in federal court.[12] The Commission's complaint alleged that Griffin, 54Freedom's Chief Financial Officer, the 54Freedom enterprises, and Griffin's wife raised at least $8 million from at least 125 investors through the offer and sale of 54Freedom's shares, promissory notes, and charitable gift annuities.[13] Specifically, the Commission asserted that Griffin and the other defendants,

> [F]raudulently induced individual investors to purchase 54Freedom securities – i.e., its stock, promissory notes[,] and "charitable gift annuities" – with materially false and misleading oral and written projections and promises regarding 54Freedom share price increases, stock listings, revenue projections, the safety of the securities, and 54Freedom's use of investor proceeds. Defendant James Griffin created and controlled 54Freedom and orchestrated the fraud.

The Commission's federal civil action has been stayed pending the resolution of Griffin's federal criminal case.

---

[11]  *U.S. v. Griffin*, Criminal Docket No. 5:15-cr-00207-FJS (N.D.N.Y., Filed July 22, 2015).

[12]  *SEC v. Griffin*, Civil Docket No. 5:15-cv-00927-FJS (N.D.N.Y., Filed July 30, 2015).

[13]  With respect to 54Freedom's charitable gift annuity, the product that CF purchased, the Commission's complaint states that 54Freedom marketed and sold $2 million in charitable gift annuities to 16 investors and paid only $30,000 in annuity payments to the investors. The Commission's complaint also states that, "Griffin and 54Freedom misappropriated nearly $1.5 million of the $2 million entrusted to the 54Freedom Foundation by the [charitable gift annuity] investors."

II.  <u>Procedural History</u>

FINRA's Department of Enforcement initiated its investigation of this matter when Cadaret Grant filed McGee's Uniform Termination Notice for Securities Industry Registration ("Form U5") with FINRA in October 2012. McGee's Form U5 stated that Cadaret Grant had permitted McGee to resign for "fail[ing] to disclose an outside business activity in violation of firm policies and procedures."

In November 2013, Enforcement filed a five-count complaint against McGee. The first cause of action alleged that McGee violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Exchange Act Rule 10b-5, and FINRA Rules 2020 and 2010 because he willfully engaged in securities fraud in two aspects.[14] First, Enforcement argued that McGee misrepresented a material fact when he allegedly told CF that she was facing a large tax liability and needed to make charitable donations to offset that tax liability, and, second, McGee omitted a material fact when he failed to inform CF of the compensation he received in connection with her purchase of the 54Freedom charitable gift annuity.

The second cause of action alleged that McGee violated NASD Rule 2310, NASD IM-2310-2, and FINRA Rule 2010 because his recommendation that CF surrender the variable annuities and purchase the charitable gift annuity was unsuitable. The third cause of action alleged that McGee violated FINRA Rules 3270 and 2010 because he engaged in undisclosed outside business activities through his business relationship with 54Freedom. The fourth cause of action alleged that McGee violated Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010 because he willfully failed to timely update his Form U4 to reflect that he moved his office to 54Freedom's premises. The fifth cause of action alleged that McGee violated NASD Rule 2110 and FINRA Rule 2010 because he provided false information to Cadaret Grant when he submitted five annual compliance questionnaires, in which he misrepresented that he had disclosed all of his business-related email addresses, and that he had not been involved in the offer or sale of any unapproved investment product.

A five-day hearing took place in Syracuse, New York, in June 2014. Nine witnesses testified at the hearing, including McGee, CF, a FINRA examiner, five individuals who were registered with Cadaret Grant, and an individual who co-managed CF's account with McGee at McGee's prior firm. The Hearing Panel issued its decision in December 2014, affirming the allegations of the complaint in all but one respect. The Hearing Panel determined that a preponderance of the evidence failed to establish that McGee represented to CF that she faced a tax liability, and that she needed the charitable deductions to offset that tax liability. The Hearing Panel dismissed the portion of the complaint related to CF's purported tax liability. The Hearing Panel barred McGee for failing to inform CF of his compensation from 54Freedom and making unsuitable recommendations to CF and ordered McGee to pay restitution to CF and disgorge the commissions that he had earned from CF's purchase of the charitable gift annuity. The Hearing Panel assessed, but declined to impose, sanctions for engaging in undisclosed

---

[14]    We discuss the rules in effect when the conduct occurred.

outside business activities, willfully failing to timely update his Form U4, and providing false information to his firm on the compliance questionnaires. This appeal followed.

III.  Discussion

As explained below, we affirm the Hearing Panel's findings for each of the five causes of action.

A.  McGee Engaged in Fraud, in Violation of the Exchange Act and FINRA's Rules

The Hearing Panel found that McGee omitted a material fact, i.e., his compensation from 54Freedom, in connection with CF's surrender of the Hartford and Pacific Life variable annuities and purchase of the 54Freedom charitable gift annuity.[15] The Hearing Panel also determined that McGee acted with scienter when he failed to inform CF of his compensation from 54Freedom. The Hearing Panel concluded that McGee's failure to disclose his 54Freedom compensation to CF constituted securities fraud, and that it was a willful violation of Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5, and FINRA Rules 2020 and 2010. We affirm the Hearing Panel's findings.

1.  Fraud Under the Exchange Act

Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 prohibit fraudulent and deceptive acts and practices in connection with the purchase or sale of a security. Section 10(b) of the Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

In this case, the Hearing Panel found, and we agree, that McGee failed to disclose his compensation from 54Freedom, in violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. To establish a violation of these antifraud provisions, a preponderance of the evidence must demonstrate that: (1) McGee "made . . . a material omission if [he] had a duty to speak;" (2) McGee made the material omission "in connection with the purchase or sale of a security;" and (3) McGee "act[ed] with scienter" when he made the material omission.[16] *SEC v.*

---

[15]    Neither party requested our review of the Hearing Panel's dismissal of the fraud, as it related to McGee's alleged representations to CF concerning her tax liability and the necessity of charitable deductions to offset that liability. On appeal, we decline to exercise our discretion to review a finding that neither party appealed.

[16]    Liability under Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 also requires proof that McGee used "means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange." 17 C.F.R. § 240.10b-5. The jurisdictional element of the case is satisfied because McGee communicated with CF via telephone, sent CF's surrender forms to Hartford via US mail, and sent her surrender forms to Pacific Life via facsimile. *See SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865 (S.D.N.Y. 1997)

[Footnote continued on next page]

*First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *see also William Scholander*, Exchange Act Release No. 77492, 2016 SEC LEXIS 1209, at *14 (Mar. 31, 2016) (explaining that securities fraud is established when the applicants "used any means or instrumentality of interstate commerce or of the mails . . . to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . with scienter . . . in connection with the purchase or sale of securities"). We discuss each element in turn.

        a.    <u>McGee Made a Material Omission When He Had a Duty to Speak</u>

McGee failed to inform CF of the compensation that he received from 54Freedom for her purchase of the company's charitable gift annuity. It is undisputed that McGee did not tell her about the compensation before she surrendered the Hartford and Pacific Life variable annuities and purchased the 54Freedom charitable gift annuity, and McGee did not inform her of the compensation after he received it from 54Freedom.

        *(i)    Duty to Speak*

Liability for failing to disclose material information is "premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella v. United States*, 445 U.S. 222, 230 (1980). "A registered representative owes such a duty to his clients to disclose material information fully and completely when recommending an investment." *Dep't of Mkt. Regulation v. Burch*, Complaint No. 2005000324301, 2011 FINRA Discip. LEXIS 16, at *23 (FINRA NAC July 28, 2011). When a registered representative recommends a security to a customer, the representative has a duty to speak and "must disclose material adverse facts of which [he] is aware," including "adverse interests such as economic self interest that could have influenced [the] recommendation." *Richmark Capital Corp.*, 57 S.E.C. 1, 9 (2003); *see Scholander*, 2016 SEC LEXIS 1209, at *17-22. McGee had an affirmative duty to speak and disclose his 54Freedom compensation to CF because he recommended that CF surrender the Hartford and Pacific Life variable annuities and purchase the 54Freedom charitable gift annuity.

In the proceedings below, McGee, Enforcement, and the Hearing Panel each agreed that the issue of whether McGee had "recommended" that CF surrender the variable annuities, and purchase of the charitable gift annuity, was at the "core" of the disciplinary action because, without the recommendation, the allegations related to the fraud, and, as discussed later, the suitability violations necessarily must fail. We agree.

---

[cont'd]

(determining that the jurisdictional requirements of the federal antifraud provisions are interpreted broadly and are satisfied by intrastate telephone calls or the use of the US mail), *aff'd*, 159 F.3d 1348 (2d Cir. 1998) (Table).

**FINRA 005874**

As he did in the proceedings below, McGee asserts on appeal that he did not recommend that CF surrender the Hartford and Pacific Life variable annuities, and that he did not recommend that CF purchase the 54Freedom charitable gift annuity. Rather, McGee asserts that the idea of surrendering the variable annuities originated with CF. McGee testified that he learned that some of CF's familial relationships had soured, and that she wanted to identify investment alternatives for her estate. McGee stated that he recommended that CF speak to an expert in charitable giving, and that she reach out to Griffin about 54Freedom. McGee stated that he provided CF with Griffin's telephone number, and that he "left [it] in her hands."

According to McGee, on March 7, 2011, CF called him to arrange an in-person meeting at her house two days later. McGee testified that, when he met with CF at her house on March 9, 2011, CF announced, for the first time, that she had talked to Griffin, and that she wanted to sell her variable annuities and invest the proceeds with 54Freedom. McGee stated that CF was "adamant" about selling the variable annuities. McGee testified that he objected to CF's proposed surrender of the variable annuities, pointed out the flaws with the surrender of the policies, and offered CF several alternatives to selling them. According to McGee, CF rejected his alternatives, and she insisted that he process the sale.

McGee similarly denied that he recommended that CF purchase the 54Freedom charitable gift annuity. McGee testified that CF and Griffin had spoken prior to McGee's meeting with CF at her house on March 9, 2011, but he did not know whether Griffin had recommended that CF purchase the 54Freedom charitable gift annuity. McGee also testified that he was not promised any type of compensation for introducing a customer to Griffin or 54Freedom, and that he had no agreement with Griffin or 54Freedom to receive any type of referral compensation.

Despite the myriad of misgivings that McGee expressed about CF's surrender of the variable annuities and purchase of the charitable gift annuity, McGee nevertheless processed CF's transactions. When asked why he did so, McGee testified that he was required to comply with CF's request because she was his "client," and she was "mad" about her deteriorating familial situation. McGee's depiction of the events leading up to CF's surrender of the variable annuities and purchase of the charitable gift annuity defy logic, the Hearing Panel's well-supported credibility determinations, and the overwhelming breadth of the documentary evidence and witness testimony.

The Hearing Panel determined that McGee's version of events was not credible, and it relied on the testimony of other witnesses, such as McGee's assistant, Baker, and the documentary evidence in the record to find that McGee recommended that CF surrender the two Hartford variable annuities, surrender the two Pacific Life variable annuities, and purchase the 54Freedom charitable gift annuity. On appeal, McGee offers us no evidence to overturn the Hearing Panel's credibility determinations.[17] *See Dep't of Enforcement v. Davidofsky*,

---

[17]   Although the Hearing Panel determined that McGee's version of events was not credible, we acknowledge that the Hearing Panel also found that the testimony of CF also was not reliable in certain respects. We therefore relied on the documentary evidence in the record, McGee's own admissions, and Baker's testimony to inform our review of this appeal. With regard to

[Footnote continued on next page]

Complaint No. 2008015934801, 2013 FINRA Discip. LEXIS 7, at *22 (FINRA NAC April 26, 2013) ("[C]redibility determinations of an initial fact-finder, which are based on hearing the witnesses' testimony and observing their demeanor, are entitled to considerable weight and deference and can be overcome only where the record contains substantial evidence for doing so.").

The evidence shows that it was McGee's goal, from even his most preliminary discussions with CF about 54Freedom in December 2011, to have CF purchase a 54Freedom charitable gift annuity. The surrender of the variable annuities was a preliminary, albeit necessary, step for CF to obtain sufficient funds to purchase the charitable gift annuity. The development of McGee's business relationship with Griffin and 54Freedom solidify these facts and demonstrate that McGee's primary interest was not in dealing candidly with CF, but rather, to gird his economically beneficial relationship with Griffin and 54Freedom.

McGee met Griffin in 2008 or 2009.[18] By late 2010, McGee and Griffin proposed to enter into a joint venture, McGee prepared a business plan to initiate the joint venture, and McGee moved his business operations to 54Freedom's offices. Around this same time, McGee began discussing the use of a customer's assets as a "case study" to determine whether 54Freedom "worked," and McGee approached CF about 54Freedom and the company's charitable gift annuity program. In addition, although the events giving rise to it remain unclear, in December 2010, CF gave McGee $13,000 to assist him with a new business, which he had identified to her as 54Freedom. By January 2011 or February 2011, McGee had provided CF with 54Freedom's marketing materials, and, by March 2011, CF had purchased a 54Freedom charitable gift annuity for $454,998.75. McGee's deepening business relationship with Griffin and 54Freedom throughout late 2010 and early 2011 and the other preparatory acts of McGee lead us to conclude that McGee recommended that CF purchase the 54Freedom charitable gift annuity, and that he recommended that she surrender the variable annuities to facilitate the subsequent charitable gift annuity purchase.[19]

---

[cont'd]

Baker, the Hearing Panel determined that his "recollection was clear, and there was no evidence of a motive for him to be untruthful or biased against McGee, with whom he still works and shares clients." McGee also testified that Baker was a "truthful" individual, and McGee did not directly dispute Baker's testimony. Rather, McGee stated that he was unable to recall several of the key events that transpired in this case. We, similar to the Hearing Panel, have looked to Baker's testimony to corroborate the documentary and testimony evidence contained in the record.

[18]  CF's first, and only, contact with 54Freedom occurred when Griffin telephoned her in January 2012, nearly one year after she had purchased the 54Freedom charitable gift annuity.

[19]  For example, when McGee met with CF on March 9, 2011, he had with him all the forms necessary for CF to surrender the Hartford and Pacific Life variable annuities. McGee testified that it was his normal practice to carry a booklet of forms with him to every customer meeting because he spent a significant amount of time out of the office visiting customers. It seems, however, implausibly coincidental that McGee happened to have with him the precise forms

[Footnote continued on next page]

FINRA 005876

(ii)    *Materiality*

An omitted fact is "material" if there is a substantial likelihood that a reasonable investor would have considered the omitted fact important in making an investment decision, and "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). McGee's omission, his compensation from 54Freedom, was a material fact in the context of his recommendation that CF purchase a 54Freedom charitable gift annuity. Indeed, a reasonable investor would have considered 54Freedom's payment to McGee as an important factor to evaluate McGee's recommendation to invest funds with the company. *See, e.g., Scholander*, 2016 SEC LEXIS 1209, at *16-22 (applicants' receipt of $350,000 from the issuer of a security constituted a "material adverse fact[]," which the applicants were required to disclose to customers to whom they recommended the purchase of the security).

At a minimum, the $50,000 payment that McGee received from 54Freedom had the potential to influence McGee's recommendation of 54Freedom's investment products, including its charitable gift annuity to CF. *See id.* at *20-21 (stating that the applicants' receipt of funds from the issuer "casts doubt on the sincerity of [a]pplicants' recommendation to buy [the issuer's] stock"). "When recommending securities to a prospective investor, a securities professional must not only avoid affirmative misstatements but also must disclose 'material adverse facts,' including any self-interest that could influence the salesman's recommendation." *Id.* at *16 (quoting *Richard H. Morrow*, 53 S.E.C. 772, 781 (1998)). Investors, therefore, "must be permitted to evaluate overlapping motivations through appropriate disclosures, especially where one motivation is economic self-interest." *Id.* at *16-17 (quoting *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171-72 (2d Cir. 1970)). As the Commission recently summarized in *Scholander*,

> When a broker-dealer has a self-interest (other than the regular expectation of a commission) in serving the issuer that could influence its recommendation, it is material and should be disclosed. The failure to disclose the . . . payment is, on its own, sufficient to support FINRA's finding of fraud. Applicants' failure to disclose their business relationship with [the issuer] also violated their duty to disclose a conflict of interest to their customers.

*Id.* (internal quotation marks omitted).

McGee's 54Freedom compensation was "other than the regular expect[ed] . . . commission." *Id.* As an initial matter, the compensation came from the issuer, 54Freedom. Second, the basis of McGee's compensation was not the purchase price of CF's charitable gift

---

[cont'd]

necessary for CF to surrender variable annuities from Hartford and Pacific Life, when he claimed to have had no advance notice that CF was planning to do so.

FINRA 005877

annuity. Rather, it was based on the value of CF's variable annuities prior to their surrender. Third, 54Freedom also paid McGee's compensation in three parts. McGee received $49,264 in March 2011, $5,000 in September 2011, and $5,000 in January 2012, for total compensation of $59,264. Finally, McGee's compensation from 54Freedom provided McGee with an economic self-interest and created a potential conflict of interest. McGee was required to disclose his compensation from 54Freedom when he recommended that CF surrender the variable annuities to purchase the 54Freedom charitable gift annuity. His failure to make that requisite disclosure constituted an omission of material fact. *See id.*

        b.      McGee Made the Material Omission in Connection with the Purchase or Sale of a Security

McGee also made the material omission, the compensation that he earned for CF's purchase of the 54Freedom charitable gift annuity, in connection with the purchase or sale of a security. On appeal, McGee argues that 54Freedom purchased Lincoln Financial fixed indexed annuities on behalf of CF, fixed indexed annuities are not securities, and, consequently, he could not have engaged in securities fraud. McGee's arguments miss their intended mark for three reasons. First, McGee's arguments too narrowly construe the phrase, "in connection with the purchase or sale of any security," as it is used in Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. Second, McGee's arguments ignore part one of the two-part strategy that he implemented for CF's investment with 54Freedom – CF's surrender of the Hartford and Pacific Life variable annuities, variable annuities that are securities within the meaning of the federal securities laws. And third, McGee's arguments ignore the fact that he recommended and sold CF a 54Freedom charitable gift annuity, not a Lincoln Financial fixed indexed annuity, and 54Freedom's charitable gift annuities constitute securities within the meaning of the federal securities laws.

        (i)      *The "in Connection with" Requirement Should Be Interpreted Broadly*

McGee's reading of the "in connection with the purchase or sale of any security" is far too narrow. Congress's objectives in promulgating the Exchange Act was to ensure honest securities markets and promote investor confidence. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 658 (1997)). Accordingly, Congress sought "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Zandford*, 535 U.S. at 819 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)). To effectuate its remedial purposes, the Exchange Act should be construed flexibly, not technically and restrictively. *Zandford*, 535 U.S. at 819 (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)). Consistent with the remedial purposes of the Exchange Act, the Supreme Court has adopted a broad reading of "in connection with the purchase or sale of any security," as used in Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. *Zandford*, 535 U.S. at 819.

When interpreting the "in connection with the purchase or sale of any security" language, the Supreme Court has determined that it is sufficient for the material misrepresentation or

material omission to "touch" or "coincide" with the purchase or sale of a security. *See Zandford*, 535 U.S. at 822 ("It is enough that the scheme to defraud and the sale of securities coincide."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction"); *Superintendent of Ins. of NY v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971) (holding that the "in connection with" requirement is satisfied where the customer's harm occurred "as a result of deceptive practices touching [a] sale of securities"). The Supreme Court also has held that a security involved in only one side of a transaction is sufficient. *See Zandford*, 535 U.S. at 820-22. In *Zanford*, for example, the Supreme Court determined that a registered representative engaged in securities fraud, in violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, when the representative convinced a customer to surrender his securities, and then converted the customers' proceeds from the securities sale. *See id.*

In this case, McGee implemented a two-part strategy and failed to disclose his compensation from 54Freedom, in connection with the purchase *and* sale of a security. Part one of the strategy, CF's surrender of the variable annuities, was a necessary first step for McGee to obtain the funds needed to implement part two of the strategy, CF's purchase of the 54Freedom charitable gift annuity. Each part of the two-part strategy was connected to the purchase or sale of a security, i.e., variable annuities, on the one side, and charitable gift annuities, on the other side.[20]

(ii)     <em>Variable Annuities Are Securities</em>

"A variable annuity is an investment product sold by life insurance companies." *Michael A. Horowitz*, Initial Decisions Release No. 733, 2015 SEC LEXIS 43, at *5 (Jan. 7, 2015). The owner of a variable annuity initially invests a sum of money in the annuity, and, subsequently, chooses how to distribute those sums among various sub-accounts, similar to a mutual fund. *See id.* at *5. "A variable annuity is a 'security' within the meaning of the federal securities law." *Horowitz*, 2015 SEC LEXIS 43, at *61 (Jan. 7, 2015); *see SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 67-73 (1959) ("[A]bsent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company. The holder gets only a *pro rata* share of what the portfolio of equity interests reflects – which may be a lot, a little, or nothing."); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001) (explaining that the Supreme Court "conclusively" resolved the question of whether a variable annuity is a security, and stating that, "the [Supreme] Court considered whether variable annuities must be registered as securities . . . [and] the Supreme Court held that . . . variable annuities are properly classified as securities and thus subject to the federal securities statutes. Thus . . . the [Supreme] Court held that variable annuity contracts are in fact securities.").

(iii)     <em>54Freedom's Charitable Gift Annuities Are Securities</em>

Unlike variable annuities, which the Supreme Court has conclusively defined as a security under the federal securities laws, charitable gift annuities present a hybrid investment product, and, consequently, courts differ as to whether all charitable gift annuities are securities

---

[20]     Either of these findings serve as a basis to find that McGee engaged in fraud.

- 17 -

within the meaning of the federal securities laws. *Compare Warfield v. Alaniz*, 569 F.3d 1015, 1020-1024 (9th Cir. 2009) (finding that charitable gift annuities are securities within the meaning of the federal securities laws), *with Riniker v. Locust St. Sec., Inc.*, 2006 Iowa App. LEXIS 1716, at *6 (Iowa Ct. App. May 10, 2006) (finding that charitable gift annuities are not securities within the federal securities). We therefore examine and apply the fact-specific "investment contracts" framework, articulated in *SEC v. W.J. Howey*, 328 U.S. 293 (1946), to determine whether 54Freedom's charitable gift annuities constituted securities within the meaning of the federal securities laws.[21] *See, e.g., Warfield*, 569 F.3d at 1020 (applying the *Howey* investment contracts test to examine whether charitable gift annuities are securities); *SEC v. Bennett*, 904 F. Supp. 435, 436-37 (E.D. Pa. 1995) (same).

To determine whether a particular investment product is a security, a preponderance of the evidence must demonstrate that the investment product involved: (1) "an investment of money;" (2) "in a common enterprise;" (3) "with a reasonable expectation by the investors of profits;" (4) "to be derived from the managerial efforts of others." *Howey*, 328 U.S. at 301; *Warfield*, 453 F. Supp. 2d at 1124 (enumerating the *Howey* factors), *aff'd*, 569 F.3d 1015 (9th Cir. 2009). When applying *Howey*, the Supreme Court cautioned that the test should be "broadly construed by [] courts so as to afford the investing public a full measure of protection[, and that form should be] disregarded for substance and emphasis was placed upon economic reality." *Howey*, 328 U.S. at 298. The Supreme Court underscored this point and stated that the term, security, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

### (a)  *Investment of Money*

The first factor in the *Howey* investments contracts analysis examines whether there is an investment of money. There is an "investment of money" when an investor provides "some tangible and definable consideration in return for an interest that had substantially the characteristics of a security." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559-560 (1979)); *see also Warfield*, 569 F.3d at 1021 (explaining that the key question on the "investment of money" prong is whether the investor "commit[s] his assets to the enterprise in such a manner as to subject himself to financial loss"). CF made an investment of money to satisfy the first prong of the *Howey* analysis because she purchased the 54Freedom charitable gift annuity by

---

[21]    The definition of a "security" within the federal securities laws covers a broad range of transactions. *See Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1123 (D. Ariz. 2006) (noting that Congress's purpose in enacting the federal securities laws was to regulate investments "regardless of the form they take or the name that they are called"). Although charitable gift annuities are not enumerated among the investment products identified as securities in the federal securities laws, the specified term, "investment contract," has been identified as a catch-all provision to determine whether a particular investment product meets the definition of a security. *See* Louis Loss & Joel Seligman, *Securities Regulations*, § 3-A-1(a)(i) (3d ed. 2006).

SPA-41

surrendering four variable annuities, obtaining the proceeds from the annuities in cash, and remitting the cash to 54Freedom by way of McGee.[22]

(b)    *Common Enterprise*

The second factor in the *Howey* investments contracts analysis examines whether there is a "common enterprise."[23] Courts have established three distinct tests for whether a common enterprise exists: "horizontal" commonality, "broad vertical" commonality, and "strict" or "narrow" vertical commonality. All three types of commonality exist here.

Horizontal commonality existed because 54Freedom pooled investors' funds in its bank accounts. *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 543 (D.C. Cir. 1996) (explaining that horizontal commonality is "defined by the pooling of investment funds, shared profits, and shared losses."); *Clifton*, 2013 SEC LEXIS 2022, at *32 n.55 (indicating that a "pooling of interests among more than one investor" would suffice to demonstrate a common enterprise). Broad vertical commonality existed because CF, similar to the other purchasers of 54Freedom's charitable gift annuities, played no part in how 54Freedom handled their investments. *See SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005) (explaining that broad vertical commonality exists where the investors depend on "the expertise or efforts of the investment promoter for their returns"). Finally, strict, also known as narrow, vertical commonality existed in this case because the investors' profits or losses from their investments in 54Freedom depended on the success or failure of 54Freedom. *See Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982) (asserting that strict vertical commonality requires proof that there is a direct relationship between the success or failure of the promoter and that of the investors); *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973) (stating that strict vertical commonality exists where the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties").

(c)    *Expectation of Profits*

The third factor in the *Howey* investments contracts analysis examines whether the investors had a reasonable expectation of profits. Investors are led to expect "profits" when they are led to expect income or return, including, for example, dividends, other periodic payments, or the increased value of the investment. *See SEC v. Edwards*, 540 U.S. 389, 394 (2004) (noting that "investments pitched as low-risk (such as those offering a 'guaranteed' fixed return) are particularly attractive to individuals more vulnerable to investment fraud"). The examination of

---

[22]    Hartford and Pacific Life sent CF four checks, representing the surrender value of each of the four variable annuities. On the day that CF purchased the 54Freedom charitable gift annuity, McGee drove her to the bank, where she deposited the four checks into her checking account, and wrote a single check payable to 54Freedom.

[23]    The Commission has held that a "common enterprise" is "not a distinct requirement under *Howey*." *Johnny Clifton*, Exchange Act Release No. 69982, 2013 SEC LEXIS 2022, at *32 n.55 (July 12, 2013).

whether an investor has a reasonable expectation of profits is an objective standard based on what the purchasers were led to expect. *See Warfield*, 569 F.3d at 1020-22. As 54Freedom's marketing materials touted,

> The 54Freedom Program . . . [c]reates a tax deduction through a charitable contribution, which allows the individual or married person to mitigate any taxable events while creating a better balanced portfolio[, and] . . . [n]ot only increases assets for the estate and future generations[,] but creates a charitable donation legacy for the family, including the opportunity to "Live the Gift."

The investors in 54Freedom's charitable gift annuity program expected to receive income tax deductions and periodic, fixed streams of income for life, which, collectively, constitute profits for purposes of the *Howey* investment contracts test. *See Warfield*, 453 F. Supp. 2d at 1124 n.4 (stating that, "the investors clearly expected a return on their investment in the form of annuity payments, tax benefits, and at the investors death, the return of the gift to a charity or charities designated by that investor").

### (d)    *Managerial Efforts of Others*

The final factor of the *Howey* investment contracts test, which examines whether the profits are "the product of the efforts of a person other than the investor," is also satisfied. *Warfield*, 569 F.3d at 1021. CF had no involvement in the management of 54Freedom, the funds they invested with the company, or the "charitable organizations," with which the company had affiliations. Because the *Howey* investment contracts test is satisfied,[24] we find that the 54Freedom charitable gift annuity constitutes a security within the meaning of the Exchange Act.[25] Having determined that McGee made a material omission when he had a duty to speak, and that McGee made the material omission in connection with the purchase and sale of securities, we turn to the final factor of our fraud analysis, whether McGee acted with scienter when he made the material omission.

---

[24]     On appeal, McGee asserts that the Lincoln Financial fixed indexed annuities, which 54Freedom purchased on behalf of CF as part of her charitable gift annuity package, are not securities. Because we have determined that McGee recommended and sold CF a 54Freedom charitable gift annuity, and not a Lincoln Financial fixed indexed annuity, we need not reach the issue of whether fixed indexed annuities constitute securities within the meaning of the federal securities laws.

[25]     Although our independent application of the *Howey* investment contract test leads us to conclude that the 54Freedom charitable gift annuity that CF purchased was, in fact, a security, we note that the Commission has reached the same conclusion concerning the same product. *See, e.g., Pamela S. Smith*, Exchange Act Release No. 75565, 2015 SEC LEXIS 3152, at *3-5 (July 30, 2015) (barring insurance agent for material misrepresentations, unsuitable recommendations, unregistered securities sales, and sales as an unregistered securities representative in connection with her sales of 54Freedom charitable gift annuities to customers).

FINRA 005882

- 20 -

c. McGee Acted with Scienter

Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Scholander*, 2016 SEC LEXIS 1209, at \*22 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Scienter includes recklessness, which is conduct that constitutes "an extreme departure from the standards of ordinary care . . . to the extent that the danger [of deceiving investors] was either known to the [applicant] or so obvious that the [applicant] must have been aware of it." *Scholander*, 2016 SEC LEXIS 1209, at \*22. At a minimum, McGee acted recklessly when he failed to inform CF of the $50,000 in compensation that he received from 54Freedom for her purchase of the 54Freedom charitable gift annuity. *See, e.g., id.* at \*22-26 (finding that the applicants "acted at least recklessly" and with the requisite scienter, when they recommended that customers purchase an issuer's shares without disclosing to those customers that the issuer had paid them a few months earlier).

On appeal, McGee argues that he did not act with scienter because he did not identify CF as a "case study" for the 54Freedom charitable gift annuity, he had no financial incentive for CF to surrender her variable annuities because he earned no compensation on the liquidations, and he did not have any economic motive to engage in the conduct. McGee stresses that his compensation from 54Freedom "could have in fact been zero," and that, "it would have been more profitable to . . . McGee to keep the assets and the [variable annuities] under his control." The evidence, however, does not support McGee's arguments.

McGee had an established business relationship with Griffin and 54Freedom that made him privy to the substantial compensation that awaited him after he made the sale of the charitable gift annuity to CF. By March 2011, when CF purchased the 54Freedom charitable gift annuity, McGee had known Griffin for three years, and he had developed a sufficient business relationship with Griffin to relocate his business operations to a rent-free office space on 54Freedom's premises and propose a joint business venture with Griffin and 54Freedom. The 54Freedom marketing materials that McGee provided to CF also informed sales personnel that the company provided "generous street level compensation" of at least eight percent. Finally, we turn to the events of March 9, 2011, the date that CF surrendered the variable annuities, and we note, once again, that McGee had the specific forms on hand necessary for CF to surrender the Hartford and Pacific Life variable annuities. McGee's relationship with Griffin and 54Freedom, 54Freedom's marketing materials, and the events of March 9, 2011, demonstrate that McGee knew that compensation awaited him after he sold a 54Freedom product to CF. McGee's failure to inform CF of this compensation constituted a highly unreasonable omission that presented a danger of misleading CF. *See Scholander*, 2016 SEC LEXIS 1209, at \*17 (explaining that the applicants' failure to disclose a payment from an issuer constituted fraud).

The record in this case establishes that: (1) McGee made a material omission when he had a duty to speak, (2) McGee made the material omission in connection with the purchase or sale of a security, and (3) McGee acted with scienter when he made the material omission. *See First Jersey Sec.*, 101 F.3d at 1467. We therefore affirm the Hearing Panel's findings that

McGee engaged in securities fraud and willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.[26]

### 2. Fraud Under FINRA's Rules

FINRA Rule 2020 is FINRA's antifraud rule. It is similar to, yet, broader than, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.[27] *See Dep't of Enforcement v. Fillet*, Complaint No. 2008011762801, 2013 FINRA Discip. LEXIS 26, at \*38 (FINRA NAC Oct. 2, 2013) (explaining that FINRA Rule 2020 captures a broader range of activity than Exchange Act Rule 10b-5), *aff'd in relevant part*, Exchange Act Release No. 75054, 2015 SEC LEXIS 2142, at \*1 (May 27, 2015). FINRA Rule 2020 prohibits members from "effect[ing] any transaction in, or induc[ing] the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

McGee, as a registered representative, had a duty to disclose all material facts related to CF's surrender of the variable annuities and purchase of the 54Freedom charitable gift annuity, particularly the information concerning the unusually large compensation that he received from the company. *See Fillet*, 2015 SEC LEXIS 2142, at \*32-33 (holding that the omission of material information, including material adverse facts, from an investor violates FINRA's antifraud rule). McGee violated this duty. McGee knew that his sale of the 54Freedom charitable gift annuity to CF would result in compensation to him, but he purposely withheld this material information from CF. McGee, acting with scienter, induced CF to surrender her variable annuities and purchase a 54Freedom charitable gift annuity by means of fraud and deception, in violation of FINRA Rule 2020. *See id.*; *Scholander*, 2016 SEC LEXIS 1209, at \*15 (stating that, "[a] violation of Exchange Act Section 10(b) also constitutes a violation of FINRA Rule 2020, which prohibits FINRA members from 'effect[ing] any transaction in, or

---

[26]  McGee's willful violation of Section 10(b) of the Exchange Act and Exchange Act 10b-5 results in his statutory disqualification. *See Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) ("'[W]illfully' in [the Exchange Act] means intentionally committing the act which constitutes the violation," not that "the actor [must] also be aware that he is violating one of the Rules or Acts."); *Robert Marcus Lane*, Exchange Act Release No. 74269, 2015 SEC LEXIS 558, at \*3 n.2 (Feb. 13, 2015) (stating that applicants were statutorily disqualified because they willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5); *see also* Sections 3(a)(39)(F) (15 U.S.C. § 78c(a)(39)(F)) and 15(b)(4)(D) (15 U.S.C. § 78o(b)(4)(D)) of the Exchange Act; Article III, Section 4 of FINRA's By-Laws.

[27]  Conduct that violates the Commission's or FINRA's rules, including the antifraud rules, is inconsistent with "high standards of commercial honor and just and equitable principles of trade" and violates FINRA Rule 2010. *See Scholander*, 2016 SEC LEXIS 1209, at \*15-16. FINRA Rule 2010, which generally apply to FINRA "members," is applicable to associated persons pursuant to FINRA Rule 0140(a).

induc[ing] the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance'").[28]

   B.   McGee's Recommendation That CF Surrender the Variable Annuities and
        Purchase the Charitable Gift Annuity Was Unsuitable

   The Hearing Panel found that McGee made an unsuitable recommendation to CF when he recommended that she surrender the Hartford and Pacific Life variable annuities to purchase the 54Freedom charitable gift annuity. The Hearing Panel concluded that McGee's recommendation to CF lacked customer-specific and reasonable basis suitability, in violation of NASD Rule 2310, NASD Interpretative Material ("IM") 2310-2, and FINRA Rule 2010. We affirm the Hearing Panel's findings.

   When recommending the purchase, sale, or exchange of any security, NASD Rule 2310 required registered representatives, such as McGee, to "have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs." NASD Rule 2310(a). NASD IM-2310-2 explained that, "[i]mplicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of [FINRA's r]ules, with particular emphasis on the requirement to deal fairly with the public." NASD IM-2310-2(a)(1).[29] McGee's investment recommendations resulting in CF's surrender of the variable annuities and purchase of the 54Freedom charitable gift annuity failed CF, and they demonstrate that McGee did not meet the standards necessary to satisfy customer-specific or reasonable basis suitability in this case.[30]

---

[28]   McGee states that he did not engage in fraud because neither Cadaret Grant nor CF's attorney found that he engaged in fraud. Cadaret Grant's and CF's attorney's investigations of this matter, however, are irrelevant. *Cf. Dep't of Enforcement v. Taylor*, Complaint No. C8A050027, 2007 NASD Discip. LEXIS 11, *29 n.15 (NASD NAC Feb. 27, 2007) (explaining that FINRA "is not bound by" another adjudicator's investigation or findings, and that FINRA's investigations and disciplinary actions are independent of other investigations or adjudications). We, not Cadaret Grant or CF's attorney, have been tasked with the determination of whether McGee failed to disclose his compensation to CF, engaged in fraud, and violated the Commission's and FINRA's antifraud rules. We have made that determination.

[29]   NASD Rule 2310 and NASD IM-2310-2 have been superseded by FINRA Rule 2111, effective July 9, 2012. *See Regulatory Notice 11-25*, 2011 FINRA LEXIS 45, at *2-4 (May 2011). A violation of FINRA's suitability rule also violates FINRA Rule 2010. *See Richard G. Cody*, Exchange Act Release No. 64565, 2011 SEC LEXIS 1862, at *26 (May 27, 2011).

[30]   As he did in the context of fraud, the bulk of McGee's appellate arguments concerning customer-specific and reasonable basis suitability focus on whether he recommended that CF surrender the variable annuities and purchase the 54Freedom charitable gift annuity. We have dispensed with this issue in Part III.A.1.a.i. (Duty to Speak), finding that McGee made the requisite "recommendation" for purposes of FINRA's antifraud and suitability rules.

1.   Customer-Specific Suitability

Customer-specific suitability requires that a "recommendation be consistent with the customer's best interests and financial situation." *Dep't of Enforcement v. Siegel*, Complaint No. C05020055, 2007 NASD Discip. LEXIS 20, at *37 (NASD NAC May 11, 2007), *aff'd*, Exchange Act Release No. 58737, 2008 SEC LEXIS 2459 (Oct. 6, 2008), *aff'd in relevant part*, 592 F.3d 147 (D.C. Cir. 2010). McGee asserts that he did not violate customer-specific suitability because CF was a "sophisticated and experienced [money] manager" for whom the surrender of the variable annuities and purchase of the charitable gift annuity was appropriate. McGee's arguments are contrary to the evidence in the record.

The recommended transaction was not suitable for CF in light of her net worth, investment objectives, financial sophistication, and the substantial surrender fees that she incurred as a result of the transactions. When McGee recommended that CF surrender the Hartford and Pacific Life variable annuities and purchase the 54Freedom charitable gift annuity CF was a 71-year-old retiree, with a monthly income of approximately $1,000, who would need to rely on her retirement savings to sustain her for the remainder of her life. She relied on McGee for the management of her investment portfolio, and, over the four years that McGee serviced CF's account, he became familiar with CF, her investment objectives, risk tolerance, and lack of financial sophistication. Indeed, during the hearing, McGee testified that CF was "frugal" and "very nervous about taxes."

Despite this familiarity, McGee recommended that CF surrender 59 percent of her net worth and invest the entirety of the proceeds with a single company – 54Freedom.[31] He also implemented this investment strategy, knowing that CF's sale of the variable annuities would result in surrender fees of more than $36,000.[32] McGee's recommendation of the surrender of the variable annuities, and purchase of the 54Freedom charitable gift annuity, was wholly at odds with CF's stated investment objective ("long term growth") and risk tolerance ("moderate"). McGee's recommendation did not meet the standards for customer-specific suitability. *See Dane S. Faber*, 57 S.E.C. 297, 310 (2004) ("A recommendation is not suitable merely because the customer acquiesces in the recommendation.").

---

[31]   The value of the four variable annuities was $492,640, or 59 percent, of CF's total net worth of $842,000. But McGee did not manage all of CF's funds. CF maintained $258,000 in a TIAA account, which was not under McGee's management. The four variable annuities constituted 84 percent of the $584,000 that McGee managed.

[32]   CF incurred surrender fees totaling $36,202.50. This amount represented more than seven percent of the total value of CF's variable annuities, which had been purchased a few years, and, in one instance, a few months, earlier. CF had held variable annuities for periods ranging from nine to 41 months.

2.    Reasonable Basis Suitability

    In contrast to customer-specific suitability, the reasonable basis test "relates only to the particular recommendation, rather than to any particular customer." *Siegel*, 2007 NASD Discip. LEXIS 20, at \*37 (quoting *F. J. Kaufman and Co.*, 50 S.E.C. 164, 168 (1989)). A registered representative's "recommendation may lack 'reasonable basis' suitability if the broker . . . fails to understand the transaction, which can result from, among other things, a failure to conduct a reasonable investigation concerning the security." *Id.* at \*38. McGee argues that the transaction did not lack reasonable basis suitability because he conducted due diligence on Griffin and 54Freedom. McGee lists his due diligence:

> [He] researched and reviewed 54F[reedom]'s website; . . . reviewed marketing materials from 54F[reedom]; . . . talked to people in Cazenovia[, New York,] and determined that [] Griffin had a great reputation in the community; . . . met with [] Griffin and other members of 54F[reedom]; . . . talked to [] Griffin on a number of occasions prior to March of 2011[] and knew him since approximately 2008; . . . learned that [] Griffin ran state of the county presentations in his office; . . .[] was aware that [54Freedom] did a seminar series with the [Internal Revenue Service]; . . . [] was knowledgeable of 54F[reedom]'s offices including an office that was approximately 15,000 square feet; . . . [] visited 54F[reedom]'s call center in Florida; [and learned that] 54F[reedom] was the "hub of Cazenovia[, New York]" back in 2011.

    We acknowledge McGee's activities. But these activities are insufficient to satisfy the due diligence requirements of reasonable basis suitability. By McGee's own estimation, his due diligence was limited to reviewing the company's website and marketing materials, visiting the company's call center and office, and having social engagements with Griffin and others in the Cazenovia, New York, area.[33] McGee knew virtually nothing about charitable gift annuities, 54Freedom, or 54Freedom's charitable gift annuity program. McGee knew nothing about 54Freedom's financial condition, nor did he perform any due diligence on their operations. Indeed, he did not know if anyone else actually had purchased a 54Freedom charitable gift annuity. McGee failed to conduct sufficient due diligence on charitable gift annuities, 54Freedom, and 54Freedom's charitable gift annuity program to recommend that CF surrender her variable annuities and purchase a 54Freedom charitable gift annuity. Consequently, McGee's recommendation lacked customer-specific and reasonable basis suitability, in violation of NASD Rule 2310, NASD IM 2310-2, and FINRA Rule 2010.

---

[33]    During Cadaret Grant's internal investigation, Cadaret Grant's chief compliance officer asked McGee, "[W]hat did you do to investigate and check out 54Freedom[,] and the people involved in it[,] besides playing golf and drinking beers?" Cadaret Grant's chief compliance officer testified that she "didn't get a good response" to that question.

SPA-48

C. _McGee Engaged in Undisclosed Outside Business Activities_

The Hearing Panel found that McGee violated FINRA Rules 3270 and 2010 because he failed to inform Cadaret Grant in writing of the full extent of his business relationship with 54Freedom. We affirm the Hearing Panel's findings.

FINRA Rule 3270 prohibits registered persons from engaging in any outside business activity unless the registered person has provided written notice to the firm.[34] The rule states, "[n]o registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member." FINRA Rule 3270 "ensure[s] that firms 'receive prompt notification of all outside business activities of their associated persons so that the member's objections, if any, to such activities could be raised at a meaningful time and so that appropriate supervision could be exercised as necessary under applicable law.'" _Dep't of Enforcement v. Houston_, Complaint No. 2006005318801, 2013 FINRA Discip. LEXIS 3, at *33 (FINRA NAC Feb. 22, 2013) (quoting _Proposed Rule Change by NASD Relating to Outside Business Activities of Associated Persons_, Exchange Act Release No. 26063, 1988 SEC LEXIS 1841, at *3 (Sept. 6, 1988)), _aff'd_, Exchange Act Release No. 71589, 2014 SEC LEXIS 614 (Feb. 20, 2014).

McGee informed Cadaret Grant that he acted as an independent insurance agent when he joined the firm in April 2007. McGee, however, did not disclose his business relationship with 54Freedom to Cadaret Grant until August 2012, when the firm received the letter from CF's attorney. On appeal, McGee asserts that no disclosures concerning 54Freedom were necessary because 54Freedom was an insurance company and he received all compensation from 54Freedom in his capacity as an insurance agent, and, to the extent disclosures were necessary, his initial disclosures to the firm were sufficient. McGee's arguments demonstrate a profound misunderstanding of FINRA Rule 3270.

FINRA Rule 3270 covers an array of non-securities-related activities, transactions, and relationships that take place outside of the registered person's employment with the member firm. _See Harry Friedman_, Exchange Act Release No. 64486, 2011 SEC LEXIS 1699, at *20 (May 13, 2011) (explaining that, "[NASD] Rule 3030 [the predecessor to FINRA Rule 3270] applies only to transactions involving non-securities products") (citing _NASD Notice to Members 01-79_, 2001 NASD LEXIS 85, at *2-3 (Dec. 2001)). Consequently, McGee's labeling of 54Freedom as an insurance company, himself as an insurance agent, and his compensation from 54Freedom as insurance commissions is irrelevant. The relevant inquiry before us is whether McGee provided Cadaret Grant with written notice of his business relationship with 54Freedom. He did not.

---

[34] A violation of FINRA Rule 3270 constitutes a violation of FINRA Rule 2010. _See Dep't of Enforcement v. Moore_, Complaint No. 2008015105601, 2012 FINRA Discip. LEXIS 45, at *25 (FINRA NAC July 26, 2012).

SPA-49

McGee's relationship with 54Freedom was not limited to networking and referrals, as McGee claims. McGee, Griffin, and 54Freedom were business partners. McGee accepted rent-free office space from 54Freedom,[35] began forming a joint venture with Griffin and 54Freedom, and received compensation from 54Freedom for selling the company's charitable gift annuity to CF. The narrow disclosure that McGee provided to Cadaret Grant when he joined the firm was insufficient to notify the firm of his extensive and ongoing business relationship with 54Freedom. McGee's business relationship with Griffin and 54Freedom was outside the scope of his employment with Cadaret Grant, and his failure to disclose the relationship to Cadaret Grant violated FINRA Rules 3270 and 2010.

D.  McGee Failed to Timely Update His Form U4 to Disclose His Move to
    54Freedom's Offices

The Hearing Panel found that McGee violated Section 2(c) of Article V of FINRA's By-Laws and FINRA Rules 1122 and 2010 because he failed to timely update his Form U4 to reflect moving his business operations to 54Freedom's premises. We affirm the Hearing Panel's findings.

Section 2(c) of Article V of FINRA's By-Laws states that every application for registration, including the Form U4, must be kept current at all times by filing supplementary amendments within 30 days of learning of the facts or circumstances giving rise to the amendment. FINRA Rule 1122 underscores the requirements of Section 2(c) of Article V of FINRA's By-Laws and states, "[n]o member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof." The duty to provide accurate information and amend the Form U4 to provide current information assures that "regulatory organizations, employers, and members of the public have all material, current information about the securities professional with whom they are dealing." *Richard A. Neaton*, Exchange Act Release No. 65598, 2011 SEC LEXIS 3719, at \*17-19 (Oct. 20, 2011). McGee's failure to timely update his Form U4 to update the change in his business address violated FINRA's rules.

It is undisputed that McGee did not update his business address on the Form U4 until December 5, 2011. McGee, however, argues on appeal that he moved to 54Freedom's premises in late 2011 or early 2012, and, accordingly, he asserts that his Form U4 update was timely. McGee's own statements contradict this argument.

---

[35]     Each party has provided briefing on how McGee's rent-free use of 54Freedom's premises should factor into our outside business activity analysis. McGee's use of 54Freedom's premises informs our analysis only to the extent that it speaks to the nature and depth of the business relationship between McGee and Griffin and 54Freedom. We decline to consider whether McGee's rent-free use of 54Freedom's premises should constitute "compensation" for purposes FINRA's outside business activities rule.

SPA-50

McGee provided on-the-record testimony to the Commission in 2012 and to FINRA in 2012 and 2013. During each interview, McGee stated that he moved to 54Freedom's premises in late 2010 or early 2011,[36] and that he was operating his business from 54Freedom's premises when the events with CF transpired in March 2011. McGee's assistant, Baker, provided a similar late 2010 or early 2011 timeframe for the move when he testified at his on-the-record testimony. The Hearing Panel therefore concluded that McGee was not credible when he testified at the hearing that the move occurred in late 2011 or early 2012.[37] McGee has not provided any evidence to overturn the Hearing Panel's credibility determination on appeal. *Cf. Davidofsky*, 2013 FINRA Discip. LEXIS 7, at *22 (explaining that the fact-finder's credibility determinations are entitled to deference). McGee's belated attempt to revise the date of his move to 54Freedom's address to comport with the notice that he provided to FINRA and Cadaret Grant is not persuasive. McGee failed to timely update his Form U4 to inform FINRA and Cadaret Grant that he moved his business offices to 54Freedom's premises, and, in so doing, McGee violated Section 2(c) of Article V of FINRA's By-Laws and FINRA Rules 1122 and 2010.

    E.    McGee Provided False Responses on Cadaret Grant's Annual Compliance Questionnaires

The Hearing Panel found that McGee violated NASD Rule 2110 and FINRA Rule 2010 because he made false statements on Cadaret Grant's compliance questionnaires. Specifically, the Hearing Panel found that McGee failed to disclose all of his business-related email addresses on the questionnaires that he completed between 2007 and 2011. The Hearing Panel also found that McGee misrepresented on the firm's 2011 questionnaire that he had not been involved in the offer or sale of any non-Cadaret Grant-processed security or investment without the firm's approval. We affirm the Hearing Panel's findings.

FINRA Rule 2010 and its predecessor, NASD Rule 2110, are FINRA's ethical standards rules.[38] These rules require that associated persons observe high standards of commercial honor and just and equitable principles of trade. NASD Rule 2110 and FINRA Rule 2010 apply broadly to all business-related misconduct, regardless of whether the misconduct involves securities. *See Vail v. SEC*, 101 F.3d 37, 39 (5th Cir. 1996). The principal consideration of NASD Rule 2110 and FINRA Rule 2010 is whether the misconduct "reflects on the associated person's ability to comply with the regulatory requirements of the securities business." *Daniel*

---

[36]    When McGee provided his on-the-record testimony to FINRA in 2013, he explained that the move occurred in late 2011 or early 2012, then later during that same testimony, he testified that the move occurred in late 2010 or early 2011.

[37]    At the hearing, McGee and Baker attempted to disavow their on-the-record testimony, arguing that they provided incorrect moving dates. The Hearing Panel credited McGee's and Baker's on-the-record testimony as temporally closer to the events that occurred, and, therefore, more reliable. We agree.

[38]    FINRA Rule 2010 superseded NASD Rule 2110, effective December 15, 2008. *See Regulatory Notice 08-57*, 2008 FINRA LEXIS 50, at *32-33 (Oct. 2008).

SPA-51

*D. Manoff*, 55 S.E.C. 1155, 1162 (2002). A registered representative's failure to disclose material information to his firm violates NASD Rule 2110 and FINRA Rule 2010 and is misconduct that calls into question the registered representative's "ability to comply with regulatory requirements necessary for the proper functioning of the securities industry and the protection of the public." *Dep't of Enforcement v. Davenport*, Complaint No. C05010017, 2003 NASD Discip. LEXIS 4, at *9-10 (NASD NAC May 7, 2003).

While McGee was associated with Cadaret Grant, the firm required its registered representatives to complete annual compliance questionnaires. McGee completed five questionnaires between 2007 and 2011, one for each year. In each of the questionnaires, McGee certified that he had disclosed all of his business-related email addresses. McGee also certified that he had not been involved in the offer or sale of any type of security or investment that was not "processed through Cadaret Grant . . . without written permission from Cadaret Grant."

Enforcement argues that McGee's responses to these questions were false because McGee failed to disclose a web-based email account that he used to conduct business, and he failed to inform Cadaret Grant of his sale of an outside, unapproved investment (the charitable gift annuity that he sold to CF in March 2011). McGee, on the other hand, asserts that his responses were accurate. McGee states that he was not obligated to disclose the web-based email account to Cadaret Grant because he utilized the web-based email account only for insurance business, and that he was not involved in the offer or sale of any outside, unapproved security or investment because CF's charitable gift annuity did not fall within the spectrum of products that the question covered. McGee's arguments miss the mark.

Although we agree with McGee's reading of Cadaret Grant's email disclosure policy, i.e., that Cadaret Grant only required the disclosure of accounts used for securities, not insurance, business,[39] Baker discredited McGee's statements concerning his business-related email use. Baker testified that he and McGee considered Cadaret Grant's email server slow, and they typically communicated with each other using web-based email accounts, including the web-based email account that McGee failed to disclose to Cadaret Grant in this instance. Baker also testified that the communications from McGee's undisclosed web-based email account were not limited to insurance matters, as McGee claims, but they included securities business, such as communications with Griffin concerning CF, her 54Freedom account, and the charitable gift annuity that she had purchased from 54Freedom.

McGee's response concerning the offer or sale of any outside, unapproved security or investment is similarly false. McGee sold the 54Freedom charitable gift annuity to CF on March 9, 2011. He completed Cadaret Grant's 2011 compliance questionnaire on July 1, 2011. Despite his sale of the charitable gift annuity to CF four months earlier, McGee falsely stated on the questionnaire that he had not been involved in the offer or sale of any security or investment that was not processed through Cadaret Grant without written permission from Cadaret Grant.

---

[39] Cadaret Grant's chief compliance officer testified that the firm required its registered representatives to disclose email addresses for securities business, but not for insurance business.

SPA-52

McGee misrepresented on five questionnaires that he had disclosed all of his business-related email addresses and misrepresented on one questionnaire that he had not engaged in any non-Cadaret Grant-processed security or investment without the firm's approval. Based on these facts, we conclude that McGee violated NASD Rule 2110 and FINRA Rule 2010. *See Dep't of Enforcement v. Mullins*, Complaint Nos. 20070094345, 20070111775, 2011 FINRA Discip. LEXIS 61, at *29-38 (FINRA NAC Feb. 24, 2011) (finding that respondents' misstatements on the firm's compliance questionnaires violated FINRA's rules), *aff'd*, Exchange Act Release No. 66373, 2012 SEC LEXIS 464, at *1 (Feb. 10, 2012).

IV.     Sanctions

The Hearing Panel barred McGee for the fraudulent omission and unsuitable recommendation, ordered him to pay $236,202.50 in restitution to CF, and ordered him to pay $59,264 in disgorgement. In light of the bar imposed for the fraud and suitability violations, the Hearing Panel assessed, but declined to impose, additional sanctions for McGee's other misconduct.[40] As discussed in detail below, we affirm most, but not all, of the Hearing Panel's sanctions.

A.     Fraudulent Omission of Material Fact and Unsuitable Recommendation

McGee's intentional omission of a material fact and unsuitable recommendation are related violations. It therefore follows that any sanction we may impose would be designed and tailored to deter the same underlying misconduct. Accordingly, we, like the Hearing Panel, have decided to impose a unitary sanction for these two violations.

For cases such as this one, which involve intentional or reckless material omissions of fact, FINRA's Sanction Guidelines ("Guidelines") recommend that adjudicators strongly consider barring an individual.[41] The Guidelines also recommend that adjudicators consult the Principal Considerations to determine whether to impose a suspension or a bar, and, if an adjudicator decides to impose a suspension, the Guidelines suggest that adjudicators apply the

---

[40]     The Hearing Panel explained that it would have suspended McGee in all capacities for one year and fined him $25,000 for engaging in undisclosed outside business activities, suspended him in all capacities for 15 business days and fined him $15,000 for failing to timely update his Form U4, and suspended him in all capacities for 30 business days and fined him $10,000 for providing false responses on Cadaret Grant's annual compliance questionnaires.

[41]     In assessing the appropriate sanctions for McGee's misconduct, we consulted the Guidelines. *See FINRA Sanction Guidelines* 88 (2015) (Fraud, Misrepresentations or Material Omissions of Fact), http://www.finra.org/sites/default/ files/Sanctions_Guidelines.pdf [hereinafter *Guidelines*]. We applied the applicable Guidelines in place at the time of this decision and examined the specific Guidelines related to each violation. *See id.* at 8. We also consulted the General Principles Applicable to All Sanction Determinations and Principal Considerations in Determining Sanctions, which adjudicators consult in every disciplinary case. *See id.* at 2-7.

Principal Considerations to determine the length of the suspension.[42] Finally, the Guidelines suggest that adjudicators consider imposing a fine of $10,000 to $146,000.[43]

For cases involving unsuitable recommendations, the Guidelines advise adjudicators to consider a fine of $2,500 to $110,000 and a suspension of the individual in any or all capacities for a period of 10 business days to two years.[44] Where aggravating factors predominate, however, the Guidelines recommend that adjudicators strongly consider barring the individual.[45]

Aggravating factors predominate regarding McGee's fraudulent omission and unsuitable recommendation. McGee convinced his 71-year-old, financially unsophisticated,[46] customer, CF, to sell assets composing more than half her net worth and invest those assets with Griffin and 54Freedom, an individual and company McGee barely knew. CF had been married for 36 years from the age of 20, did almost no work outside of the home, did not have any investment experience, and was not in charge of her family's finances. Yet, McGee selected CF as a "test case" to see if 54Freedom's charitable gift annuity program actually worked. It was, unfortunately, a spectacular failure. CF incurred $36,202.50 in surrender charges. And of the $454,998.75 that CF invested with 54Freedom, CF still has not recouped $200,000 of her original investment.[47] By contrast, McGee's sale of the 54Freedom charitable gift annuity to CF earned him commissions of $59,264, one of the larger commissions of his career, and it furthered his deepening business relationship with Griffin and 54Freedom.[48]

---

[42] *See id.* at 88.

[43] *See id.*

[44] *See id.* at 94 (Suitability – Unsuitable Recommendations).

[45] *See id.*

[46] *See id.* at 7 (Principal Considerations in Determining Sanctions, No. 19) (considering the sophistication of the affected customer). On appeal, McGee asserts that CF was a sophisticated customer with significant financial management experience, and, consequently, there was no need for him to disclose his compensation to her. McGee's argument is faulty. As an initial matter, McGee has provided no evidence to support his unsubstantiated claims concerning CF's financial sophistication. Moreover, we find that the level of CF's financial sophistication has no bearing on McGee's disclosure obligations because there would have been no way for CF to know about McGee's compensation absent his disclosing it to her. *Cf. Dolphin & Bradbury, Inc.*, Exchange Act Release No. 54143, 2006 SEC LEXIS 1592, at *36 (July 13, 2006) (stating that, "the protection of the antifraud provisions of the securities laws extends to sophisticated investors as well as those less sophisticated"), *aff'd*, 512 F.3d 634 (D.C. Cir. 2008).

[47] *See Guidelines*, at 6 (Principal Considerations in Determining Sanctions, No. 11) (considering whether the respondent's misconduct resulting in harm to the investing public).

[48] *See id.* at 7 (Principal Considerations in Determining Sanctions, No. 17) (considering whether the respondent's misconduct resulted in monetary gain).

**SPA-54**

The self-serving nature of McGee's fraudulent omission and unsuitable recommendation is striking, and it epitomizes McGee's gross indifference to CF's interests. Even now, McGee unapologetically trivializes the impact of his actions on CF as he explains, "a lot of people in this country have less than $700,000 and they're doing okay."[49] McGee fails to appreciate his obligation to provide CF with full disclosure of his business relationship with 54Freedom and the compensation that he would receive from her purchase of the company's charitable gift annuity. McGee's brazen disregard of CF's interests, the aggravating factors that accompanied his fraudulent omission and unsuitable recommendation, and the absence of mitigating circumstances warrant sanctions at the highest end of the relevant sanction ranges. Accordingly, we bar McGee from associating with any member firm in any capacity.

B.    Restitution

The Guidelines instruct adjudicators to order restitution where it is appropriate to remediate misconduct and necessary to "restore the status quo ante where a victim would otherwise unjustly suffer loss."[50] We may order restitution "when an identifiable person . . . has suffered a quantifiable loss proximately caused by a respondent's misconduct."[51] Although the Commission and courts have not adopted a single approach to proximate causation,[52] we conclude that CF's losses were the foreseeable, direct, and proximate result of McGee's misconduct.[53] McGee fraudulently failed to inform CF of his compensation from 54Freedom and failed in his duty to place CF in a suitable investment product. Based on these findings, we order McGee to pay $237,643.25 in restitution to CF.[54] McGee's payment of restitution shall

---

[49]    *See id.* at 6 (Principal Considerations in Determining Sanctions, No. 2) (considering whether the respondent has accepted responsibility for and acknowledged the misconduct).

[50]    *See id.* at 4 (General Principles Applicable to All Sanction Determinations, No. 5) (discussing restitution).

[51]    *Id.*

[52]    *See United States v. Monzel*, 746 F. Supp. 2d 76, 85 (D.D.C. Oct. 22, 2010) ("[T]here is no single approach to proximate causation in either the federal or state courts . . . .").

[53]    *See Dep't of Enforcement v. Brookstone Secs., Inc.*, Complaint No. 2007011413501, 2015 FINRA Discip. LEXIS 3, *147-53 (FINRA NAC Apr. 16, 2015) (ordering respondents to pay restitution where the customers' losses were the "foreseeable, direct, and proximate result" of the respondents' fraudulent and unsuitable sales of collateralized mortgage obligations).

[54]    The actual value of the variable annuities that CF surrendered was $492,642. CF paid surrender fees of $36,202.50 and taxes and administrative fees of $1,440.75. She remitted $454,998.75 to 54Freedom. 54Freedom used $254,998 to purchase fixed indexed annuities from Lincoln Financial on behalf of CF, but Lincoln Financial refunded these premiums to CF. The amounts that we have awarded as restitution include the unreturned original investment ($200,000), the surrender fees ($36,202.50), and the tax and administrative fees ($1,440.75),

[Footnote continued on next page]

include interest, which shall accrue from March 9, 2011(the date McGee sold CF the 54Freedom charitable gift annuity), until paid. The interest rate shall be the rate established for the underpayment of income taxes in Section 6621(a) of the Internal Revenue Code, 26 U.S.C. § 6621(a).[55]

### C. Undisclosed Outside Business Activities

For engaging in undisclosed outside business activities, the Guidelines recommend a fine of $2,500 to $73,000.[56] The Guidelines also recommend a suspension of up to 30 business days, when the outside business activities do not include aggravating conduct.[57] Where there is aggravating conduct, the Guidelines recommend a suspension of up to one year.[58] In egregious cases, such as those involving a substantial volume of activity or significant injury to a customer, the Guidelines recommend a longer suspension or a bar.[59] In assessing sanctions for cases involving undisclosed outside business activities, the Guidelines advise adjudicators to consider: (1) whether the outside activity involved customers of the firm; (2) whether the outside activity resulted directly or indirectly in injury to customers of the firm; (3) the duration of the outside activity, the number of customers, and the dollar volume of sales; (4) whether the respondent's marketing and sale of the product or service could have created the impression that the firm had approved the product or service; and (5) whether the respondent misled the firm about the existence of the outside activity or otherwise concealed activity from the firm.[60]

Aggravating factors accompany McGee's undisclosed outside business activities. As an initial matter, CF was a customer of Cadaret Grant.[61] Second, there is no evidence in the record

---

[cont'd]

which CF paid, but did not recoup. The Hearing Panel's restitution award failed to account for the taxes and administrative fees that CF paid.

[55]    Although disgorgement would potentially be available here, our review of the evidence suggests that McGee's compensation from 54Freedom was part of CF's investment with the company. We therefore conclude that ordering McGee to pay disgorgement would be duplicative of his obligation to pay restitution.

[56]    *See Guidelines*, at 13 (Outside Business Activities).

[57]    *See id.*

[58]    *See id.*

[59]    *See id.*

[60]    *See id.*

[61]    *See id.* (Principal Considerations in Determining Sanctions, No. 1) (considering whether the outside business activity involved customers of the firm).

to support that McGee distinguished between his employment with Cadaret Grant and 54Freedom when he solicited CF. Consequently, McGee's marketing of 54Freedom's charitable gift annuity to CF could have created the impression that Cadaret Grant had approved of the product.[62] Third, McGee's undisclosed outside business activities with 54Freedom deprived Cadaret Grant of the opportunity to monitor McGee's activities with 54Freedom and insulate CF from the company's dubious products and services.[63] Finally, McGee misled Cadaret Grant about the existence and scope of his activities at 54Freedom on the firm's annual compliance questionnaires and in the investigation that followed CF's complaint to the firm.[64] The presence of these aggravating factors, and the absence of mitigating ones, lead us to conclude that McGee's undisclosed outside business activities merit a $25,000 fine and a suspension in all capacities for one year. We, however, decline to impose these sanctions in light of the sanctions that we have imposed for McGee's fraud and unsuitable recommendation.

D.   Failure to Timely Update the Form U4

The Guidelines for failing to timely update the Form U4 recommend a fine of $2,500 to $37,000 and a suspension in any or all capacities for five to 30 business days.[65] In egregious cases, such as those involving repeated failures to file, untimely filings or false, inaccurate, or misleading filings, those involving the failure to disclose or timely disclose a statutory disqualification event or customer complaint, or where the failure to disclose or timely disclose delayed the regulatory investigation of terminations for cause, the Guidelines recommend a suspension in any or all capacities for up to two years, or a bar.[66] The principal considerations for determining sanctions for Form U4 violations include: (1) the nature and significance of the information at issue; (2) whether the failure resulted in a statutorily disqualified individual becoming or remaining associated with a firm; and (3) whether the misconduct resulted in harm to a registered person, another member firm, or any other person or entity.[67]

Although we find that there are no particularly salient aggravating factors applicable to McGee's Form U4 violation, we note that a registered representative's obligation to update his business address is a matter of due course. By the time McGee moved his business operations to

---

[62]     *See id.* (Principal Considerations in Determining Sanctions, No. 4) (considering whether the respondent's marketing and sale of the product could have create the impression that the firm had approved the product).

[63]     *See id.* (Principal Considerations in Determining Sanctions, No. 2) (considering whether the outside business activity resulted in customer harm).

[64]     *See id.* (Principal Considerations in Determining Sanctions, No. 5) (considering whether the respondent misled the firm about the existence of the outside business activity).

[65]     *See id.* at 69 (Forms U4/U5 – Late Filing of Forms or Amendments).

[66]     *See id.* at 70.

[67]     *See id.* at 69.

FINRA 005896

- 34 -

54Freedom's premises in December 2010, he was a seasoned securities professional. McGee had 22 years of industry experience, had associated with several firms, and was a registered general securities principal subject to a heightened level of licensing. In our estimation, McGee knew that he should have updated his Form U4 within 30 days to reflect his new business address.[68] Based on these facts, we conclude that McGee's Form U4 violation merits a $15,000 fine and a suspension in all capacities for 15 business days. We, however, decline to impose these sanctions in light of the sanctions that we have imposed for McGee's fraud and unsuitable recommendation.

    E.    <u>Misrepresentations on Cadaret Grant's Annual Compliance Questionnaires</u>

There are no specific Guidelines concerning misstatements on firm compliance questionnaires. Nevertheless, the Guidelines related to recordkeeping and the falsification of records are sufficiently analogous under the circumstances because McGee's failure to disclose all of his business-related email addresses and outside securities and investment activities resulted in the falsification of Cadaret Grant's books and records.[69]

For recordkeeping violations, the Guidelines recommend a fine between $1,000 and $15,000 and a suspension in any or all capacities for up to 30 business days.[70] In cases involving egregious recordkeeping violations, the Guidelines recommend a fine of $10,000 to $146,000 and a lengthier suspension of up to two years or a bar.[71] When assessing sanctions, the Guidelines for recordkeeping violations advise adjudicators to consider the nature and materiality of the inaccurate or missing information.[72]

---

[68]    *Cf. Philippe N. Keyes*, Exchange Act Release No. 54723, 2006 SEC LEXIS 2631, at *21 (Nov. 8, 2006) (considering registered representative's 15 years of securities industry experience to determine that it was implausible for him to be unaware of FINRA's prohibition on selling away).

[69]    *See Guidelines*, at 1 (Overview) ("For violations that are not addressed specifically, [a]djudicators are encouraged to look to the guidelines for analogous violations."); *cf. Mullins*, 2012 SEC LEXIS 464, at *83 (applying the Guidelines for recordkeeping violations for misstatements on firm compliance questionnaires); *Dep't of Enforcement v. Braff*, Complaint No. 2007011937001, 2011 FINRA Discip. LEXIS 15, at *26-27 (FINRA NAC May 13, 2011) (applying the Guidelines related to the falsification of records for false statements on firm compliance questionnaires), *aff'd*, Exchange Act Release No. 66467, 2012 SEC LEXIS 620, at *1 (Feb. 24, 2012). The Hearing Panel also consulted the Guidelines concerning recordkeeping and the falsification of records in its sanctions analysis.

[70]    *See Guidelines*, at 29 (Recordkeeping Violations).

[71]    *See id.*

[72]    *See id.*

For the falsification of records, the Guidelines recommend a fine of $5,000 to $146,000.[73] The Guidelines advise adjudicators to consider suspending the respondent in any or all capacities for up to two years if mitigating factors exist.[74] In egregious cases, the Guidelines suggest that adjudicators consider a bar.[75] When imposing sanctions, the Guidelines instruct adjudicators to consider the nature of the falsified documents and whether the respondent had a good-faith, but mistaken, belief of express or implied authority.[76]

Between 2007 and 2011, McGee misrepresented on five of Cadaret Grant's annual compliance questionnaires that he had disclosed all of his business-related email addresses,[77] and he misrepresented on one questionnaire that he had not engaged in any non-Cadaret Grant-processed security or investment without the firm's approval.[78] Cadaret Grant's compliance questionnaires were important, and McGee's his lack of candor on the questionnaires impeded Cadaret Grant's ability to monitor McGee, his permissible (and impermissible) business operations and activities, and his customer interactions and solicitations.[79] As Cadaret Grant's annual compliance questionnaire stated on the first page, the questionnaires were "an integral part of [Cadaret Grant's] Compliance and Supervision Program," and their "primary objective . . . is to verify [registered representatives'] sales activities and other business activities, as well as their compliance with regulatory requirements and [firm] policies." McGee's misstatements on Cadaret Grant's annual compliance questionnaires reflected "directly on [McGee's] ability to abide by his firm's policies, many of which are designed to protect the public and the firm, and to deal responsibly with the public."[80] Based on these circumstances, we conclude that McGee's misstatements on Cadaret Grant's annual compliance questionnaires merit a $10,000 fine and a suspension in all capacities for 30 business days. We, however, decline to impose these sanctions in light of the sanctions that we have imposed for McGee's fraud and unsuitable recommendation.

---

[73]     See id. at 37 (Forgery and/or Falsification of Records).

[74]     See id.

[75]     See id.

[76]     See id.

[77]     We also note that the undisclosed web-based email address, which McGee used, contained Cadaret Grant's name, and it therefore had the potential to mislead recipients into believing that the firm had authorized emails sent from that web-based email address.

[78]     See id. at 6 (Principal Considerations in Determining Sanctions, Nos. 8, 9) (considering whether the respondent engaged in numerous acts and engaged in the misconduct over an extended period of time).

[79]     See id. at 29, 37 (Principal Considerations in Determining Sanctions, No. 1) (considering the nature of the information missing from the records and the nature of the falsified documents).

[80]     Davenport, 2003 NASD Discip. LEXIS 4, at *10.

- 36 -

V.     Conclusion

        We affirm the Hearing Panel's findings that McGee: (1) willfully omitted a material fact in connection with a customer's purchase and sale of securities, in violation of Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5, and FINRA Rules 2020 and 2010; (2) made unsuitable recommendations to a customer, in violation of NASD Rule 2310, NASD IM-2310-2, and FINRA Rule 2010; (3) engaged in undisclosed outside business activities, in violation of FINRA Rules 3270 and 2010; (4) willfully failed to timely update his Form U4 to disclose his change of address, in violation of Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010; and (5) provided false information to his firm on five annual compliance questionnaires, in violation of NASD Rule 2110 and FINRA Rule 2010.

        We bar McGee for willfully omitting a material fact in connection with a customer's purchase and sale of securities and making an unsuitable recommendation to that customer. In light of the bar for those two causes of action, we decline to impose sanctions on McGee for engaging in undisclosed outside business activities, willfully failing to timely update his Form U4, and providing false information to his firm on the compliance questionnaires. We also order McGee to pay $237,643.25, plus interest, in restitution to CF. Finally, we affirm the Hearing Panel's order that McGee pay hearing costs of $12,325.34, and we impose appeal costs of $1,743.04.[81]

                                        On behalf of the National Adjudicatory Council,

                                        *Marcia E. Asquith*

                                        _____
                                        Marcia E. Asquith,
                                        Senior Vice President and Corporate Secretary

---

[81]     The bar is effective as of the date of this decision.

SPA-60

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT,<br><br>             Complainant,<br><br>     v.<br><br>BERNARD G. McGEE<br>(CRD No. 1203327),<br><br>          Respondent. | Disciplinary Proceeding<br>No. 2012034389202<br><br>Hearing Officer–DRS<br><br>**AMENDED EXTENDED HEARING<br>PANEL DECISION**[1]<br><br>December 22, 2014 |

Respondent is barred in all capacities from associating with any FINRA member for: (1) willfully violating Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and violating FINRA Rules 2020 and 2010, by failing to disclose material information to a customer; and (2) violating NASD Rule 2310, IM-2310-2, and FINRA Rule 2010, by making an unsuitable recommendation to that customer. Respondent is ordered to disgorge his commissions and to pay restitution to the affected customer. Respondent is also ordered to pay hearing costs.

In light of the bar, no additional sanctions are imposed for Respondent's violation of FINRA Rules 3270 and 2010 by failing to disclose his outside business activities; willful violation of Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010 by failing to timely update his Form U4; and violation of FINRA Rule 2010 and NASD Rule 2110 by providing false information to his member firm.

Enforcement failed to establish that Respondent made a material misrepresentation to a customer regarding a purported impending tax liability, in violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, FINRA Rules 2020 and 2010. Accordingly, that charge is dismissed.

### Appearances

For the Department of Enforcement, Complainant, Daniel L. Gardner, Esq., Edwin Aradi, Esq., and Lane Thurgood, Esq., Rockville, Maryland.

---

[1] This Amended Extended Hearing Panel Decision is issued to correct a typographical error on page 38 of the original decision in the amount of losses incurred by the affected customer.

FINRA 005284

For Bernard G. McGee, Respondent, Kevin R. Van Duser, Esq., and Stephen A. Davoli, Esq., Sugarman Law Firm, LLP, Syracuse, New York.

## DECISION

### I.   Introduction

While registered with a FINRA member firm, Respondent Bernard G. McGee recommended to his customer CF that she surrender her four variable annuities ("VAs") and purchase a charitable gift annuity from an entity named 54F. CF's variable annuities were worth approximately $490,000, and represented over half her investment holdings. CF followed McGee's recommendation. In so doing, she incurred surrender charges of more than $36,000 and a tax liability. McGee gave the remaining proceeds, totaling approximately $455,000, to 54F, ostensibly for the purchase of a charitable gift annuity. 54F invested her funds in three fixed index annuities ("FIAs"), and donated approximately $175,000 to various charities. McGee received a commission from 54F of more than $59,000 for CF's investment.

Based on this conduct, as well as McGee's use of a personal email account to communicate regarding securities business; his false responses to firm compliance questionnaires; and his undisclosed business activities with 54F, the Department of Enforcement filed a five-cause Complaint against him.[2] The Complaint charged McGee with: (1) misrepresenting to CF that she faced a tax liability in order to induce her to sell her VAs and invest in a charitable gift annuity, and failing to disclose to her the fee he would receive in connection with her investment with 54F, in willful violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and in violation of FINRA Rules 2020 and 2010; (2) making unsuitable recommendations to CF that she sell her VAs and purchase a charitable gift

---

[2] Enforcement filed the Complaint on November 11, 2013.

annuity, in violation of NASD Rule 2310 and IM-2310-2; (3) not disclosing his outside business

relationship with 54F to his employing member firm, in violation of FINRA Rules 3270 and

2010; (4) failing to timely update his Form U4 with his new office address, in willful violation of

FINRA Rule 1122 and Article V, Section 2 of FINRA's By-Laws, and in violation of FINRA

Rule 2010; and (5) making misrepresentations on firm compliance questionnaires regarding his

email address and whether he had processed transactions away from his firm, in violation of

NASD Rule 2110 and FINRA Rule 2010.

McGee filed an Answer denying all charges, requested a hearing, and asked that the

Complaint be dismissed. McGee denied that he recommended to CF that she sell her four VAs,

contending, instead, that they were unsolicited liquidations which she had requested; denied

recommending to CF what she should do with the proceeds from the sale of the VAs; asserted

that the financial products 54F purchased on her behalf were not securities, and therefore, not

subject to SEC or FINRA jurisdiction; and maintained that he properly disclosed all outside

business activity to his firm, as well as all office and email addresses.[3]

After a hearing on June 2–6, 2014, in Syracuse, New York, the Extended Hearing Panel[4]

finds that, with the exception of the alleged misrepresentation to CF concerning a purported

impending tax liability, Enforcement proved the violations charged in the Complaint and

imposes the sanctions set forth herein.

---

[3] McGee Affidavit in support of Motion for Summary Disposition ¶ 6.

[4] The Hearing Panel consisted of a Hearing Officer and a current member of the District 8 Committee and a former member of FINRA's District 10 Committee.

## II.    Findings of Fact

### A.    Bernard G. McGee

McGee is currently associated with a FINRA member firm as a General Securities Representative and a General Securities Supervisor.[5] He first became associated with a member firm in 1988[6] and, since entering the securities industry, has been registered with five member firms.[7]

McGee was associated with Cadaret, Grant & Co., Inc., as a General Securities Representative and a General Securities Supervisor from April 2007 until October 2012, at which time he resigned.[8] Cadaret filed a Uniform Termination Notice for Securities Industry Registration ("Form U5") on McGee's behalf stating that he had been permitted to resign during a firm investigation for "failure to disclose an outside business activity, in violation of firm policies and procedures."[9] Cadaret's filing of the Form U5 triggered the investigation that led to this disciplinary proceeding.[10] While registered at Cadaret and his current firm, McGee conducted business through an entity known as M.T. Flanagan & Associates ("M.T. Flanagan").[11] He also acted as an independent insurance agent through M.T. Flanagan.[12] While associated with Cadaret, McGee engaged in misconduct that is the subject of this disciplinary action.

---

[5] Ans. ¶ 10; Stip. ¶ 1; CX-12, at 4.

[6] CX-1, at 4.

[7] Ans. ¶ 10.

[8] Ans. ¶ 10; Stip. ¶ 1.

[9] CX-1, at 4, 10–11, 20–21; Tr. (Velez) 286–87 (Wendoly Velez was the FINRA staff principal investigator assigned to the investigation.).

[10] Tr. (Velez) 286–87.

[11] Ans. ¶ 11; Stip. ¶ 2.

[12] Ans. ¶ 11; Stip. ¶ 2.

FINRA 005287

**B.    Customer CF**

CF first became McGee's customer in 2007, when he was associated with member firm New England Securities.[13] McGee and AR, another broker at that firm,[14] inherited the account when CF's broker left New England Securities in early 2007.[15] At that time, CF was 67 years old.[16] She had become a customer of New England Securities in the late 1990's following her divorce.[17] As part of the divorce settlement, she received a TIAA account, a CREF account, and cash.[18] In 1999, CF used the cash to purchase a VA.[19] CF held these assets at the time McGee became her broker in 2007.[20] In April 2007, at McGee's recommendation, CF purchased a New England Securities VA.[21] Later that month, New England Securities discharged McGee, and he joined Cadaret.[22] CF then transferred her account to Cadaret,[23] which she opened with a "long term growth" investment objective and a "moderate" risk tolerance.[24]

From October 2007 through June 2010, McGee made a number of recommendations to CF, which she followed. These transactions resulted in a substantial overhaul of her account. Among other things, CF sold her New England VA[25] and purchased two Hartford VAs[26] and two

---

[13] Ans. ¶ 12; Stip. ¶ 3.

[14] Tr. (AR) 1314.

[15] Tr. (McGee) 764, 1109.

[16] Ans. ¶ 12; Stip. ¶ 3.

[17] Tr. (CF) 514–15.

[18] Tr. (CF) 514.

[19] Tr. (McGee) 774.

[20] Tr. (CF) 518–19.

[21] Tr. (McGee) 775–76.

[22] CX-1, at 4–5.

[23] Ans. ¶ 12; Stip. ¶ 3.

[24] Ans. ¶ 12; Stip. ¶ 3.

[25] CX-6, at 3–4; Tr. (McGee) 779–80, 787.

[26] CX-6, at 3–4, 12–13; Tr. (McGee) 779–80, 787–89.

FINRA 005288

Pacific Life VAs.[27] By March 2011, CF's holdings with McGee totaled approximately $840,000, over half of which was invested in the four Hartford and Pacific Life VAs.[28]

### C. McGee Recommends that CF Purchase a Charitable Gift Annuity

By late 2010 or early 2011, McGee decided that CF should embark upon a major new investment course. In March 2011, he recommended that she sell her four VAs and invest in a charitable gift annuity offered by 54F, a Cazenovia, New York-based corporation run by JG, whom McGee had met several years earlier. According to 54F's marketing materials, it offered a product called the 54F Gift Annuity designed for "donors" who have "a tax qualified or other investment that is either underperforming or [are] facing a taxable event." Such persons would use "part of the proceeds from the sale of one of these investments to make a major gift to charity, and use[] the remaining funds to purchase an annuity." Then, the donor could use the annuity proceeds to purchase life insurance or pay for long term care premiums, among other things. According to 54F, the product "permits the donor to offset significant capital gains or regular income tax with a large tax deduction from a charitable donation." Also, the donor "has the option of receiving income for life, or selecting a stream of payments that will continue after their death." [29] McGee's recommendation that CF liquidate her four VAs and purchase a charitable gift annuity offered by 54F is at the core of this disciplinary proceeding.

McGee's recommendation derived from his relationship with JG and 54F. In approximately 2008 or 2009, McGee first met JG,[30] the head of 54F.[31] Thereafter, JG provided

---

[27] CX-6, at 20–21, 48–49; Tr. (McGee) 789–92.

[28] Ans. ¶ 13; Stip. ¶ 4.

[29] CX-9, at 3.

[30] Tr. (McGee) 795.

[31] Ans. ¶ 15; Stip. ¶ 7.

FINRA 005289

54F marketing materials to McGee.[32] In late 2010, McGee told him about his company and the charitable gift annuity it offered.[33] Around this time, in late 2010 or early 2011, McGee told his partner at M.T. Flanagan, AB, that he had a "perfect client" or "a match for this gift annuity concept."[34] McGee did not identify the client by name, but described her to AB as "elderly," a "widow or something" who "had a lot of money" that she "wasn't spending" and who "didn't have anybody to leave her money to."[35] Further, he told AB, essentially, that this customer "will be our case study to see . . . how this process works . . . and if this thing really works out."[36] The client McGee had in mind for the charitable gift annuity was CF.[37]

In January or February 2011, McGee gave CF 54F marketing materials.[38] At this time, McGee understood little about 54F and charitable gift annuities. Specifically, he knew nothing about 54F's financial condition and did not try to educate himself about charitable gift annuities. Further, he did not speak with any customer who had previously purchased a charitable gift annuity, and he was unaware if anyone else had actually ever purchased a 54F charitable gift annuity,[39] or if 54F sold any products other than charitable gift annuities.[40] By contrast, he

---

[32] Ans. ¶ 16; Stip. ¶ 8.

[33] Tr. (McGee) 795–96.

[34] Tr. (AB) 160.

[35] Tr. (AB) 168–69.

[36] Tr. (AB) 182–84 (consisting of AB's investigative testimony, which the Panel credits because it was given closer in time to the events at issue than his hearing testimony in which he stated that he did not recall McGee using these words). At the hearing, McGee did not recall making this statement to AB. Tr. (McGee) at 800–01.

[37] Although AB did not recall McGee mentioning the client by name, it is clear that McGee was referencing CF. In November 2012, he wrote to Cadaret that CF was the only client to whom he "suggested the [charitable gift annuity]." CX-50, at 7; Tr. (McGee) 819. (At the hearing, McGee tried to retreat from that statement, testifying that it was an "error," and that he meant that she was the only client he had ever referred to 54F. Tr. (McGee) 1134).

[38] Tr. (McGee) 814, 970.

[39] Tr. (McGee) 820; *see also* Tr. (McGee) 805–06.

[40] Tr. (McGee) 804.

focused on the compensation he could receive from 54F,[41] learning that it paid brokers a large

commission—at least eight or ten percent—for client referrals.[42]

**D.      CF Surrenders Her VAs and Invests the Proceeds with 54F; McGee Receives
a Large, Undisclosed Commission**

Many of the facts and circumstances surrounding CF's surrender of her four variable

annuities in March 2011 are undisputed.[43] Specifically, McGee admits that he met with CF at her

home on March 9, 2011, at which time he prepared and had CF sign surrender forms for CF's

four VAs and an application for a Lincoln FIA.[44] As she had done many times in the past, she

signed the forms at McGee's direction. McGee also does not dispute that CF incurred charges of

$36,202.50[45] when she surrendered the annuities and that the surrender of the annuities created

taxable income. However, McGee disputes other circumstances surrounding the surrender of the

annuities, including whether it was McGee's or CF's idea to sell them, or whether CF even

understood that she was selling her VAs or just transferring funds to 54F to be managed there by

McGee.

At or around the time of the meeting at CF's home on March 9, 2011, McGee created a

document entitled "[CF] Liquidation Proceeds." The document lists the proceeds from the

liquidation of the VAs and states further: "I will assume the following and let me know if this is

correct: 1) I will get a check on Thursday from [CF] for the total net of $454,999 . . . 4) I will be

---

[41] Tr. (McGee) 920.

[42] Tr. (McGee) 797–98, 828; Tr. (AB) 161–63; *see also* Stip. ¶ 9. McGee testified that after the liquidations he learned from JG that he would receive a ten percent commission. Tr. (McGee) 986–87. The evidence showed, however, that before the liquidations, he knew that his commission would be at least eight or ten percent. Tr. (McGee) 1147–48.

[43] Stip. ¶ 5.

[44] Tr. (CF) 719–20; RX-18–RX-21; CX-29–CX-30.

[45] Ans. ¶ 2; Stip. ¶ 5. The exact amount was $36,202.47, as reflected on the liquidation checks. CX-14–CX-17.

FINRA 005291

paid based on 10% of the total deductible contribution or $49,262."[46] McGee also prepared a document entitled "[54F] Proposal" which contains a charitable gift analysis; a reference to current and estimated amounts attributable "To Indexed Annuity;" the statement "I, assume, in this case, I will be paid $50,147.00;" and a reference to surrender charges of $35,000.[47]

On or about Thursday, March 17, 2011, McGee called CF and informed her that redemption checks from Hartford and Pacific Life were being delivered to her home.[48] On that date, McGee went to CF's home shortly after the VA liquidation checks arrived.[49] Those checks, totaling $454,998.75, reflect that CF incurred $36,202.50 in surrender charges.[50] While at her home, McGee filled out part of a deposit slip, and then drove CF to her bank to deposit the checks.[51] While at the bank, McGee directed CF to write a check to 54F for the full amount of the liquidation checks,[52] and she complied.[53] Later that day, McGee hand-delivered the check to

---

[46] CX-21, at 1.

[47] CX-21, at 2. The record does not permit a precise determination of when McGee created the two documents comprising CX-21. Both are undated. McGee testified he did not know exactly when he prepared CX-21, Tr. (McGee) 851–53, 856, but knew that he created these documents after CF signed the surrender forms and, specifically, that he prepared CX-21, at 1 on March 16—after CF signed the surrender forms but before CF received the proceeds. Tr. (McGee) 853–55. It is likely that McGee prepared CX-21, at 1 after the VA liquidations on Wednesday, March 9, 2011, because the document refers to McGee anticipating receiving a check on Thursday. And, in fact, the checks arrived the next week on Thursday, March 17, 2011. As to CX-21, at 2, Enforcement argued that McGee created this document before the March 9 meeting and, therefore, it shows that McGee prepared in advance to make a recommendation to CF. The Extended Panel makes no finding as to precisely when the documents were prepared or whether CX-21, at 2 was created before the March 9 meeting. But from these documents, it is clear that before McGee received his commission, he had an understanding of how large it would likely be and the potential use that would be made by 54F of the liquidation proceeds.

[48] Ans. ¶ 23.

[49] Tr. (CF) 525.

[50] CX-14–CX-17. The surrender charges reflected on the checks amount to $36,202.47. The parties stipulated to the rounded figure of $36,202.50, referenced above at footnote 45.

[51] CX-18; Tr. (CF) 526–27; Ans. ¶ 23.

[52] CX-19; Tr. (CF) 526–27.

[53] Tr. (CF) 548–49.

54F.[54] McGee created nothing in writing reflecting that the sale of CF's VAs was unsolicited,[55] and never told Cadaret that the transactions were unsolicited.[56]

As to the suitability of the VA sales, McGee admitted at the hearing that he did not perform a suitability assessment in connection with the surrender of the four VAs.[57] To have made that assessment, he testified, he would have needed "a lot more information,"[58] including her "liquidity needs, current income needs, assets, liabilities, a pretty thorough fact finder [sic] of a snapshot of her life."[59] Moreover, because of the surrender charges and tax liability incurred, he thought the surrender of the VAs was a "terrible idea" [60] and unsuitable.[61] He also thought the liquidations were probably unsuitable based on her investment objectives of growth and income.[62] Notably, at the time of the transactions, CF's monthly income was below $1,000 per month and consisted of Social Security payments.[63]

In connection with his referral of CF to 54F to purchase a charitable gift annuity, 54F paid McGee three commission checks totaling $59,264.[64] On March 25, 2011, eight days after he delivered CF's check to 54F, McGee received his first commission check, in the amount of

---

[54] Tr. (McGee) 863; Ans. ¶ 23.

[55] Tr. (McGee) 771, 1078, 1090.

[56] Tr. (BLJ) 1291.

[57] Tr. (McGee) 866.

[58] Tr. (McGee) 1355.

[59] Tr. (McGee) 1360. The record reflects the value of CF's investment holdings at the time of the VA liquidations, but not her net worth at that time.

[60] Tr. (McGee) 975–76. The Panel makes no finding regarding the actual tax consequence to CF resulting from the VA liquidations. CF testified that she owed $16,000 in taxes for the 2011 tax year as a result of the sale of the VAs. Tr. (CF) at 575–76. This figure is also mentioned in a letter written to CF by her counsel. But it is not clear from the record what portion of her tax liability derived from the sale of the VAs. It is undisputed, however, that the sale of the VAs created a taxable event for CF.

[61] Tr. (McGee) 1089–90.

[62] Tr. (McGee) 1355.

[63] Tr. (CF) 577.

[64] Stip. ¶¶ 10, 11; *see also* Ans. ¶¶ 3, 19.

FINRA 005293

$49,264.[65] This initial commission payment represented ten percent of the gross value of the

VAs, i.e., before deducting surrender and other miscellaneous charges.[66] McGee admitted at the

hearing that a ten percent commission "on the total amount of the customer's account" was

"unusually high."[67] Further, he knew that he received his first commission check before any

annuity was issued to CF.[68] Two additional checks followed, for $5,000 each, on September 16,

2011, and January 9, 2012. At no time did McGee disclose to CF the commission he would earn

as a result of her investment.[69] McGee's total commission was approximately 12 percent of the

funds CF paid to 54F.[70]

### E. McGee's Defense that He Did Not Recommend the VA Liquidations was Not Credible

The core of McGee's defense to the suitability charges is that he did not recommend that

CF surrender her VAs and invest in a charitable gift annuity. Rather, according to McGee, it was

all her idea. And, though he tried to dissuade CF from doing so, she insisted on following that

course. CF's testimony painted a very different picture. She claimed not to have even known that

she was liquidating her VAs and investing in a charitable gift annuity, and thought she was just

moving her money to 54F where McGee would manage it for her. The Hearing Panel finds

neither McGee nor CF credible in certain respects. Nevertheless, as explained below, considering

the weight of the credible evidence, the Hearing Panel finds that McGee recommended that CF

liquidate her VAs and invest in a 54F-offered charitable gift annuity.

---

[65] Tr. (McGee) 1104–05, 857.

[66] Tr. (Velez) 475; CX-14–CX-17.

[67] Tr. (McGee) 986–87. *But see* Tr. (McGee) 1147 (testifying that his commission from 54F was "a little bit high" compared to the marketing materials he had seen from 54F).

[68] Tr. (McGee) 1104–05.

[69] Ans. ¶¶ 4, 47; Tr. (McGee) 829.

[70] The evidence did not establish, however, that at the time of the recommendation, McGee knew the exact amount of the total commission he would receive.

FINRA 005294

### 1.  McGee's Description of Events

According to McGee, the idea of selling the VAs originated with CF.[71] McGee testified

that he learned that CF had been estranged from her daughters for a number of years, and that by

early 2011, their relationship had soured to a point where she wanted to ensure that they did not

receive any of her money.[72] Consequently, according to McGee, she wanted to explore some

alternatives, and he thought a good place to start was with an expert in charitable giving.[73]

Accordingly, he recommended that she talk with JG at 54F,[74] gave her JG's phone number,[75] and

"left [it] in her hands."[76]

McGee testified when he met with CF on March 9, she announced for the first time that

she had talked to JG[77] and now wanted to sell her annuities and move the money to 54F.[78]

Indeed, he said she was adamant about selling the four VAs and placing the funds with 54F.[79]

McGee claimed to have had no idea whether, beforehand, JG had recommended that she

purchase a charitable gift annuity.[80]

McGee further testified that he objected to her decision and told her so. He claims that he

then spent "a couple of hours" presenting her with alternatives, such as annuitizing the VA

liquidations to avoid the surrender charges or simply changing the beneficiary designation on the

---

[71] Tr. (McGee) 978–79.

[72] Tr. (McGee) 950–56.

[73] Tr. (McGee) 964.

[74] Tr. (McGee) 963, 801.

[75] Tr. (McGee) 967.

[76] Tr. (McGee) 967.

[77] Tr. (McGee) 971.

[78] Tr. (McGee) 973, 981.

[79] Tr. (McGee) 950–56, 981.

[80] Tr. (McGee) 982.

FINRA 005295

VAs.[81] Nevertheless, according to McGee, CF rejected these proffered alternatives and insisted

that she wanted to liquidate her annuities. Because she was steadfast, McGee stated that he was

required to comply with her request.[82] He also denied recommending or soliciting CF to

purchase a charitable gift annuity[83] and claimed that he had no financial incentive for her to

liquidate her VAs. He represented that he did not earn any commission related to their

liquidation,[84] was not promised any type of compensation for introducing a customer to JG, and

had no agreement to receive such compensation.[85]

### 2. CF's Description of Events

CF's recollection of events bore no resemblance to McGee's story. CF testified that the

liquidation of her VAs had nothing to do with her children and even denied ever telling McGee

that she had a bad relationship with them.[86] Rather, on March 9, 2011, during a periodic portfolio

review, McGee allegedly told her that she was facing an impending $100,000-plus tax liability.[87]

According to CF, he then advised her that she should consider lowering her tax liability by

donating to charity[88]—something that she had not previously done[89]—but she told him she was

not interested in donating.[90]

CF further testified that at the March 9 meeting, she signed the VA surrender forms but

had no idea she was liquidating her VAs. She also maintains that she did not realize that 54F

---

[81] Tr. (McGee) 974, 976–78, 1094–95, 1144–45.

[82] Tr. (McGee) 979.

[83] Tr. (McGee) 982.

[84] McGee's Opening Brief at 9; Tr. (McGee) 979.

[85] Tr. (McGee) 966–67.

[86] Tr. (CF) 591.

[87] Tr. (CF) 505–06.

[88] CX-46; Tr. (CF) 508–09, 591.

[89] Tr. (CF) 509, 592–93, 825, 720.

[90] Tr. (CF) 591–92.

13

FINRA 005296

would make investments and donations on her behalf. Rather, she testified that she believed that all she was doing was transferring her funds to what she believed was McGee's new business so he could manage her funds there.[91] As to her understanding of 54F, CF stated that in December 2010, McGee first told her about 54F, explaining that it was his new business and that he needed funds for it. She testified that she obliged and gave him $13,000 in cash to assist him.[92] (McGee, however, denied that CF gave him these funds and maintained, instead, that he simply helped her cash two checks and that she then took the money for her personal use).[93]

CF testified that when the VA liquidation checks arrived, McGee came to her home and took the checks. CF did not review the checks herself, and McGee did not review them with her. He then drove her to the bank to deposit the checks.[94] Later, at the bank, she claims that an impatient McGee directed her to give him a check for the full amount of the liquidation proceeds, namely $454,998.75, made payable to 54F. She further stated that McGee never told her what he was going to do with the check.[95] Finally, CF denies that McGee ever gave her JG's phone number; denies he told her to call JG; and states that she only spoke with JG once, in January 2012, when he telephoned her and she hung up on him because he seemed inebriated.[96]

---

[91] Tr. (CF) 548–50, 645.

[92] Tr. (CF) 484, 489, 497–98, 501–502; CX-11; CX-12.

[93] The evidence on this issue was conflicting and inconclusive. In any event, the resolution of this issue is not essential to adjudicating the charges in this case.

[94] Tr. (CF) 529, 533, 718.

[95] Tr. (CF) 548–49.

[96] Tr. (CF) 570–73.

FINRA 005297

### 3.    Hearing Panel's Conclusion

The Panel rejects McGee's account of events for a number of reasons.

First, there was convincing evidence that McGee planned, in advance, to have CF invest in a charitable gift annuity. The Panel credited the testimony of AB that McGee told him that he had the perfect test case customer for the product. From McGee's description of the customer to AB, he was likely referring to CF. This conversation occurred well before McGee's March 9 meeting with CF. AB's recollection was clear, and there was no evidence of a motive for him to be untruthful or biased against McGee, with whom he still works and shares clients. [97] Indeed, McGee testified that AB was a truthful person[98] and, notably, did not directly dispute AB's recollection. Instead, he said he could not remember the conversation.[99] Additionally, McGee provided 54F marketing materials to CF at least one or two months before the March 9 meeting. Finally, when McGee met with CF on March 9, he had with him the necessary VA surrender forms. This constituted evidence that he had planned, before the meeting, to have CF surrender her VAs. McGee testified that he spent much of his time on the road seeing clients and his normal practice was to carry a booklet of forms with him in the car to every client meeting.[100] The Panel rejected as implausibly coincidental that McGee just happened to have with him on March 9 the precise forms necessary for CF to surrender four VAs from two issuers when he claimed to have had no advance notice that she was planning to do so.

Second, McGee had a strong financial motive to recommend the transactions at issue. The evidence showed that McGee knew, in advance of the March 9 liquidations, that he would

---

[97] Tr. (AB) 150.

[98] Tr. (CF) 1146.

[99] Tr. (McGee) 800–01.

[100] Tr. (McGee) 981, 1126.

15

FINRA 005298

make a commission of at least eight percent, perhaps as high as ten percent, on a referral of CF to 54F.

Third, McGee's version of events lacked corroboration, namely, that CF wanted to disinherit her daughters by liquidating her VAs and giving the proceeds to 54F, and that he tried to dissuade her from doing so. The record reflects no notes or communications by McGee to CF or Cadaret to that effect.[101] While McGee claimed that he created notes memorializing his explanation to CF that surrendering her annuities would result in a "$100,000+" tax liability,[102] his notes did not clearly support his version. They are scant, undated, and ambiguous, and the evidence and inferences concerning them are conflicting regarding when they were prepared. Although they contain certain numbers — "Taxes-$100,000+" and "SC's=$36,516.60"—the notes do not reflect what McGee or CF said about these numbers. Hence, the notes do not corroborate McGee's story. This lack of corroboration undercuts McGee's explanation of events, as it is unlikely that a broker as experienced as McGee would have taken no steps to memorialize such a purportedly strong disagreement with a client's intended course of action or created no record confirming that the transactions were unsolicited.

Fourth, McGee's version of events was inconsistent with his earlier investigative testimony that he did not believe he ever explained to CF the tax implications of liquidating the VAs and had not discussed alternatives with her.[103] The Hearing Panel credited McGee's investigative testimony over his hearing testimony as it was given closer in time to the events at

---

[101] Tr. (McGee) 771, 1078, 1090–91, 1291.

[102] CX-13, at 1; Tr. (McGee) 971–72.

[103] Compare McGee's hearing testimony, Tr. (McGee) 974, 1094–95, with his investigative testimony presented at the hearing. Tr. (McGee) 1079–80, 958.

FINRA 005299

issue and was consistent with the lack of corroboration for his claim that he opposed the liquidation and offered alternatives to CF.

Fifth, the Panel was not persuaded that had CF sought to prevent her daughters from receiving any more money from her, that she would have devised the idea, herself, of liquidating her VAs and giving the entire proceeds to 54F. Several facts compel this conclusion: (1) CF never originated her own investment ideas; [104] (2) CF relied on McGee for investment advice; (3) CF never said "no" to a recommendation from him; and (4) liquidating the VAs created sizable surrender charges and a tax liability for a customer whom McGee described as "frugal"[105] and "very nervous about taxes."[106]

In conclusion, the Hearing Panel rejects McGee's version of events and finds that McGee recommended CF liquidate her VAs and invest in a charitable gift annuity.

### F. CF's Account of Events was Not Credible in Certain Respects

Although the Hearing Panel rejects McGee's version of events, and finds that he made a recommendation to CF, it did not find CF's recollections credible in a number of respects, including whether McGee made a misrepresentation to her about an impending tax liability.

First, CF's testimony was largely uncorroborated. Moreover, the August 1, 2012 letter from her attorney to Cadaret, written a year and a half after the liquidations, undercuts her version because it omits certain key elements. The letter did not mention: (1) that McGee had told CF that he had a relationship with 54F; (2) that CF was unaware that she was liquidating her VAs; (3) that CF thought she was giving her funds to McGee to manage at 54F; or (4) that

---

[104] Tr. (CF) 522–24.

[105] Tr. (McGee) 772.

[106] Tr. (McGee) 955. But even if CF had devised this strategy herself, it is unlikely that she would have implemented it in the face of McGee's purportedly strong opposition, given her dependence on him for investment advice.

FINRA 005300

McGee told her she was facing a tax liability of $100,000. Instead, the letter states that her VAs "were liquidated under McGee's supervision."[107]

Second, CF's credibility was undermined because she testified inconsistently with credible testimony from another witness. CF denied that she had ever discussed her daughters with AR, her prior broker, and specifically denied telling him that she had a poor relationship with them.[108] That testimony was flatly contradicted by AR, who testified that he knew CF from April 2007 until August 2007, and she spoke frequently about the animosity between her and her children.[109] The Panel finds AR credible. His recollections were clear and he was not impeached during cross examination. Although CF terminated their relationship abruptly,[110] the Panel detected no hostility on AR's part against her. Further, though he spoke favorably of McGee and considered him a friend,[111] the Panel did not find a sufficient basis for concluding that AR was motived to be less than forthright in his testimony.[112]

Third, the Hearing Panel did not believe that CF was unaware that she was liquidating her VAs. According to AR, when he dealt with her, she "asked questions that a savvy investor would ask;" was "knowledgeable about what she had;" "asked a lot of very good questions;" and read

---

[107] CX-48, at 1. CF refused to testify about her dealings with any attorneys. Tr. (CF) 706. Accordingly, the record is silent as to why the letter did not contain these details. As discussed above, Enforcement argues that CX-13— McGee's purported notes of the March 9, 2011 meeting—corroborates CF's version that McGee told her she faced a $100,000 tax liability. But as also discussed above, the notes are inconclusive.

[108] Tr. (CF) 588–89.

[109] Tr. (AR) 1320–24.

[110] Tr. (AR) 1328–29.

[111] Tr. (AR) 1349.

[112] McGee claims that CF's credibility was also impeached because, contrary to her testimony that they spoke only once after March 17, they had, in fact, spoken more than 20 times. McGee testified that his phone records substantiate the existence of these phone calls. But although McGee stated that his attorney possessed these records, Tr. (McGee) 1151, McGee did not offer them into evidence. Accordingly, the Panel did not give weight to McGee's testimony on this point.

FINRA 005301

and asked questions about documents before signing them.[113] Also, CF signed surrender forms

that prominently displayed the words "WITHDRAWAL REQUEST for Variable Annuities" or

"Variable Annuity Surrender Request" at the top of a number of the pages,[114] including, in one

instance, the signature page.[115] She had previously signed similar forms in connection with other

VAs.[116]

Additionally, CF received four checks that reflect on their face that they were issued by

The Hartford and Pacific Life.[117] Attachments to the checks also reflect surrender or withdrawal

fee deductions. Even a cursory glance at the checks would have revealed this information and, at

a minimum, CF would have seen that she was receiving large checks from companies that held

her VAs. Even if CF failed to notice the surrender/withdrawal fees, it is unlikely that she looked

at neither the surrender forms nor the checks and failed to realize that she was liquidating her

VAs.

Finally, CF's testimony was equivocal about what McGee told her regarding a purported

$100,000 tax liability. She testified that McGee told her at their March 9 meeting she faced a

$100,000 tax liability.[118] But when directly asked if McGee told her she faced that liability "if

she did nothing with [her] money," she responded: "I don't recall him saying that."[119] CF's lack

of certainty regarding exactly what McGee told her about this purported liability, coupled with a

lack of corroboration, and other concerns the Panel had regarding her credibility (*see* discussion

---

[113] Tr. (AR) 131, 1337, 1347.

[114] CX-7.

[115] CX-7, at 12.

[116] CX-6.

[117] CX-14–CX-17.

[118] Tr. (CF) 506–09.

[119] Tr. (CF) 594.

19

above) preclude a finding that McGee misrepresented to CF that she faced a $100,000 tax

liability unrelated to liquidating her VAs.

### G. 54F Purchases FIAs on CF's Behalf and Makes Charitable Donations

After McGee gave 54F the check from CF in the amount of $454,998.75, there is no

dispute regarding the actions 54F then took on her behalf. 54F gave $175,000 to four charities[120]

and purchased three Lincoln FIAs on CF's behalf, with initial premium payments totaling

$254,998.[121] Lincoln later returned CF's initial premiums[122] after CF hired an attorney to obtain

information about the whereabouts of her funds. However, CF did not seek or receive the return

of her charitable donations.[123]

### H. McGee Engages in Undisclosed Outside Business Activities with 54F

McGee's relationship with JG and 54F began when they played golf together in 2008 or

2009.[124] Thereafter, as discussed above, JG explained the nature of 54F's business to McGee and

the charitable gift annuity it offered. Also, he received commission checks from 54F for the CF

transaction.

But McGee's relationship with JG and 54F was more extensive than these somewhat

limited interactions. 54F owned property located in Cazenovia, New York, which contained both

---

[120] 54F claimed that it donated $200,000 on CF's behalf to four charities. Ans. ¶ 28. Instead, the evidence substantiated donations to three charities totaling $175,000. *See* CX-54, at 2; CX-55, at 2; CX-28; CX-79, at 10; Tr. (Velez) 373–75, 378 ($40,000); CX-52, at 2, 3, 5, 7, 9; RX-5, at 54, 57, 63, 368–69 ($85,000); and CX-53, at 2; Tr. (Velez) 371; (McGee) 920 ($50,000).

[121] CX-31–CX-33 (containing a $90,000 initial premium with certificate dated July 1, 2011; a $90,329 initial premium with certificate dated January 22, 2012; and a $74,669 initial premium with certificate dated March 22, 2012).

[122] Tr. (CF) 714–15.

[123] Tr. (CF) 715–17.

[124] Tr. (McGee) 795.

FINRA 005303

a main house and a carriage house.[125] 54F had an office in the main house.[126] McGee occupied an office in the carriage house rent-free; prepared and sent a business/marketing plan to JG that proposed a joint venture whereby he would sell securities products while 54F would sell fixed products; and proposed the creation of joint office on Singer Island, Florida, where JG lived.[127] McGee also traveled to Florida to "meet with potential clients to participate in this charitable program that was being offered."[128]

It was undisputed that McGee did not disclose to Cadaret his activities with 54F. In fact, Cadaret did not learn of McGee's involvement with 54F until August 1, 2012, when it received an inquiry letter from CF's lawyer.[129]

### I.     McGee Provides False Information to His Firm

While McGee was associated with Cadaret, the firm required its representatives to complete annual compliance questionnaires.[130] McGee completed compliance questionnaires for the years 2007 through 2011.[131] On the questionnaires, McGee certified that he had disclosed all of his business-related email addresses and that he had not been involved in any offers or sales of any type of investment that were not processed through his member firm or that were done

---

[125] Ans. ¶ 34.

[126] Ans. ¶ 34.

[127] CX-20; Tr. (McGee) 802, 879, 881, 912–13, 917, 1138–39. *See also* Ans. ¶ 33 (In 2011, McGee submitted a joint business proposal to 54F's CEO, JG. McGee's proposal outlined a plan for 54F and McGee to generate more than $800,000 in commissions and fees by jointly selling $15 million worth of insurance and securities products).

[128] Tr. (SO) 77.

[129] Tr. (SO) 66–67; CX-48; CX-61, at 1.

[130] Ans. ¶ 36; Stip. ¶ 12.

[131] CX-71–CX-74. McGee became registered with Cadaret in 2007 and resigned in October 2012, before he completed a questionnaire for 2012. Tr. (Velez) 310.

FINRA 005304

without his firm's written permission.[132] In each of these questionnaires, McGee provided false responses.

First, on the 2011 compliance questionnaire (which McGee executed on July 1, 2011) McGee represented that he had not been involved, without the Cadaret's written permission, in the offer or sale of any security or other investment that was not processed through Cadaret.[133] This answer was false, in light of the transactions involving CF, discussed above.

Second, on each compliance questionnaire for the years 2007 through 2011, McGee answered "yes" to the question: "Have you disclosed all business related email addresses, to Cadaret, Grant."[134] These responses were false; McGee did not disclose that he had communicated regarding business matters, including securities business, through his Yahoo! email account, which he had begun using no later than 2007.[135] This was not a Cadaret-authorized email account.[136] According to AB, who was associated with Cadaret from November 6, 2006, until October 12, 2012,[137] he and McGee considered Cadaret's email server slow. Therefore, they typically communicated with each other using McGee's Yahoo! email address (and AB's Gmail address). These communications included securities business and other matters.[138] After McGee signed his last compliance questionnaire on July 1, 2011, he continued

---

[132] Ans. ¶¶ 8, 38, 66, 67.

[133] CX-74, at 2.

[134] CX-70, at 5; CX-71, at 5; CX-72, at 4; CX-73, at 4; CX-74, at 5.

[135] Tr. (Velez) 320; *see also* Tr. (McGee) 769.

[136] Tr. (DJ) at 1192–93.

[137] AB's association dates are reflected in the Central Registration Depository, of which the Panel takes official notice. *See, e.g., Dep't of Market Regulation v. Lane*, No. 20070082049, 2013 FINRA Discip. LEXIS 34, at *3 n.1 & *4 n.2 (NAC Dec. 26, 2013), *appeal docketed*, SEC Admin. Proceeding No. 3-15701 (Jan. 22, 2014) (taking official notice of firm's CRD record reflecting the date it requested termination of its broker-dealer registration and the date on which its registration was terminated and taking official notice of the capacities in which respondents were registered during the relevant period based on information reflected in CRD).

[138] Tr. (AB) 206–07.

22

FINRA 005305

to communicate using his Yahoo! email account for business matters.[139] McGee also used this

email account to communicate with JG regarding CF in at least the spring of 2012.[140]

In his defense, McGee asserts that he used his Yahoo! email account solely for insurance-

based business, and, therefore, he did not need to disclose the address because the firm only

required the disclosure of accounts used for securities business.[141] Cadaret's Chief Compliance

Officer testified that the firm required brokers to disclose securities-related email addresses, but

not insurance-related ones.[142] But AB's testimony contradicted McGee's uncorroborated

statement that he used the Yahoo! email address only for insurance-based business, and the Panel

finds AB persuasive. The record does not reflect any reason to distrust either AB's memory or

his motives, and his testimony on this point was not challenged by McGee on cross-examination.

Accordingly, the Panel finds that McGee gave false responses on five annual compliance

questionnaires by not disclosing a business-related email address.

### J. McGee Fails to Timely Update His Form U4 to Reflect His Office's Change of Address

On December 5, 2011, McGee notified Cadaret by email that his M.T. Flanagan office

had moved to 5 Ledyard Avenue, the 54F-owned structure known as The Carriage House, in

Cazenovia, New York.[143] Later that day, Cadaret filed with FINRA an update to McGee's Form

U4 reflecting that change in address. The Panel finds, however, that McGee and AB moved into

that address approximately a year before McGee disclosed the change of address to Cadaret.

While the record does not fix the exact date of the move, Enforcement demonstrated that the

---

[139] *See* CX-63 (February 2012); CX-64, at 1 (May and June 2012).

[140] CX-40 (March 2012); CX-42 (April 2012).

[141] Tr. (McGee) at 1014.

[142] Tr. (BLJ) 1280–81; *see also* Tr. (DJ) at 1211–12. However, depending on the substance of an email and the recipient, if the address included the "Cadaret" name, the firm expected a broker to disclose that email address, even if it were used solely for insurance purposes. Tr. (DJ) at 1214–15.

[143] CX-67.

FINRA 005306

move occurred by late 2010 or early 2011[144] and, specifically, that McGee had moved there by the time of the CF transactions,[145] and by the time he told AB he had the "perfect client" for the 54F charitable gift annuity.[146]

### K.    McGee was Not Candid with Cadaret During its Internal Investigation

After Cadaret received a letter from CF's attorney in August 2010, it conducted an investigation into McGee's activities regarding CF and 54F. McGee was not candid with Cadaret during its investigation. For example, the firm dispatched SO, an assistant vice president in the compliance department, to McGee's home for an unannounced meeting.[147] At that meeting, McGee originally told SO that he had not received any compensation for his 54F-related activities. As the meeting progressed, however, and as SO pressed for more details, McGee stated that he had been paid a "referral fee" and for "consulting work" unrelated to a specific transaction.[148] McGee later told his supervisor, DJ, the same thing.[149] As to CF and 54F, McGee told SO that he had "just handed [CF] off to [JG], and that was it."[150] This was untrue; McGee had orchestrated the VA liquidations and the payment of the proceeds to 54F to purchase a charitable gift annuity.

---

[144] Tr. (Velez) 472–73 (reading into the record the portion of McGee's investigative testimony where he stated that the move occurred in late 2010 or early 2011).

[145] Tr. (AB) 248–49; Tr. (McGee) 889.

[146] Tr. (AB) 160, 164. By contrast, AB testified that a week before the hearing, he found receipts for business cards indicating that he ordered them in January 2012, which, he stated, would have been shortly after he and McGee moved offices. Tr. (AB) 243–44. Based on this evidence, McGee argues that he did not move to Ledyard until December 2011. This evidence was not persuasive. AB's testimony was based on records not offered in evidence and which, in any event, purportedly do not directly show when they moved offices. The Panel finds that AB's hearing testimony regarding the business cards was insufficient to overcome McGee's prior, sworn, investigative testimony—given closer in time to the events at issue—indicating that the move had occurred much earlier, as well as AB's other hearing testimony that the move had occurred earlier.

[147] Tr. (SO) 65, 71.

[148] Tr. (SO) 91–92; CX-85, at 10.

[149] Tr. (DJ) 1198, 1221.

[150] CX-85, at 9; Tr. (SO) 76. *See also* (BLJ) 1247–49 (McGee failed to promptly notify the firm that he had received a complaint from CF's attorney and that the FBI had contacted him about 54F).

III.   Conclusions of Law

    A.   Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and FINRA Rules 2020 and 2010 (First Cause of Action)

        1.   McGee Willfully Violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and Violated FINRA Rules 2020 and 2010 by Failing to Disclose to CF His Expected Compensation

The First Cause of Action charges McGee with fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934[151] and SEC Rule 10b-5,[152] by misrepresenting to CF that she faced a large tax liability and needed to make charitable donations to offset that liability.[153] Additionally, McGee is charged with violating those provisions by failing to disclose to CF that he would make nearly $60,000 on her purchase of a charitable gift annuity from 54F.[154] The Complaint also alleges violations of FINRA Rule 2020—FINRA's anti-fraud rule— and FINRA Rule 2010. But since the Hearing Panel finds that McGee committed Rule 10b-5 fraud, those FINRA rules were also violated and need not be separately discussed here.[155]

Recently, in *Dep't of Enforcement v. Anthony A. Grey*,[156] the National Adjudicatory Council ("NAC") addressed the elements of a federal securities fraud violation under Section

---

[151] 15 U.S.C. § 78j(b).

[152] 17 C.F.R. § 240.10b-5.

[153] *See* Compl. ¶ 46.

[154] *See* Compl. ¶ 47.

[155] FINRA Rule 2020 proscribes fraud in language similar to Section 10(b): "No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." A violation of Section 10(b) is also a violation of FINRA Rule 2020. *See Dep't of Enforcement v. Thomas Weisel Partners, LLC*, No. 2008014621701, 2013 FINRA Discip. LEXIS 1, at *15 (NAC Feb. 15, 2013). Additionally, "[c]onduct that violates Commission rules or FINRA rules is inconsistent with high standards of commercial honor and just and equitable principles of trade and therefore also violates NASD Rule 2110 (now FINRA Rule 2010)." *Dep't of Enforcement v. The Dratel Group, Inc.*, No. 2008012925001, 2014 FINRA Discip. LEXIS 6, at *28 n.25 (NAC May 2, 2014).

[156] No. 2009016034101, 2014 FINRA Discip. LEXIS 31 (NAC Oct. 3, 2014).

10(b) and Rule 10b-5.[157] According to the NAC, "Section 10(b) of the Exchange Act makes it unlawful for any person to use or employ any manipulative or deceptive device or contrivance in connection with the purchase or sale of a security. Rule 10b-5, promulgated under Section 10(b), makes it unlawful to make material misstatements or to omit material facts in connection with the purchase or sale of a security."[158]

Additionally, to violate Section 10(b), the respondent's misrepresentation or omission must be made with scienter, namely, a mental state embracing intent to deceive, manipulate, or defraud, or at least knowing misconduct.[159] The scienter requirement can be established by showing that the respondent acted recklessly.[160] "Recklessness in this context is a 'highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the [respondent] or is so obvious that the actor must have been aware of it.'"[161]

Misrepresentations and omissions are treated differently under these provisions. "Those who make affirmative representations have 'an ever-present duty not to mislead.'"[162] An omission, however, "is actionable under the securities laws when a person is under a duty to

---

[157] *See also Dep't of Enforcement v. The Dratel Group, Inc.*, No. 2008012925001, 2014 FINRA Discip. LEXIS 6, at *27 n.24 (NAC May 2, 2014); 17 C.F.R. § 240.10b-5.

[158] *Grey*, 2014 FINRA Discip. LEXIS 31, at *21. Section 10(b) also requires that the violative conduct use the means or instrumentality of interstate commerce or of the mails.

[159] *Grey*, 2014 FINRA Discip. LEXIS 31, at *22.

[160] *Id.* at *22–23.

[161] *Id.* at *23 (quoting *Alvin W. Gebhart, Jr.*, Exchange Act Rel. No. 58951, 2008 SEC LEXIS 3142, at *26 n.26 (Nov. 14, 2008), *aff'd*, 595 F.3d 1034 (9th Cir. 2009)).

[162] *Dep't of Enforcement v. Fillet*, No. 2008011762801, 2013 FINRA Discip. LEXIS 26, at *15 (Oct. 2, 2013) (quoting *Basic Inc. v. Levinson*, 485 US. 224, 242 n.18 (1988).

FINRA 005309

disclose."[163] When recommending an investment, a registered representative has a duty to disclose material information fully and completely.[164]

A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"[165] Failing "to disclose information related to a registered representative's own self-interest constitutes a material omission."[166] And when the circumstances are not "ordinary," and the compensation that a broker will receive in connection with recommending a transaction is unusually high, the compensation is material and must be disclosed.[167] Failing to do so deprives a customer of the knowledge that the broker's recommendation might be based on the broker's financial self-interest.[168]

By not disclosing his expected compensation, McGee made a material omission that violated Section 10(b), Rule 10b-5, FINRA Rules 2020, and 2010. The omission was material, as it involved McGee's unusually large expected compensation from 54F, an entity with which he had an ongoing business relationship (including receiving rent-free office space). Under these circumstances, his compensation was material, as this information would have been important

---

[163] *Dep't of Enforcement v. Pierce*, No. 2007010902501, 2013 FINRA Discip. LEXIS 25, at *67 (NAC Oct. 13, 2013); *see also Basic Inc.*, 485 U.S. at 239, n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

[164] *Pierce*, 2013 FINRA Discip. LEXIS 25, at *67.

[165] *Pierce*, 2013 FINRA Discip. LEXIS 25, at *69 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[166] *See, e.g., Dep't of Enforcement v. Meyers*, No. C3A040023, 2007 NASD Discip. LEXIS 4, at *20 (NAC Jan. 23, 2007) (probable receipt of incentive payment on sale of stock had to be disclosed); *Dep't Enforcement v. DaCruz*, 2007 NASD Discip. LEXIS 1, No. C3A040001, at *24–28 (NAC Jan. 3, 2007); *Richard H. Morrow*, 53 S.E.C. 772, 781–82 (1998) (failing to disclose to prospective investors additional compensation, characterized as an equity kicker was a material omission); *Joseph J. Barbato*, 53 S.E.C. 1259, 1274 (1999) (failing to disclose compensation for selling house stocks was a material omission).

[167] *Meyers*, 2007 NASD Discip. LEXIS 4, at *21–24.

[168] *Meyers*, 2007 NASD Discip. LEXIS 4, at *27; *SEC v. Hasho*, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992).

for a reasonable investor to know, and, therefore, he should have disclosed it.[169] Further, the materiality of this omitted information was so obvious that McGee acted at least recklessly, and therefore with scienter, by not disclosing it to CF.

Finally, McGee's conduct was willful. "A willful violation under the federal securities laws simply means 'that the person charged with the duty knows what he is doing.'"[170] It is clear from the evidence that McGee knew what he was doing.

In reaching these conclusions, the Hearing Panel considered and rejected each of McGee's defenses to this charge. While McGee does not claim he disclosed his commission to CF, he denies that he committed fraud by failing to do so. First, McGee denies that he had any obligation to disclose his commission because he did not recommend to CF that she liquidate her VAs and purchase a charitable gift annuity. The Hearing Panel, however, rejects McGee's version and concludes that, in fact, he had recommended this investment strategy to her.

Second, McGee argues that he did not commit fraud because Cadaret investigated his conduct and did not conclude it was fraudulent.[171] The Hearing Panel, however, is not bound by, and does not accord weight to, Cadaret's conclusions. Rather, it is for the Panel to decide whether McGee engaged in fraud, based on the evidence presented at the hearing. And based on that evidence, the Panel concludes that he committed fraud by material omission.

---

[169] The other requirements for liability under the federal anti-fraud provisions are met, as well. The omission was made "in connection with" the sale of CF's four VAs. This language is broadly interpreted and includes activity that "touches" or "coincides" with a securities transaction, *Merrill Lynch v. Dabit*, 547 U.S. 71, 85 (2006), or where the sale of a security was necessary to complete the fraud. *SEC v. Pirate Investor LLC*, 580 F.3d 233, 244–45 (4th Cir. 2009). McGee's omission both touched and coincided with securities transactions (the sale of the VAs) and were necessary to complete the fraudulent activity. Finally, the fraudulent activity utilized the instrumentalities of interstate commerce because McGee telephoned CF to set up appointments, mailed her surrender forms to Hartford, and faxed them to Pacific Life. Also, the liquidation checks arrived from outside New York, via FedEx.

[170] *The Dratel Group, Inc.*, 2014 FINRA Discip. LEXIS 6, at *77 (quoting *Robert D. Tucker*, Exchange Act Rel. No. 68210, 2012 SEC LEXIS 3496, at *41 (Nov. 9, 2012)).

[171] Tr. (SO) 110–11; (BLJ) 1268–71.

FINRA 005311

Third, McGee argues that he acted without scienter. Specifically, he claims that he had no motive for CF to liquidate her VAs, as he did not earn a commission based on their liquidation and would have earned more in annual commissions had she retained them.[172] The Panel finds this argument speculative and unpersuasive. Moreover, even if true, it does not demonstrate that McGee was willing to forgo an immediate and large commission in exchange for even larger commissions over time.

Fourth, McGee maintains that Enforcement failed to prove that his omission was made in connection with a securities transaction because he did not receive the commission for the sale of the securities (i.e. the VAs) but, rather, from the purchase of non-securities insurance products (i.e. Lincoln FIAs). This argument construes too narrowly the connection between the omission and the transactions at issue here. McGee implemented a two-part strategy: the sale of VAs and the intended purchase of a charitable gift annuity. The sale of securities was the essential first step in that strategy, as it provided the needed funds for the second step. Accordingly, the omission "touched" or "coincided" with a securities transaction necessary to complete the fraud. This nexus is sufficient to establish that the omission was made in connection with the sale of securities.[173]

### 2. Enforcement Failed to Establish that McGee Violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, FINRA Rules 2020 and 2010 by Misrepresenting to CF that She Faced a Tax Liability

Enforcement failed to establish that McGee represented to CF that she faced a $100,000 tax liability and that she needed charitable deductions to offset that tax liability.[174] Consequently, Enforcement failed to establish that McGee violated Section 10(b) of the Securities Exchange

---

[172] Tr. (McGee) 960–62.

[173] *See* footnote 169.

[174] Compl. ¶¶ 20, 46.

29

Act of 1934 and SEC Rule 10b-5, and FINRA Rules 2020 and 2010 by making a material

misrepresentation to CF. Therefore, that charge is dismissed.

### B. McGee Violated NASD Rule 2310, IM-2310-2, and FINRA Rule 2010 by Making an Unsuitable Recommendation to CF (Second Cause of Action)

When recommending that a customer purchase, sell, or exchange any security, NASD

Rule 2310 required that the broker "have reasonable grounds for believing that the

recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by

such customer as to his other security holding and as to his financial situation and needs."[175]

Additionally, NASD IM-2310-2 provided that "[i]mplicit in all member and registered

representative relationships with customers is the fundamental responsibility of fair dealing."

When making a recommendation, "a registered representative must make a 'customer-specific

determination of suitability' and tailor his or her recommendations 'to the customer's financial

profile and investment objectives.'"[176]

The suitability obligations under NASD Rule 2310 extended to "a broker's

recommendation of an 'investment strategy' involving both a security and a nonsecurity."[177]

Further, and more specifically, the obligations apply to a broker's recommendation "to liquidate

securities to purchase an investment-related product that is not a security."[178]

---

[175] A violation of NASD Rule 2310 is also a violation of FINRA Rule 2010. *Dep't of Enforcement v. Watkins*, No. 2009018771602, 2013 FINRA Discip. LEXIS 36, at *6 (NAC Dec. 31, 2013).

[176] *Epstein*, No. C9B040098, 2007 FINRA Discip. LEXIS 18, at *62 (NAC Dec. 20, 2007) (quoting *F.J. Kaufman & Co.*, 50 S.E.C. 164, 168 (1989).

[177] Regulatory Notice 12-25 (May 2012) at 8.

[178] Regulatory Notice 12-25 at 8; Notice to Members 05-50, at 5 (Aug. 2005) ("[R]ecommendations to liquidate or surrender a registered security such as a . . . variable annuity. . . must be suitable, including where such liquidations or surrender[s] are for the purpose of funding the purchase of an unregistered EIA.").

FINRA 005313

These suitability obligations, however, only attach to a transaction if it is recommended by the broker.[179] Whether a broker has made a recommendation "remains a 'facts and circumstances' inquiry to be conducted on a case-by-case basis" based on a number of considerations.[180] Additionally, "the determination of whether a 'recommendation' has been made is an objective, rather than a subjective, inquiry," and, "[i]n this regard, an important consideration is whether the communication—given its content, context, and manner of presentation—reasonably would be viewed as a 'call to action' or a suggestion that the customer engage in a particular transaction." Also relevant is "[t]he degree to which a communication reasonably 'would influence an investor to trade a particular security or group of securities.'" Finally, "a series of actions which may not constitute 'recommendations' when considered individually, may amount to a 'recommendation' when considered in the aggregate."[181]

The record does not firmly establish exactly all that transpired on March 9, 2011, between McGee and CF, including how much CF understood about McGee's strategy to sell her VAs and invest in a charitable gift annuity with 54F. But for the reasons explained above, the Panel was persuaded that McGee, not CF, devised the strategy of selling CF's VAs and giving the proceeds to 54F to invest in a charitable gift annuity. At a minimum, CF acquiesced in that strategy and helped McGee implement it. Conversely, the evidence does not show that CF decided, on her own, to do so, and that McGee tried unsuccessfully to convince her to abandon that course.[182]

---

[179] *Epstein*, 2007 FINRA Discip. LEXIS 18, at *61.

[180] *Epstein*, 2007 FINRA Discip. LEXIS 18, at *61 (quoting *NASD Notice to Members 01-23* (Apr. 2001)).

[181] *Epstein*, 2007 FINRA Discip. LEXIS 18, at *61 (quoting *NASD Notice to Members 01-23* (Apr. 2001)).

[182] *Cf. Charles E. Marland & Co.*, 45 S.E.C. 632, 636 (1974) (rejecting broker's assertion that he tried to dissuade his customers from engaging in mutual fund switching, where many of the customers were friends of the broker and would have been unlikely to act contrary to broker's recommendation).

FINRA 005314

Additionally, the context of McGee's dealings with CF compels the conclusion that McGee made a recommendation to CF. By the time of the transactions, McGee was generally involved with JG and 54F and was seeking to expand his dealings with them. CF trusted McGee as evidenced by her having followed his prior recommendations. Also, the fact that CF gave the liquidation proceeds to 54F after first hearing about that company from McGee further supports the Panel's finding that McGee recommended these transactions to CF.[183] Accordingly, the Hearing Panel finds that McGee made a recommendation to CF that triggered his suitably obligations.

At the time McGee made his recommendation, he knew little about 54F or charitable gift annuities, focusing, instead, on the fee he could earn by directing a customer to 54F. In short, he did not perform sufficient due diligence on either 54F or charitable gift annuities to know whether the product was suitable for any customer, let alone CF, and therefore should not have recommended that CF liquidate her VAs in order to purchase a charitable gift annuities. As the NAC explained, "[A] broker cannot determine whether a recommendation is suitable for a particular customer unless he has a 'reasonable basis' to believe that the recommendation could be suitable for at least some customers." Moreover, "it is self-evident that a broker cannot determine whether a recommendation is suitable for a specific customer unless the broker understands the potential risks and rewards inherent in that recommendation."[184]

Further, during the hearing, McGee testified that the liquidation of CF's VAs was a terrible idea. The Hearing Panel agrees. Given CF's age, investment goals, income, value of her

---

[183] See Dep't of Enforcement v. Siegel, No. C05020055, 2007 NASD Discip. LEXIS 20, at *32–33 (May 11, 2007).

[184] Siegel, 2007 NASD Discip. LEXIS 20, at *37–38 (quoting F. J. Kaufman and Co., 50 S.E.C. 164, 168 (1989).

FINRA 005315

portfolio and assets,[185] as well as the surrender charges and tax consequences of the liquidations,

the Panel finds that McGee's recommendation was unsuitable. Accordingly, McGee violated

NASD Rule 2310, IM-2310-2, and FINRA Rule 2010 by making an unsuitable recommendation

to CF.

### C.  McGee Violated FINRA Rules 3270 and 2010 by Failing to Disclose His Outside Business Activities (Third Cause of Action)

FINRA Rule 3270 prohibits registered persons from, among other things, being an

employee of another person or being compensated or having the reasonable expectation of

compensation, from any other person as a result of any business activity outside the scope of the

relationship with their member firm, unless they have provided prior written notice to the

member, in such form as specified by the member. The purpose of the Rule "is to ensure that

firms receive prompt notification of all outside business activities of their associated persons so

that the member's objections, if any, to such activities could be raised at a meaningful time and

so that appropriate supervision could be exercised as necessary under applicable law."[186] With

respect to the timing of the notification, the registered representative must "disclose outside

business activities at the time when steps are taken to commence a business activity unrelated to

his relationship with his firm."[187] A violation of Rule 3270 constitutes conduct inconsistent with

---

[185] While the record reflects the value of CF's investment portfolio and asset allocations at the time of the VA liquidations, Enforcement did not establish CF's net worth at that time.

[186] *Dep't of Enforcement v. Houston*, No. 2006005318801, 2013 FINRA Discip. LEXIS 3, at *33 (NAC Feb. 22, 2013), *aff'd, Kent M. Houston*, Exchange Act Rel. No. 71589, 2014 SEC LEXIS 614 (Feb. 20, 2014) (quoting *Proposed Rule Change by NASD Relating to Outside Business Activities of Associated Persons*, Exchange Act Rel. No. 26063, 1988 SEC LEXIS 1841, at *3 (Sept. 6, 1988)); *see also NASD Notice to Members 88-86* (Nov. 1988) (introducing the substance of the predecessor to Rule 3270 and explaining that the rule is "intended to improve the supervision of registered personnel by providing information to member firms concerning outside business activities of their representatives").

[187] *Dep't of Enforcement v. Schneider*, No. C10030088, 2005 NASD Discip. LEXIS 6, *13–14 (NAC Dec. 7, 2005) (citing *Dep't of Enforcement v. Abbondante*, No. C10020090, slip op. at 12 (NAC Apr. 5, 2005)) (rejecting argument that representative was not required to disclose outside business activity when outside business was formed to conduct future business).

FINRA 005316

just and equitable principles of trade and, therefore, violates Rule 2010.[188]

The Hearing Panel finds that McGee violated FINRA Rules 3270 and 2010 by failing to disclose his relationship with 54F to Cadaret. This relationship was outside his employment relationship with Cadaret, and was not encompassed within the sole, limited, outside business disclosure he made to his firm, namely, that he was to be an independent insurance agent selling fixed insurance products independent of Cadaret.[189] 54F was not an insurance company, and McGee was not an insurance agent for them. McGee's relationship with 54F, including accepting rent-free office space, taking steps to form a joint venture, and receiving a commission payment for referring a client, triggered a disclosure obligation. McGee is incorrect that the narrow disclosure he made to Cadaret was sufficient, as the firm was not placed on notice, as it should have been, of his extensive intended and actual business activities with 54F.

**D.    McGee Willfully Violated Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010 by Failing to Timely Update His Form U4 (Fourth Cause of Action)**

Article V, Section 2 of FINRA's By-Laws requires that associated persons applying for registration with FINRA provide "such . . . reasonable information with respect to the applicant as [FINRA] may require" and further that such applications "shall be kept current at all times by supplementary amendments . . . filed . . . not later than 30 days after learning of the facts or circumstances giving rise to the amendment." FINRA Rule 1122, in turn, prohibits associated persons from filing or failing to correct registration information that is incomplete or inaccurate so as to be misleading. These provisions required that registered persons ensure that their Forms U4 contain accurate, up-to-date information so that regulators, employers, and members of the

---

[188] *See Dep't of Enforcement v. Moore*, No. 2008015105601, 2012 FINRA Discip. LEXIS 45, at *25 (NAC July 26, 2012).

[189] CX-1, at 39, 55, 71.

FINRA 005317

public "have all material, current information about the securities professional with whom they are dealing."[190] It follows, therefore, that filing a false or incomplete Form U4, or failing to timely amend a Form U4, violates FINRA Rule 1122.[191] Failing to timely and accurately disclose information on a Form U4 also runs afoul of the high standards of commercial honor and just and equitable principles of trade that FINRA members and their associated persons must observe under Rule 2010.[192]

McGee moved his securities business to the 5 Ledyard address in late 2010 or early 2011, but took no steps to update his Form U4 to reflect the change until December 5, 2011.[193] Accordingly, McGee violated Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010. Additionally, McGee's violation was willful. To find a willful violation, the Panel must find "that the person charged with the duty knows what he is doing."[194] The Hearing Panel need not find that he intentionally violated FINRA rules or acted with a culpable state of mind, only that he engaged in the misconduct voluntarily.[195] McGee engaged in this conduct voluntarily, and therefore, his violation was willful.

---

[190] *Richard A. Neaton*, Exchange Act Rel. No. 65598, 2011 SEC LEXIS 3719, at *17–18 (Oct. 20, 2011).

[191] *See, e.g., Dep't of Enforcement v. Scott Mathis*, No. C10040052, 2008 FINRA Discip. LEXIS 49, at *16–17 (NAC Dec. 12, 2008), *aff'd, Scott Mathis*, Exchange Act Rel. No. 61120, 2009 SEC LEXIS 4376 (Dec. 7, 2009), *aff'd, Mathis v. SEC*, 671 F.3d 210 (2d Cir. 2012).

[192] *Mathis*, 2008 FINRA Discip. LEXIS 49, at *16–17.

[193] CX-67.

[194] *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000).

[195] *See Dep't of Enforcement v. Amundsen*, No. 2010021916601, 2012 FINRA Discip. LEXIS 54, at *16 (NAC Sept. 20, 2012); *Dep't of Enforcement v. Kraemer*, No. 2006006192901, 2009 FINRA Discip. LEXIS 39, at *16–17 (NAC Dec. 18, 2009).

FINRA 005318

E.   **McGee Violated FINRA Rule 2010 and NASD Rule 2110 by Providing False Information to His Member Firm (Fifth Cause of Action)**

It is a violation of FINRA Rule 2010 and NASD Rule 2110 for a registered representative to make false statements to his member firm,[196] including making a false statement on a firm's compliance questionnaire.[197] The Panel finds that McGee made false statements on Cadaret's compliance questionnaires for the years 2007 through 2011. McGee falsely responded on the firm's 2011 compliance questionnaire that he had not engaged, without Cadaret's permission, in any securities transactions or other investment activity that was not processed through Cadaret. Additionally, on each compliance questionnaire for the years 2007 through 2011, he falsely represented that he had disclosed all of his business related email addresses. Accordingly, McGee violated FINRA Rule 2010 and NASD Rule 2110.

IV.   **Sanctions**

In considering the appropriate sanctions to impose on McGee, the Panel looked to FINRA's Sanction Guidelines ("Guidelines"), which contain General Principles Applicable to All Sanctions Determinations ("General Principles"), overarching Principal Considerations, as well as a range of sanctions for particular violations.[198] Among the General Principles are the following: "Disciplinary sanctions are remedial in nature and should be designed to deter future misconduct and to improve overall business standards in the securities industry." Additionally, "[t]he overall purposes of FINRA's disciplinary process and FINRA's responsibility in imposing sanctions are to remediate misconduct by preventing the recurrence of misconduct, improving overall standards in the industry, and protecting the investing public." The General Principles

---

[196] *See Geoffrey Ortiz*, Exchange Act Rel. No. 58416, 2008 SEC LEXIS 2401, at *22–23 (Aug. 22, 2008); *Dep't of Enforcement v. Hardin*, No. E072004072501, 2007 NASD Discip. LEXIS 24, at *10–11 (NAC July 27, 2007).

[197] *Dep't of Enforcement v. Mielke*, No. 2009019837302, 2014 FINRA Discip. LEXIS 24, at *42 (NAC July 18, 2014).

[198] FINRA Sanction Guidelines at 1 (Overview) & 2 (General Principle No. 1) (2013) ("Guidelines"), *available at* www.finra.org/sanctionguidelines.

FINRA 005319

further state that "[t]oward this end, Adjudicators should design sanctions that are significant enough to prevent and discourage misconduct by a respondent, to deter others from engaging in similar misconduct, and to modify and improve business practices."[199]

### A. McGee is Barred and Ordered to Disgorge His Commissions and Pay Restitution for: (1) Willfully Violating Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and (2) Violating FINRA Rules 2020 and 2010, and (3) Violating NASD Rule 2310, IM-2310-2, and FINRA Rule 2010

For intentional or reckless material omissions of fact, the Guidelines recommend a suspension in any or all capacities for a period of ten business days to two years. In egregious cases, the panel should consider a bar. Also, the Guidelines recommend a fine of $10,000 to $100,000.[200]

For making unsuitable recommendations, the Guidelines provide that the respondent should be suspended in any or all capacities for a period of ten business days to one year, and, in egregious cases, the panel should consider a suspension of up to two years, or a bar. The Guidelines also recommend a fine of $2,500 to $75,000 and disgorgement.[201] The Guidelines for these two violations do not contain specific principal considerations, but direct adjudicators to take into account the Principal Considerations Applicable to All Sanction Determinations.

The Hearing Panel finds that McGee's unsuitable recommendation and omission of material information violations are related and that the sanctions imposed should be designed and tailored to deter the same underlying misconduct. Thus, the Hearing Panel imposes a unitary

---

[199] Guidelines at 2 (General Principle No. 1).

[200] Guidelines at 88.

[201] Guidelines at 94.

FINRA 005320

sanction for these two violations.[202] For the following reasons, the Hearing Panel concludes that

McGee should be barred and ordered to disgorge his commissions and to pay restitution to CF.

First and foremost, McGee's misconduct was egregious. He betrayed the trust placed in

him by an elderly customer who lived alone[203] and was not close to friends or family.[204] He used

her as a "test case" for a product he knew little about, except that it paid him a large commission.

To implement this strategy, he had her liquidate securities comprising more than half of her

investment holdings and turn the funds over to 54F—a company he also knew little about, but

with which he was trying to form a joint venture and from which he was accepting rent-free

office space. Although the compensation he was to receive for placing her funds with 54F was a

material fact, he never disclosed it to her while recommending these unsuitable transactions. His

actions were at least reckless.[205]

Additionally, McGee's misconduct occurred in connection with four VA liquidations

totaling close to $500,000,[206] resulted in substantial customer harm,[207] and conferred a

substantial benefit on him.[208] CF incurred $36,202.50 in surrender charges. McGee gave to 54F

the funds resulting from the VA liquidations, $454,998.75, of which $200,000 has not been

returned. Consequently, CF lost $236,202.50 (not including the tax liability she incurred as a

---

[202] *Mielke*, 2014 FINRA Discip. LEXIS 24, at *55 (citing *Dep't of Enforcement v. Fox & Co. Inv., Inc.*, No. C3A030017, 2005 NASD Discip. LEXIS 5, at *37 (NAC Feb. 24, 2005) (finding that "where multiple, related violations arise as a result of a single underlying problem, a single set of sanctions may be more appropriate to achieve NASD's remedial goals . . ."), *aff'd*, Exchange Act Rel. No. 52697, 2005 SEC LEXIS 2822, at *36 (Oct. 28, 2005)).

[203] Tr. (AR) 1324.

[204] Tr. (McGee) 764; Tr. (AR) 1331.

[205] Guidelines at 7 (Principal Consideration No. 13).

[206] Guidelines at 7 (Principal Consideration No. 18).

[207] Guidelines at 6 (Principal Consideration No. 11).

[208] Guidelines at 7 (Principal Consideration No. 17).

FINRA 005321

result of the liquidations) as a direct result of McGee's misconduct. By contrast, McGee earned commissions totaling $59,264 as a result of his misconduct.

Second, McGee failed to accept responsibility for and acknowledge his misconduct to Cadaret or a regulator prior to detection and intervention. Instead, he tried to conceal his misconduct. When Cadaret began investigating him, he was not candid with them about his actions and tried to minimize both his involvement in the CF transactions and his relationship with 54F.[209]

Third, McGee's lack of candor continued through the hearing. He told the Panel the concocted tale that liquidating the VAs and giving the proceeds to 54F was CF's idea and that he had tried to convince her not to do so.[210] McGee's untruthfulness reflects negatively on his fitness to remain in the securities industry.[211]

Fourth, on a related point, McGee showed no remorse for his actions. To the contrary, he never returned his commissions to CF[212] and demonstrated a cavalier attitude toward her plight, testifying that "a lot of people in this country have less than $700,000 and they're doing okay."[213]

---

[209] Guidelines at 6 (Principal Consideration Nos. 2, 10); *see, e.g.*, page 24, above.

[210] *See Dep't of Market Regulation v. Jerry William Burch*, No. 2005000324301, 2011 FINRA Discip. LEXIS 16, at *47 (NAC July 28, 2011) (finding respondent's "lack of candor during these proceedings to be disturbing" and that respondent "provided inaccurate and incomplete information in an effort to minimize his own responsibility") (citing *Dep't of Enforcement v. Frankfort*, No. C02040032, 2007 NASD Discip. LEXIS 16, at *41 (NAC May 24, 2007) ("Providing inaccurate information in an effort to minimize one's own responsibility serves to aggravate sanctions."). *See also Thomas S. Foti*, Exchange Act Rel. No. 31646, 1992 SEC LEXIS 3329, at *13 (Dec. 23, 1992) (finding that lack of candor at hearing is an aggravating factor); *Dist. Bus. Conduct Comm. v. Goodman*, No. C9B960013, 1999 NASD Discip. LEXIS 34, at *45–46 (NAC Nov. 9, 1999) *aff'd, Steven D. Goodman*, Exchange Act Rel. No. 43889, 2001 SEC LEXIS 144 (Jan. 26, 2001) (finding that false hearing testimony is an aggravating factor).

[211] *Burch*, 2011 FINRA Discip. LEXIS 16, at *47.

[212] Tr. (McGee) 1089.

[213] Tr. (McGee) 1094.

The Guidelines authorize adjudicators to order restitution when an identifiable person has suffered a quantifiable loss proximately caused by a respondent's misconduct. The Guidelines direct adjudicators to calculate restitution orders based on the actual amount of the loss sustained by a person, as demonstrated by the evidence.[214] Additionally, "[r]estitution . . . is a particularly fitting sanction in cases of unsuitable recommendations."[215] Here, CF suffered quantifiable losses of $236,202.50 proximately caused by McGee's misconduct. Accordingly, McGee is ordered to pay CF restitution in this amount, plus prejudgment interest.[216]

Finally, an order of disgorgement against McGee is appropriate in order to deprive him of the benefits of his misconduct. Both the General Principles[217] and the Suitability Guidelines[218] authorize disgorgement to deprive wrongdoers of their ill-gotten gains.[219] Therefore, the Hearing Panel orders McGee to disgorge his commissions in the amount of $59,264, plus interest. There are no mitigating factors warranting lesser sanctions.

**B.** **In Light of the Bar, No Further Sanctions are Imposed Against McGee for His Other Violations**

**1.** **Undisclosed Outside Business Activities, in Violation of FINRA Rules 3270 and 2010**

The Guidelines provide that when the outside business activities do not involve aggravating conduct, the Panel should consider a suspension for up to 30 business days; a longer suspension of up to one year where there is aggravating conduct; and, in egregious cases,

---

[214] Guidelines at 4 (General Principle No. 5).

[215] *David Joseph Dambro*, Exchange Act Rel. No. 32487, 1993 SEC LEXIS 1521, at *14 (June 18, 1993).

[216] Guidelines at 11.

[217] Guidelines at 5 (General Principle No. 6).

[218] Guidelines at 94 n.2.

[219] "Disgorgement is appropriate in all sales practice cases, even where an individual is barred, if, among other things, 'the respondent has retained substantial ill-gotten gains.'" *Dep't of Enforcement v. Murphy*, No. 2005003610701, 2011 FINRA Discip. LEXIS 42, at *116 (NAC Oct. 20, 2011) (citing Guidelines at 10 (Technical Matters)).

FINRA 005323

including significant injury to customers, a longer suspension, or a bar. The Guidelines also recommend a fine of $2,500 to $50,000 and state that the panel may also order disgorgement.[220]

In determining the appropriate sanction in this case, the Panel considered several aggravating circumstances. The outside activity involved a customer of the firm[221] and resulted in injury to a firm customer.[222] Further, McGee's conduct could have created the impression that Cadaret had approved the product or service, as the record does not reflect that he made it clear to CF that his recommendation was outside his role as a Cadaret registered representative.[223] And, finally, during Cadaret's investigation of his conduct, he misled the firm about the existence and scope of his outside activities.[224] There are no mitigating factors.

Accordingly, for this violation, the Hearing Panel would impose a one–year suspension and a $25,000 fine, and would order McGee to disgorge the commissions he received from 54F related to CF's transactions. But in light of the bar and the disgorgement order imposed for McGee's material omission and unsuitable recommendation violations, no further sanctions are imposed for this violation.

2.    **Failure to Timely Update Form U4, in Willful Violation of Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010**

For failing to timely update a Form U4, the Guidelines recommend a fine of between $2,500 and $25,000 and, additionally, for egregious violations, a suspension longer than 30 days of up to two years or a bar.[225] The relevant principal consideration in this Guideline is the nature and significance of the information at issue. Enforcement argues that the non-disclosure was

---

[220] Guidelines at 13.

[221] Guidelines at 13 (Principal Consideration No. 1).

[222] Guidelines at 13 (Principal Consideration No. 2).

[223] Guidelines at 13 (Principal Consideration No. 4).

[224] Guidelines at 13 (Principal Consideration No. 4).

[225] Guidelines at 69–70.

SPA-101

significant—by not promptly disclosing that he had moved his offices to the Ledyard address, McGee hide his affiliation with 54F from his employer. But Enforcement failed to demonstrate that Cadaret would have learned of his outside business activities had McGee made timely disclosure of his office move. (In fact, even when McGee did disclose the address change, the disclosure did not lead his firm to discover his relationship with 54F. That revelation occurred only after CF's attorney wrote a letter to Cadaret). Therefore, the Panel concludes that a fine of $10,000 and a suspension of 15 business days is appropriate. In light of the bar imposed above, however, no additional sanctions are imposed for this violation.

### 3. Providing False Information to Cadaret on Firm Compliance Questionnaires, in Violation of FINRA Rule 2010 and NASD Rule 2110

There is no Guideline specifically addressing this violation. However, the Panel may look to the Guidelines relating to falsification of records[226] and recordkeeping violations.[227] For falsification of records, the Guideline recommends a fine of $5,000 to $100,000. Additionally, where mitigating factors exist, the Guideline recommend a suspension for up to two years or a bar in egregious cases.[228] The recordkeeping Guideline recommends a fine of $1,000 to $10,000, and in egregious cases, a fine of $10,000 to $100,000. Also, that Guideline directs adjudicators to consider a suspension for up to 30 business days or a lengthier suspension (of up to two years) or a bar.[229]

---

[226] *Mielke*, 2014 FINRA Discip. LEXIS 24, at *69–70 (citing *Dep't of Enforcement v. Braff*, No. 2007011937001, 2011 FINRA Discip. LEXIS 15, at *26–27 (NAC May 13, 2011) (applying the Guidelines related to the falsification of records where the respondent made false statements on firm compliance questionnaires concerning outside brokerage accounts), *aff'd*, Exchange Act Rel. No. 66467, 2012 SEC LEXIS 620, at *1 (Feb. 24, 2012).

[227] *John E. Mullins*, Exchange Act Rel. No. 66373, 2012 SEC LEXIS 464, at *83 (Feb. 10, 2012).

[228] Guidelines at 37.

[229] Guidelines at 29.

FINRA 005325

The Guidelines instruct adjudicators to focus on the nature of the documents falsified[230] and the nature and materiality of the inaccurate or missing information.[231] Both are aggravating factors, here. As the firm's questionnaires stated on the first page, the questionnaires were "an integral part of [Cadaret's] Compliance and Supervision Program," and their "primary objective . . . is to verify [brokers'] sales activities and other business activities, as well as their compliance with regulatory requirements and [firm] policies."[232] Also, the false information was important, as McGee's false responses enabled him to escape firm oversight of CF's transactions and his email communications.

Additionally, the Panel was troubled by McGee's use of an unauthorized email address that contained Cadaret's name, as this had the potential to mislead recipients into believing that the firm had authorized emails sent from that address.

After considering these Guidelines, the Panel would impose a fine of $10,000 and a 30 business day suspension. However, in light of the bar imposed for McGee's violations above, no further sanctions are imposed for this violation.

## V.    Order

McGee is barred for: (1) willfully violating Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and violating FINRA Rules 2020 and 2010, by failing to disclose material information to a customer; and (2) violating NASD Rule 2310, IM-2310-2, and FINRA Rule 2010, by making an unsuitable recommendation to the customer. For these violations, McGee is also ordered to: (1) pay restitution to CF in the principal amount of $236,202.50 (representing the unreturned portion of CF's payment to 54F, plus the surrender charges she

---

[230] Guidelines at 37 (Principal Consideration No. 1).

[231] Guidelines at 29 (Principal Consideration No. 1).

[232] CX-70, at 1; CX-71, at 1; CX-72, at 1; CX-73, at 1; CX-74, at 1.

incurred), plus interest thereon from March 9, 2011, until paid; and (2) disgorge his commissions, in the amount of $59,264, plus interest thereon from the date on which he received his last commission check, January 9, 2012,[233] until paid. Interest shall accrue at the rate set in 26 U.S.C. § 6621(a)(2).[234] If this decision becomes FINRA's final disciplinary action, the bar will take effect immediately.

In light of the bar, no additional sanctions are imposed for: (1) McGee's violation of FINRA Rules 3270 and 2010 by failing to disclose his outside business activities; (2) willfully violating Article V, Section 2(c) of FINRA's By-Laws and FINRA Rules 1122 and 2010 by failing to timely update his Form U4; and (3) violating FINRA Rule 2010 and NASD Rule 2110 by providing false information to his member firm.

McGee is also ordered to pay the costs of the hearing in the amount of $12,325.34, which includes a $750 administrative fee and the cost of the hearing transcript.[235]

Finally, Enforcement failed to establish that McGee made a material misrepresentation to a customer in willful violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC

---

[233] Stip. ¶ 11.

[234] This rate is used for calculating interest on orders of both disgorgement and restitution, and is the rate set in Section 6621(a)(2) of the Internal Revenue Code is used by the Internal Revenue Service to determine interest due on underpaid taxes, is adjusted each quarter, and reflects market conditions. In the event that customer CF cannot be located, unpaid restitution plus accrued interest should be paid to the appropriate escheat, unclaimed-property, or abandoned-property fund for the state in which CF last known to reside. Satisfactory proof of payment of the restitution (with accrued interest), or of reasonable and documented efforts undertaken to effect restitution (with accrued interest), shall be provided to the staff of FINRA's Department of Enforcement no later than 90 days after the date when this decision becomes FINRA's final action. The customer is identified here by her initials. In an addendum to this decision, which is served only on the parties, the customer is identified by name.

[235] The Hearing Panel considered and rejected without discussion all other arguments by the parties.

FINRA 005327

Rule 10b-5, and in violation of FINRA Rules 2020 and 2010. Accordingly, that charge is dismissed.

David R. Sonnenberg
Hearing Officer
For the Extended Hearing Panel

Copies to:    Bernard G. McGee (via overnight courier and first-class mail)
Kevin R. Van Duser, Esq. (via overnight courier and first-class mail)
Stephen A. Davoli, Esq. (via electronic mail)
Daniel L. Gardner, Esq. (via first-class and electronic mail)
Edwin Aradi, Esq. (via electronic mail)
Lane Thurgood, Esq. (via electronic mail)
Jeffrey D. Pariser, Esq. (via electronic mail)

FINRA 005328

**This Page
Intentionally Left
Blank**